IN THE COURT OF APPEALS OF TENNESSEE
AT JACKSON
FEBRUARY 16, 2005 Session

**IN RE: ADOPTION OF AMH, A Minor**

**JERRY L. BAKER and wife, LOUISE K. BAKER v.
SHAO-QIANG (JACK) HE and wife, QIN (CASEY) LUO**

**Direct Appeal from the Chancery Court for Shelby County**
**No. CH-01-1302-III     Robert L. Childers, Chancellor By Designation**

---

**No. W2004-01225-COA-R3-PT - Filed November 23, 2005**

---

In this appeal, we are called upon to evaluate the trial court's decision to terminate the parental rights of the biological parents to a minor child. The biological parents are Chinese immigrants who are presently in this country illegally and are subject to deportation proceedings. Shortly after coming to the United States, the biological parents had a daughter. Facing financial difficulties at the time of their daughter's birth, the parents decided to place their daughter in the care of an adoption agency until their financial situation improved. The agency placed the child with foster parents who agreed to care for the child over an initial three month period. At the conclusion of the three month foster care period, the biological parents agreed to the entry of a consent order by the juvenile court transferring custody of the child to the foster parents. The biological parents continued to visit with their daughter at the home of the custodial non-parents approximately once each week for one hour each visit. However, they paid no child support to the custodial non-parents. The biological parents subsequently filed a petition to modify the juvenile court's custody order seeking to regain custody of their daughter, which the court denied. Thereafter, the biological parents continued to visit their daughter with the same frequency as before. On one day in particular, the biological parents asked to take their daughter for a family portrait, and the custodial non-parents refused their request. When the biological parents refused to leave the custodial non-parents' home, the police were called. After speaking with the police, the biological parents left the home and never returned to visit their daughter citing their fear of arrest. A short time after this incident, the biological parents filed a second petition to modify the juvenile court's custody order. In response, the custodial non-parents filed a petition to adopt the child and to terminate the biological parents' parental rights in the chancery court, primarily relying on the ground of abandonment. As a result, the biological parents' petition to modify the custody order was transferred to the chancery court. Following a lengthy and tortured procedural history, the chancery court held a bench trial in the matter and subsequently entered an order terminating the biological parents' parental rights. The biological parents filed a timely appeal to this Court. We affirm in part and reverse in part the decisions of the chancery court in this case. However, in light of our decisions on certain issues presented in this case, we need not remand this case to the chancery court for further proceedings.

**Tenn. R. App. P. 3; Appeal as of Right; Judgment of the Chancery Court Affirmed in Part; Reversed in Part**

ALAN E. HIGHERS, J., delivered the opinion of the court, in which DAVID R. FARMER, J., joined, and HOLLY M. KIRBY, J., dissented.

David A. Siegel, Memphis, TN, for Appellant, Shao-Qiang (Jack) He

Richard A. Gordon, Memphis, TN, for Appellant, Qin (Casey) Luo

Larry E. Parrish, Memphis, TN, for Appellees

Paul G. Summers, Attorney General and Reporter, Douglas Earl Dimond, Senior Counsel, Nashville, TN, In Defense of Challenged Tennessee Statutes

Christina A. Zawisza, Memphis, TN, for Amicus Curiae: Childlaw Center, Vanderbilt Legal Clinic, Child Advocacy Clinic, Tennessee Alliance for Legal Services

Scott A. Kramer, Memphis, TN, for Amicus Curiae: Greater Seattle Chapter of the Organization of Chinese Americans, Inc.

Linda L. Holmes, Memphis, TN, for Guardian Ad Litem, Kimbrough Mullins

**OPINION**

**I.**
**FACTUAL BACKGROUND AND PROCEDURAL HISTORY**

*A.*
*The Hes Enter the United States*

Shao-Qiang (Jack) He ("Father") was born on July 18, 1964 in the Peoples Republic of China ("China"). From 1979 to 1985, Father pursued his bachelor's degree at a university in China. Upon completing his bachelor's degree, Father taught at a high school in Hunan, China. From 1986 to 1998, Father worked toward obtaining his master's degree from Hunan University in teaching English as a second language. After he received his master's degree, the Chinese government assigned Father to teach English courses at the University of Nanjing, where he continued to teach as a tenured professor from 1990 until 1995. In March of 1995, Father came to the United States to pursue a master's degree in teaching English as a second language at Arizona State University.

Father entered the United States on a student visa, and he received a full scholarship to attend Arizona State University. Father attended Arizona State University from 1995 until 1997, and he returned to the university in 2000 to defend his master's thesis. In August of 1997, Father enrolled at the University of Memphis to pursue a doctorate degree in economics. Father received a full scholarship to attend the University of Memphis, which included a stipend in the amount of $1,050.00 each month for working as a teaching/research assistant for approximately twenty (20) hours each week. Father subsequently abandoned his doctoral degree and changed his course of study to pursue a master's degree in management information systems.

After coming to the United States, Father returned to China in May of 1998 to visit for approximately one month. Qin (Casey) Luo ("Mother" or, collectively with Father, "the Hes" or "Appellants") was born in China on March 21, 1968. Mother and Father never met in person prior to Father's return trip to China, but they did communicate through telephone calls and email for six to seven months prior to their first meeting. During his return trip to China in May of 1998, Mr. He met Mother in person. According to Mother, Father mailed her some material in 1998 instructing her to go to the United States Embassy in China to secure a visa, and he returned to China to assist her with securing the visa. In order to assist Mother in coming to this country, Father submitted a form to the University of Memphis indicating that he and Mother were married.[1] Mother and Father indicated on their immigration documents that they were legally married in China. Mother was able to secure a visa as the wife of a student, and she entered the United States in June of 1998. In fact, the Hes were not legally married in China before Mother came to the United States, therefore, Mother has been an illegal alien since she entered the United States. In a subsequent deposition, Father testified that his intent was to get Mother into the country without ever having married her in China.

**B.**
***The Birth of A.M.H. and the Hes' Financial Difficulties***

When she entered the United States, Mother could speak very little English. She began working as a waitress in a Chinese restaurant shortly after arriving in this country earning approximately $200 to $300 per month. In July of 1998, Father learned that Mother was pregnant. Between the time Mother entered the United States and October of 1998, the Hes' finances remained stable. On October 11, 1998, Father worked as a computer lab assistant at the University of Memphis. According to Father, another Chinese student approached him and asked for assistance with her studies. Father recounted that the student asked to borrow money, and he refused her request. On October 19, 1998, the student filed a complaint against Father with the campus police department alleging that Father sexually assaulted her. As a result of the compliant being filed, Kathryn Story ("Ms. Story"), the Associate Dean of Judicial and Ethical Programs for the University of Memphis at the time, launched an investigation. During the pendency of the investigation, Ms.

---

[1] Father married his first wife in 1990, and they divorced at the end of 1995 or in 1996.

Story reported that Mother came to her office toward the end of 1998 and began yelling, calling her a "racist devil." Ms. Story called the campus police, and an ambulance was summoned for Mother. Subsequent to the sexual assault complaint being filed, the University of Memphis decided to terminate Father's graduate assistantship position, resulting in the loss of his $1,050.00 monthly stipend.

After Father lost his stipend, the Hes began to experience financial difficulty. Around Thanksgiving of 1998, the Hes were shopping at a Chinese grocery store in Memphis when they encountered Father's accuser accompanied by two other men. An altercation erupted, and, as a result, Mother lost her balance and fell into a shopping cart. Mother, approximately seven months pregnant at the time, experienced vaginal bleeding and was taken to the hospital. The Hes sought legal counsel to file a lawsuit for the incident in the grocery store, but they never pursued the litigation to a conclusion. As the birth of their child grew nearer, the Hes considered placing the child for adoption. In November or December of 1998, the Hes approached Mid-South Christian Services ("Mid-South"), a licensed child placement agency providing adoption and foster care services, seeking assistance. The Hes met with Dianne Chunn ("Ms. Chunn"), a birth-parent counselor with Mid-South.

As a birth-parent counselor, Ms. Chunn counseled the Hes on their decision to parent their child or place the child for adoption. Ms. Chunn opened a birth-parent file on the Hes on December 1, 1998, which included her notes from conversations with the Hes. In her discussions with the Hes, they represented themselves as a married couple, but Ms. Chunn did not request to see their marriage license. In fact, the Hes completed a "Pregnancy Counseling Status Sheet" representing that they were married even though they were not legally married at the time. Ms. Chunn stated that, in one of their conversations, Father expressed concerns about whether he was the biological father of the unborn child. Father subsequently denied making any statements to Ms. Chunn questioning his paternity of the child.

According to Ms. Chunn, the Hes initially expressed their desire to place their unborn child for adoption. When subsequently recounting her discussions with the Hes, Ms. Chunn stated that they expressed their desire to find a family that was financially stable. To that end, Ms. Chunn scheduled a meeting between the Hes and a prospective adoptive family on December 1, 1998. Ms. Chunn's notes from January 1, 1999, reflected that Mother felt "cheated" because the prospective family "was not wealthy, as was their request." Her notes also indicated that Father stated that they felt that the adoptive family should be "taking care of them; visiting, bringing nutritious food, etc." According to Father, he and Mother never wanted to place their unborn child for adoption. He asserted that they simply listened to Ms. Chunn's advice and considered it, but Ms. Chunn pushed for adoption to fill a quota and make money for her agency.

On January 28, 1999, Mother gave birth to a daughter, A.M.H. A.M.H. remained in the hospital for several days while Mother returned home. The hospital "OB Admission Assessment Record" dated January 28, 1999 indicated that A.M.H. was not to be placed for adoption. Shortly after Mother gave birth to A.M.H., she conveyed to Ms. Chunn that she did not want to place A.M.H.

for adoption. Ms. Chunn met with Mother and Father at their home to discuss different options. According to Ms. Chunn, Father still believed that adoption was the best course of action, while Mother disagreed. On February 22, 1999, Father called Ms. Chunn to report that they were still considering adoption. The following day, Ms. Chunn met with the Hes at their apartment. During their conversation, Father stated that adoption was the best plan for A.M.H., but their alternative course of action was long-term foster care. Father estimated that they would need between six months to one year of long-term foster care for A.M.H. to allow them to reestablish themselves financially. Father told Ms. Chunn that they would go to the juvenile court to inquire about long-term care.

On February 24, 1999, the Hes went to juvenile court and spoke to Sarah Cloud ("Ms. Cloud"), a probation counselor at the time, to explain their inability to care financially for A.M.H. Ms. Cloud called Ms. Chunn that same day to inquire about the situation. Ms. Chunn informed Ms. Cloud that the Hes initially wanted to place A.M.H. for adoption, but they subsequently changed their minds and wanted to place her in foster care. As a result of this call, Ms. Chunn agreed to provide the Hes with three months of foster care for A.M.H. through Mid-South. While Mid-South normally did not provide foster care beyond one month, Ms. Chunn agreed to provide three months of foster care for A.M.H. to allow the Hes to improve their financial situation. On February 24, 1999, the Hes entered into an "Interim Care Agreement and Consent Form" with Mid-South which provided, in relevant part, as follows:

> FINANCIAL ARRANGEMENTS
> I understand that 90 days of interim care will be provided my child at no charge to me. If, after 90 days, I have not reached a decision of adoption for my child, I agree to pay MID-SOUTH $_____ per day for this care, beginning (review needs at that time), plus any medical expenses incurred on my child's behalf. Interim care can continue at the discretion of MID-SOUTH when there is a case plan which justifies it.
>
> . . . .
>
> CUSTODY
> I understand that this Agreement does not terminate my parental rights, privileges and obligations to my child. By signing this Agreement, I designate MID-SOUTH, its agents and officers, such rights, privileges and obligations which are necessary for my child's well-being from the date of admission until I sign a release requesting termination of care by MID-SOUTH and receive my child from MID-SOUTH, or until such time as I sign a legal surrender of my parental rights, privileges and obligations before a Chancery Court Judge, thereby placing said child with MID-SOUTH for permanent adoptive planning.

My parental rights to this child can only be terminated by due process
of law appropriately prescribed by the State of Tennessee.

When Mid-South agreed to perform foster-care, they turned to the next foster family on their list which happened to be Jerry Baker ("Mr. Baker") and Louise Baker ("Mrs. Baker" or, collectively with Mr. Baker, "the Bakers" or "Appellees").

*C.*
*The Hes' Relationship with the Bakers*

In 1989, Mrs. Baker underwent a tubal ligation while pregnant with the Bakers' third child. In approximately 1998, the Bakers decided that they wanted another child, and Mrs. Baker underwent a tubal reversal. The Bakers considered adopting a child, but they wanted to try to have a child of their own first. The Bakers previously submitted a "Foster Home Application" to Mid-South in 1997. In response to the question "Why are you interested in providing a foster home?" on the application, the Bakers responded by stating, in relevant part, that they "were first interested in adoption of a newborn, but thought we would try foster care of newborns for a couple of years." According to Mrs. Baker, they were considering adoption, and serving as foster parents allowed them to decide if adoption was something they wanted to pursue. After submitting their application, the Bakers began serving as foster parents for Mid-South. The Bakers served as foster parents for approximately ten different children, and they never considered adopting any of the children placed with them by Mid-South. The extent of their foster care was usually limited to ten days, with the longest period being six weeks, in order to allow Mid-South to finalize the adoption paperwork.

At Mid-South's request, the Bakers began providing foster care for A.M.H. (who was approximately three weeks old at the time) on February 24, 1999, for the agreed upon three month period while the Hes decided whether they wanted to pursue adoption. According to Mrs. Baker, she was still attempting to get pregnant, and they did not expect to keep A.M.H. beyond the agreed upon three month foster care period. The Bakers stated that they fully intended to end their involvement at the end of the three month period; either A.M.H. would be returned to the Hes or the Hes would place her with an adoptive family of their choosing.

According to Ms. Chunn, Mid-South customarily allowed the birth parents to visit their child once a week while the child was in foster care, however, she did not participate in any visitation agreement between the Hes and the Bakers. The Bakers and the Hes apparently reached an oral agreement whereby the Hes could visit A.M.H. once a week during the three month foster care period. Pursuant to this agreement, the Hes came to the Bakers' home approximately once a week to visit A.M.H., and they stayed for about an hour each time they visited. Ms. Chunn documented the March 1998 visits by the Hes in her notes. On March 8, 1999, Ms. Chunn went with the Hes to visit A.M.H. at the Bakers' home, and she noted that Mother was excited to see A.M.H. Father told Ms. Chunn that Mother was "moving more toward adoption," and Mother would "readily agree" to

an adoption if the adoptive family would allow them weekly visits until Mother became pregnant again. Father informed Ms. Chunn of a Chinese superstition which characterized A.M.H. as less than an ideal child due to her difficult birth. During a visit on March 15, 1999, Ms. Chunn noted that the Hes were excited to see A.M.H., but Mother continued to be hesitant about adoption. On March 30, 1999, Ms. Chunn documented a phone conversation with Father wherein he stated that, while Mother seemed comfortable with adoption, she "wants to maintain guardianship of the child so she can continue in the U.S."

According to Mother, the initial three month foster care period went well, and Mrs. Baker took good care of A.M.H. and taught Mother how to care for her as well. At some point during the three month foster care period, the Hes attempted to pay the Bakers $300, presumably for caring for A.M.H. According to Mrs. Baker, they refused to accept the money because they were paid $6 per day through Mid-South, and their agreement with Mid-South prevented them from accepting money from the foster parents. Mid-South did not have a specific set of rules preventing foster parents from accepting money from the biological parents, and Mid-South did not instruct the biological parents to pay the foster parents. However, it was Mid-South's practice to reimburse the foster parents for caring for a child.

In mid-April of 1999, the Hes decided that they wanted to apply for a passport for A.M.H. so they could send her to China at the end of the three month foster care period. Father informed the Bakers of their intentions, and he requested their assistance in having A.M.H.'s passport photo taken. Mrs. Baker complied and took A.M.H. to have a passport photo taken, and A.M.H. subsequently received her passport. The Hes attempted to locate someone they could trust to take A.M.H. back to China at the end of three month foster care period, but they were unable to find a suitable person. Father stated that they could not leave to go to China because, without a green card, they would be unable to return. According to the Hes, the Bakers attempted to persuade them to keep A.M.H. in the United States by stating that they could visit her more frequently if she remained in this country. Toward the end of April of 1999, Father was arrested and charged with sexual assault for the incident at the University of Memphis in October of 1998.[2]   At the time of his arrest, Father worked part-

---

[2] Father was never convicted of the criminal charges leveled against him. The record is not entirely clear as to whether the charges were dismissed or whether Father was acquitted following a jury trial. Stephanie Johnson ("Ms. Johnson"), the assistant district attorney general involved in the criminal case, subsequently stated that the Father's case was set for trial on or around December of 2001. At a hearing during that period, Ms. Johnson learned that Mother had threatened the victim in the case, and she brought this to the attention of the trial judge. The trial judge admonished Mother about communicating with the victim in the case.

In February of 2003, Ms. Johnson attended a motions hearing in preparation for Father's trial. During that hearing, Ms. Johnson learned that Mother had improperly communicated with the jury outside the courtroom. Once again, the trial judge admonished her about this conduct as well. Ms. Johnson subsequently learned that a tape of Father's preliminary hearing was unintelligible. As a result, the indictments against Father were dismissed, and the case was returned to the lower court for a new preliminary hearing. In the lower court, Father produced a copy of the tape from the original preliminary hearing, but it was decided to continue with a new preliminary hearing. As the case progressed to trial for the second time, Mr. He did not show up for an afternoon hearing after the trial judge instructed him to do so. The trial judge subsequently issued a warrant for Mr. He's arrest. In any event, Mr. He was never

(continued...)

-7-

time at the University of Memphis in a dormitory earning approximately $200 per month, and Mother continued to work part-time as a waitress. After his arrest, the university fired Father from his job at the dormitory.

On May 8, 1999, the Hes sent Mrs. Baker a Mother's Day card inside which they wrote the following:

> Dear Louise:
>
> Happy Mothers Day!
> You have offered endless love to many children. You are the real
> Mom of [A.M.H.]. Our thanks to you is beyond expression.
>
> /s/ Jack & Casey
> 5/8/99

While she acknowledged that they sent the card, Mother asserted that she did not intend for the card to mean that she wanted to give up her daughter.

Their inability to secure a suitable person to take A.M.H. back to China at the end of the three month foster care period prompted the Hes to decide to allow A.M.H. to remain with the Bakers. In addition, the Hes were still not able to financially care for A.M.H. at the end of the three month foster care period. According to Mrs. Baker, Father came to them toward the end of the three month foster care period and asked them to adopt A.M.H., but Mother opposed an adoption. On May 19, 1999, Ms. Chunn met with Father to discuss the Hes' future plans for A.M.H. Father stated that they would like to maintain their parental rights, but they wanted to continue the custody arrangement with the Bakers. Ms. Chunn felt that such an arrangement was unrealistic, and she discussed the possible adverse effects long-term foster care could have on A.M.H. after she bonded with the Bakers. Thereafter, Father returned to the Bakers' home to discuss a custody arrangement. The Bakers informed Father that they would not be willing to retain custody of A.M.H. on the basis suggested by Father. According to the Bakers, they entered into an oral agreement with Father whereby the parties agreed that the Bakers would raise A.M.H. until she turned eighteen, and the Hes would retain their parental rights so they could remain in the United States.

On May 24, 1999, Father and Mrs. Baker called Ms. Chunn to inform her that the Bakers were willing to accept temporary custody of A.M.H. Ms. Chunn understood that the parties were in agreement that the Bakers would care for A.M.H. until she reached eighteen years of age. After speaking with Father and Mrs. Baker, Ms. Chunn contacted attorney Kevin Weaver ("Mr. Weaver"). Mr. Weaver previously advised Mid-South on adoption and parental termination matters, and he commonly met with families at the request of Mid-South. Ms. Chunn asked Mr. Weaver to meet

_____

[2](...continued)
convicted of the criminal charges brought against him stemming from the October 1998 incident.

with the Bakers and the Hes to discuss the legal implications of the custody arrangement and some of the risks involved.

On June 2, 1999, Father, the Bakers, and Ms. Chunn met Mr. Weaver at his office to discuss the custody arrangement. Father informed Mother of the meeting, but Mother did not attend the meeting because she had to work. According to Mr. Weaver, Ms. Chunn, and the Bakers, Father called Mother from the meeting to inquire if they should proceed in her absence. Father subsequently denied that he called Mother from the meeting to make this inquiry. Mr. Weaver, Ms. Chunn, and the Bakers all stated that, after Father concluded his telephone conversation with Mother, he stated that he and Mother were ready to proceed with the agreement, and they should continue with the meeting.

Mr. Weaver did not consider himself to be representing either party at the meeting, and he explained to the parties at the outset of the meeting that he was not there to represent either party. Mr. Weaver explained how the parties could obtain a consent order for temporary custody, and he told Father that he and Mother would need to obtain a court order to regain custody in the future if everyone was not in agreement to a change of custody. Father subsequently confirmed that Mr. Weaver did indeed tell him that, once they signed a consent order giving the Bakers custody of A.M.H., they would have to go before a court to obtain a change in custody. Mr. Weaver recalled Father asking questions during the meeting, but he did not recall any specific questions. Mr. Weaver did not advise Father that he and Mother could lose their parental rights if they failed to visit A.M.H. or failed to pay child support for A.M.H. for four consecutive months, and no one advised Father to have an attorney present at this meeting. At the conclusion of the meeting, Mr. Weaver felt that everyone understood the process and was satisfied with their decision. According to Mrs. Baker, Father stated that he would inform Mother of what transpired at the meeting and would let them know of their decision. Father subsequently stated that he did not understand the concepts of adoption and custody, and he understood that they were entering the temporary agreement so A.M.H. could be covered under the Bakers' health insurance. Father stated that he spoke to Mother after the agreement and informed her that they would need to sign something to allow A.M.H. to be placed on the Bakers' health insurance.

Mr. Weaver subsequently sent a bill to Mid-South in the amount of $100.00 for his services at the meeting. Ms. Chunn's records indicate that Mid-South forwarded the bill to the Bakers for payment. Ms. Chunn asked the Bakers to reimburse Mid-South for the cost of the meeting because she felt the Hes were not financially able to do so. The Bakers apparently paid the bill for Mr. Weaver's services at the June 2, 1999 meeting.

On June 3, 1999, Ms. Chunn asked Pastor Kenny Yau ("Pastor Yau") to accompany her to the Hes' apartment to speak with Mother. Father was not present at this meeting. On the way to the Hes' apartment, Ms. Chunn indicated that she felt Mother did not completely understand the agreed upon custody arrangement the parties were about to enter into. Ms. Chunn told Pastor Yau that she wanted to ensure that Mother understood the process and was not being forced into anything. She asked Pastor Yau to attend the meeting and translate so Mother could better understand the

agreement. Pastor Yau stated that, at the conclusion of the meeting, Mother indicated that she understood the process. Later that day, Father called the Bakers to inform them that they wanted to go ahead with the consent order transferring custody of A.M.H. to the Bakers.

### D.
### *The Juvenile Court Order Transferring Custody of A.M.H. to the Bakers*

On June 4, 1999, the Hes, the Bakers, and Ms. Chunn met at Mid-South's office. From there, they proceeded to the Shelby County Juvenile Court in the Bakers' van. Mr. Weaver did not accompany the parties to juvenile court, and neither party had an attorney present at the meeting in juvenile court. According to Father, Ms. Chunn told the Hes to go to juvenile court, but he did not know why. Since Mother was not present at the meeting with Mr. Weaver, the Bakers requested that Pastor Yau attend the meeting to interpret so that they could ensure that Mother fully understood what was transpiring.

Ms. Cloud met with the parties at juvenile court, and she noted that Mother was "very concerned" that the arrangement would be temporary and not permanent. Ms. Cloud drafted a "Petition for Custody" which provided that the Hes were unable financially to care for A.M.H. at the time, and the Hes were requesting that custody of A.M.H. be transferred to the Bakers. Ms. Cloud also drafted a "Consent Order Awarding Custody" which provided, in relevant part, as follows:

> This cause was before the Court on a sworn petition, and it being evident to the Court by the signatures of the parties that they do place themselves before this Honorable Court and acknowledge its jurisdiction and admit the following:
>
> 1.      That [the Hes] have been fully advised of their legal rights and that a hearing before the Court is hereby expressly waived.
> 2.      That all parties agree that it is in the best interest of the child(ren) for custody and guardianship of the person of said child[3] to be awarded to <u>Jerry and Louise Baker, non relatives</u>.
> 3.      That [the Hes] are aware that on this agreement is based the Order of this Court, and that failure to comply herewith, without just cause, places them in contempt of Court and subjects them to such action as the Court deems proper within its jurisdiction.

---

[3] Ms. Cloud typed the language "and guardianship of the person of said child" into the document which appears to be a standardized form used by the juvenile court. According to Ms. Cloud, the Bakers did not request the inclusion of the guardianship language, but she inserted the language based upon what she had been told by the parties.

> Having considered the admissions and agreement of the parties, it is the judgment of the Court that a change of custody is in the best interest of the said child(ren).
>
> IT IS THEREFORE ORDERED, ADJUDGED, AND DECREED that custody and guardianship of the person[4] of said child(ren) be and is hereby awarded to Jerry and Louise Baker, non-relatives with authority to make appropriate plans for the care and supervision of said child(ren).

Before the Hes signed the order, Ms. Cloud, Ms. Chunn, and Pastor Yau took Mother into a separate room to talk privately about the consent order.

According to Ms. Cloud, Mother asked if the arrangement she was agreeing to was a temporary arrangement. Pastor Yau stated that he was shown the consent order, but he did not read it to Mother word for word. Instead, he read the document himself then translated its contents to Mother. He conveyed to Mother that, since they were financially unable to care for A.M.H., another family would care for her. Furthermore, since they needed health insurance for A.M.H., Mother needed to sign the document to give the Bakers legal authority. According to Mother, Pastor Yau told her that the custody arrangement was only temporary, and she could have A.M.H. returned to her at any time. Pastor Yau felt that he adequately conveyed the order's import to Mother, and Mother never indicated that she did not understand the document and never asked him to repeat anything. Ms. Cloud and Ms. Chunn both described Mother as emotional during their meeting, stating that she was tearful when she signed the order. However, Ms. Chunn and Ms. Cloud both felt that Mother understood the order, which they described as a document providing that the Hes would retain their parental rights, but they would be transferring legal custody of A.M.H. to the Bakers. Ms. Cloud explained that she did not schedule a hearing before the juvenile court judge that day because everyone was in agreement. She stated that it was her standard practice to ensure that the biological parents understood that they would have to go before the juvenile court judge if they did not agree to the order. According to Ms. Cloud, had she thought that the Hes were not sincerely consenting to the order, she would have set the case for a hearing before the juvenile court. On the day that the Hes signed the consent order giving the Bakers custody of A.M.H., the Hes also signed a form provided by Mid-South which effectively removed A.M.H. from Mid-South's care and ended Mid-South's involvement up to that point.

Ms. Cloud stated that no one asked about visitation during the meeting, and the order did not contain any provisions for visitation. The order also did not make provisions for any child support to be paid by the Hes. Pastor Yau stated that he did not recall any discussion during the meeting regarding the law of abandonment, specifically child support or visitation. Ms. Cloud stated, however, that the Bakers told the Hes that they could visit A.M.H. According to Father, the Bakers assured them that they could continue to visit A.M.H. once every week. Regarding child support,

---

[4] Ms. Cloud typed the language "and guardianship of the person" into the document at this point as well.

the Bakers never told the Hes not to pay child support, but they did not expect the Hes to pay child support since the parties agreed that the Bakers were to raise A.M.H. until she turned eighteen. In fact, the parties agreed that A.M.H. should begin to refer to the Bakers as "mommy" and "daddy" and refer to the Hes as "Jack" and "Casey." During subsequent visits, Father would refer to himself as "Uncle Jack."

After June 4, 1999, the Hes continued to visit A.M.H. at the Baker's home approximately once a week for one hour each visit. On June 5, 1999, the day after the parties signed the consent order, Mrs. Baker began keeping a journal of the Hes' visits to their home. According to Mrs. Baker, the purpose of the journal was to document "everything" that occurred when the Hes visited their home. The Hes were not aware that Mrs. Baker was keeping a journal of their visits, however, Father subsequently acknowledged that he did not dispute the journal's accuracy. The Bakers encouraged the Hes to interact with A.M.H. during their visits, and Mrs. Baker would show Mother how to feed, change diapers, and generally care for A.M.H. About two weeks after the parties signed the consent order, the Bakers learned that Mrs. Baker was pregnant with the Bakers' fourth child.

Between June 4, 1999, and October of 1999, the He's visits with A.M.H. continued to go well as evidenced by Mrs. Baker's journal. During their June visits, the Hes brought A.M.H. jars of baby food, formula, juice, diapers and two books. In August of 1999, the Bakers told the Hes that they were expecting another child. During a visit on August 28, 1999, Mother kept giving A.M.H. a gold chain and glass chime to play with. Mrs. Baker warned Mother that A.M.H. could cut herself or get choked, and Mrs. Baker wrote in her journal that the Hes "have no concept on what babies can do or not do." During a visit on September 11, 1999, the Hes expressed excitement over the fact that A.M.H. would have a sibling to grow up with. Mrs. Baker noted in her journal that Mother gave A.M.H. one of her rings to play with, and Mrs. Baker reiterated her concern about A.M.H. putting things in her mouth. On September 30, 1999, Mother brought A.M.H. porridge, and the Bakers allowed A.M.H. to have a few bites.

On September 15, 1999, the University of Memphis Social Discipline Committee conducted a hearing on the sexual assault complaint filed against Father. At the conclusion of the hearing, the committee unanimously found Father guilty of violating certain provisions of the Code of Student Conduct. On September 20, 1999, the committee notified Father by letter that he was suspended from the university for the remainder of the 1999 to 2000 term until the Summer of 2000 term, that he would be placed on trespass status, that he must complete sexual abuse counseling, and that he could not receive his degree during the term of his suspension.[5] As a result of his suspension, Father became an illegal alien subject to deportation proceedings.

On October 3, 1999, Mrs. Baker made an entry in her journal expressing concern over the Hes' request to take A.M.H. out of the Bakers' home during a visit, stating:

---

[5] According to Ms. Story, Father completed his degree requirements at the university, but he was unable to obtain his degree due to the suspension. Apparently, the university subsequently awarded Father his degree.

> Jack and Casey came at 3:00. [A.M.H.] played for a minute with them and then wanted us. The visit was very discouraging to us. They wanted to see if they could come and get [A.M.H.] and keep her for the day next Sunday. I told them No. She is too little to be away from us. Casey was very distraught, crying very loud. They left soon after. Jack kept telling us that they had friends that kept asking about her and a doctor at church wanted to see her. We told them she didn't need to see a doctor and if anyone wanted to see her they could come to our home. We stood strong with this. I think Jack was just trying to please Casey. No words were exchanged. We feel like Jack will try something now. We would like to get visits to every other week. We feel like they would wean away, but the last 2 visits we could see Casey is wanting to come more.
>
> If Jack confronts us with the visit we are going to tell him this is the way its going to be and set rules for him. He is very pushy and overbearing. They are suppose [sic] to com [sic] Thurs, 8:45 AM because Jerry is going to be out of town. Jack will not come to our home without Jerry being here.

Mrs. Baker subsequently stated that they were not going to allow the Hes to take A.M.H. out of their home, and, after the October 3, 1999, visit, they decided to move visitation to every other week. According to Mother, she wanted to see A.M.H. more often, but the Bakers began to change visitation times or make their visits more difficult. However, Mrs. Baker's journal indicated that the Hes occasionally missed visits, rescheduled visits, or the Bakers would miss church to accommodate the Hes' visits on Sundays. Father subsequently stated that their visits with A.M.H. continued to go well, and they experienced no problems with visitation during this period.

On November 14, 1999, Father called the Bakers to tell them he was bringing a friend from church, Elizabeth Marshall ("Ms. Marshall"), to visit A.M.H. Ms. Marshall previously adopted two Chinese children, and she hired Mother when she was pregnant with A.M.H. to babysit for her. Ms. Marshall was aware that the Bakers were caring for A.M.H., but the Hes did not tell her the specifics of their arrangement with the Bakers. Father asked the Bakers to pretend that they were A.M.H.'s foster parents, not her custodial parents. In fact, Father told Ms. Marshall that the Bakers were A.M.H.'s temporary foster parents. During the visit, Ms. Marshall inquired as to how the Bakers could give up A.M.H. after caring for her for so long, and she referred to A.M.H. as A.M. Marshall. Mrs. Baker got the impression that the Hes had spoken to Ms. Marshall about adopting A.M.H. Ms. Marshall subsequently stated that she had no intention of adopting A.M.H.

At some point in November of 1999, Mother asked Father to approach the Bakers and request that they return custody of A.M.H. to them. Pursuant to Mother's request, Father approached Mr. Baker about their regaining custody of A.M.H. According to Father, Mr. Baker stated that they did not want to return A.M.H. to the Hes, and Mr. Baker asked him not to mention it again because Mrs. Baker was pregnant, and he did not want to cause a miscarriage. After this conversation, the Hes

stated that they no longer felt comfortable with the Bakers, and their relationship began to deteriorate. The Bakers invited the Hes to come to their home on December 22, 1999 to see what A.M.H. received for Christmas. The Hes brought gifts for everyone but A.M.H. On January 28, 2000, the Bakers invited the Hes to their home to celebrate A.M.H.'s birthday. The Hes brought food for everyone and they had birthday cake. The Hes brought A.M.H. a Sesame Street suitcase as a gift. On February 15, 2000, the Hes visited A.M.H. and brought some fish which had bones in it. Mrs. Baker decided not to feed it to A.M.H. On February 21, 2000, Mrs. Baker gave birth to a daughter, Aimee. During a visit on February 28, 2000, the Hes stated that they were pleased that A.M.H. had a new sister. Around this time, Mother became pregnant with the Hes' second child.

On April 26, 2000, the Hes visited the Bakers' home, and Father asked if he could bring a friend from Ohio to visit A.M.H. According to Mrs. Baker's journal entry for that date, Mr. Baker asked Father if he told his friend the truth about A.M.H., and Father said he did not because he was worried about being criticized for telling the truth. Father wondered aloud if he should tell his friend that A.M.H. was "temporary," or if he should tell his friend the whole truth about A.M.H. being "permanent." They encouraged Father to tell his friend the truth about the situation, and the Bakers invited the Hes' friend to dinner.

### E.
### *The Hes' Decision to Petition the Juvenile Court for a Change in Custody*

According to Ms. Cloud, the Hes came to juvenile court or called her on the telephone several times after the original agreed upon custody order was entered to complain about their visitation with A.M.H. and to express their desire to regain custody of A.M.H. However, Ms. Cloud could not remember the exact dates of these conversations. On May 3, 2000, the Hes signed a petition seeking to modify the June 4, 1999 consent order awarding custody of A.M.H. to the Bakers alleging that a change in circumstances warranted a change in custody. Father subsequently acknowledged that he had been contacted by immigration officials prior to filing the May 2000 petition. According to the Hes, as of the date they filed the petition they were financially able to care for A.M.H. Mrs. Baker's journal entry for May 3, 2000, indicates that the Hes did not apprise the Bakers of their intentions during the visit, and, in fact, the Hes and the Bakers discussed the kinds of lessons they wanted A.M.H. to learn growing up. Ms. Cloud subsequently called Ms. Chunn to inform her that the Hes had filed a petition in the juvenile court to regain custody of A.M.H. In turn, Ms. Chunn called Mrs. Baker on May 4, 2000, to alert her of the fact that a petition had been filed.

Mrs. Baker called Mr. Baker to inform him of the news. According to her journal entry for May 4, 2000, the Bakers were "floored" by this news. Mr. Baker called Father that afternoon to arrange a meeting to discuss the Hes' decision to file the petition, and Mr. Baker met Father at the clubhouse of the Hes' apartment complex. During their meeting, Mr. Baker asked Father why they filed the petition. Father responded by stating that Mother insisted on filing the petition to regain custody of A.M.H., but he wanted A.M.H. to remain with the Bakers. Father told Mr. Baker that the

Hes planned to "ship" A.M.H. back to China. Father acknowledged the parties' prior oral agreement (that the Bakers would raise A.M.H. until she turned eighteen), but he stated that they needed to discuss changes to the agreement. As Father began talking about the proposed changes, Mr. Baker started writing down what Father proposed. When Mr. Baker indicated that the Bakers would not agree to changing their prior agreement, Father grabbed the paper from Mr. Baker and began writing. The discussion between the two men resulted in the following three options being presented by Father:

> The below options were discussed by Jerry Baker and Jack He.
> /s/ Jerry Baker
> /s/ Jack He 5/4/00
>
> OPTION # 1
> That the Bakers and the He's [sic] agree to give [A.M.H.] back to the Hes without disputing custody in court. The Hes agree that in the event the Hes must leave the United States for China they will let the Bakers adopt [A.M.H.] forever.
> * The Bakers must agree not to cause the Hes to leave the United States by reporting to the U.S. Government.
>
> OPTION # 2
> The Hes agree to stay in Memphis as long as they stay in United States. The Hes will allow the Bakers to have [A.M.H.] for a visit no less than two days per week. * Option 1 and 2 go together.
>
> OPTION # 3
> The Bakers and the Hes agree to continue their current agreement with one supplement: the Hes may take [A.M.H.] back home one day every other week. Such agreement will continue for 18 years. The Hes agree to leave [A.M.H.'s] passport to the care of the Bakers.

Mr. Baker wrote the first two options as Father spoke, and Father wrote the third option. Father and Mr. Baker were unable to reach any agreement that day, and the matter remained unresolved.

After the Hes filed their petition to modify the original custody order, the Hes continued to visit A.M.H. at the Bakers' home with the same regularity. On May 7, 2000, the Hes came to the Bakers' home with their friends from Ohio. When Mrs. Baker was alone in the kitchen, Father approached her and stated that "it was going to be alright, that he was going to persuade Casey not to do this." At some point in May of 2000, the Bakers contacted Mr. Weaver.

The Hes' May 2000 petition to modify custody was filed in the juvenile court on June 19, 2000. On June 28, 2000, the juvenile court referee held a hearing on the Hes' petition.[6] Mr. Weaver attended the hearing on behalf of the Bakers. The Hes did not hire a lawyer to represent them at the hearing, and no translator was present. Prior to the hearing, the juvenile court appointed a Court Appointed Special Advocate ("CASA") to investigate the Hes' petition to modify custody and determine if they were presently able to provide for A.M.H. The CASA provided the referee with a copy of his report on the date of the hearing, which provided, in relevant part as follows:

CONCERNS AND EVALUATIONS

Mrs. Luo does not speak English. Therefore, Mr. He translated for her during this CASA's visit. Presently, both parents stated they want [A.M.H.] back home with them, as they are now able to financially care and provide for her. This CASA believes that [A.M.H.'s] parents love her very much. However, Mr. He and Mrs. Luo do not seem to understand the serious nature of this matter. For instance, neither parent appears to understand why they have to go to court to regain custody of [A.M.H.]. They do not understand why they have to prove anything. This CASA believes the fact that the mother and the father are not able to speak English is relative to their lack of issues surrounding custody of their child.

. . . .

Qin (Casey) Luo is four months pregnant with her second child. This CASA is concerned about the added responsibility that a new baby would bring to Mr. He and Mrs. Luo. Presently, the couple lives in a two-bedroom apartment with an adult female roommate named Ping. Ping was not present during this CASA's home visit. The couple plans for both [A.M.H.] and the new baby to share their existing bedroom with them.

This CASA is concerned that Mr. He and Mrs. Luo want custody of [A.M.H.] reinstated for the purpose of citizenship. The Bakers stated that they were very shocked when [A.M.H.'s] parents filed for custody without first discussing it with them. They stated that they believe Mr. He and Mrs. Luo want custody of [A.M.H.] reinstated in order to become citizens and stay in the United States. Mr. Baker stated that Mr. He would do anything to remain in this country.

---

[6] The record on appeal does not include a transcript of the June 28, 2000 hearing in the juvenile court.

This CASA is concerned about the possibility that Mr. He and Mrs. Luo might send [A.M.H.] back to China if custody is reinstated. Mr. He informed Mr. Baker that they might send [A.M.H.] back to China to live with relatives if Mr. He and Mrs. Luo regain custody. The Bakers believe that this would be traumatic to the child since [A.M.H.] thinks of the Bakers as her parents.

The CASA recommended that the Bakers retain custody of A.M.H. and that the juvenile court grant the Hes supervised visitation with A.M.H. twice a week for four hours each day.

According to the parties, the juvenile court referee primarily spoke to Father during the hearing about the Hes' plans for A.M.H. The referee asked Father about the Hes' finances, his pending criminal matter, and their plans for A.M.H. if they regained custody. Father told the referee that they were presently financially able to care for A.M.H., and, if they were awarded custody, they planned to send A.M.H. to China and send $25 to $35 a month to support her. At the conclusion of the hearing, the referee entered "Findings and Recommendations of Referee" denying the Hes' petition to modify the previous June 4, 1999 custody order, and the juvenile court confirmed those findings that same day. The Hes did not appeal this ruling, and they continued to visit A.M.H. at the Bakers' home once a week occasionally bringing food and other items for A.M.H.

Shortly after the hearing, Father went to Macon, Georgia to work for approximately two months, and Mother remained in Memphis. During this period of time, Mother continued to visit A.M.H. at the Bakers' home. Of particular significance is a visit Mother made to the Bakers' home on August 1, 2000 to visit A.M.H. The Bakers had previously spoken to Mother and asked her to come at 10:00 a.m. because Mrs. Baker had to leave at 11:00 to meet Mr. Baker for lunch. Mother arrived at 10:45 a.m, and at 12:15 p.m. Mrs. Baker informed Mother she needed to leave to meet Mr. Baker. Mother picked A.M.H. up and refused to leave, stating that Mrs. Baker should call the police. Mother began yelling and screaming at Mrs. Baker, referring to the Bakers as "bad people, demons." Mrs. Baker called Mr. Baker and informed him of the situation, and she asked him to return home. Mr. Baker called Father in Macon, Georgia and informed him of the situation, and Father advised Mr. Baker to call the police. According to the Bakers, Father apologized for Mother's behavior. After the police arrived, Mother agreed to leave. The Bakers informed Father that Mother would not be allowed back in their home unless he accompanied her. As a result of the incident, Father quit his job in Macon, Georgia and returned to Memphis.

The Hes continued to visit A.M.H. approximately once each week in September and October of 2000. On October 23, 2000, the Hes visited A.M.H. and brought her pears, chips, watermelon seeds, and some Chinese books. According to Mrs. Baker's journal, the Hes spoke Chinese the whole time, and they were "determined to get [A.M.H.] to call them Mama & Papa." On October 28, 2000, Mother gave birth to a son, Andy. One of Andy's ears was only partially developed at birth. After Mother gave birth to Andy, Father called Mrs. Baker to ask if she would pick up Mother and Andy from the hospital, which Mrs. Baker agreed to do. At Father's request, Mrs. Baker also delivered a document for the Hes to a social services office. Mrs. Baker visited the Hes' home

throughout the month of November 2000 to bring them food, items for Andy, and helped teach Mother how to care for the newborn. She also took Mother shopping for Andy, and she drove Mother to see Andy's pediatrician. The Hes also called Mrs. Baker occasionally to inquire about how to care for the baby. Toward the end of November, the Bakers helped the Hes when their automobile needed repairs, and they drove Mother on her errands. According to the Hes, their financial situation began to improve after Andy was born, and they were able to hire a full-time Chinese babysitter to care for Andy.

On December 4, 2000, Mrs. Baker drove Father to work, and she took Mother and Andy to see Andy's ear specialist. On December 15, 2000, Mrs. Baker took Mother and Andy to another doctor's appointment, and she took Andy to have his passport photo made. Mrs. Baker subsequently took Andy to a doctor's appointment without Mother at the request of the Hes. On December 22, 2000, the Bakers invited the Hes to their home for Christmas, and the Hes visited A.M.H. the following day. The Hes did not bring A.M.H. any gifts, stating they did not have time to shop. The Bakers gave the Hes a vacuum cleaner and gave Andy clothes.

In January of 2001, the Hes visited A.M.H. at the Bakers' home four times. On January 1, 2001, friends of the Hes drove them and Andy to visit A.M.H. Shortly after arriving, Father said he had to leave, and he asked the Bakers to drive Mother and Andy back home, which they agreed to do. On January 13, 2001, the Hes visited A.M.H. and brought her three pears and some Chinese jell-O. On January 20, 2001, Father called the Bakers and wanted to come visit, but the Bakers informed him that it was an inconvenient time because Mrs. Baker was having a baby shower. They rescheduled the visit for January 22, 2001. On their way to the Bakers' home on January 22, 2001, Father called to ask if Mother could visit A.M.H. on her birthday, January 28, 2001, and the Bakers agreed. When the Hes arrived at the Bakers' home, they introduced a female accompanying them as Mother's sister. When Mrs. Baker inquired further because of her understanding that Mother only had a brother, Father stated that the female was actually Mother's cousin. Mrs. Baker noted in her journal that Mother appeared to be upset. She also noted in her journal that A.M.H. was sick, and she made an appointment for her to see the doctor.

On January 28, 2001, the Hes arrived at the Bakers' home to visit A.M.H. for what turned out to be their final visit. According to the Hes, they called the Bakers about a week prior to the visit to inform the Bakers that they wanted to take A.M.H. to have a family portrait made, and the Bakers agreed to their request. According to Mrs. Baker's journal, they had no prior knowledge of this request. When the Hes stated their intentions, the Bakers told them that A.M.H. was sick and could not leave the house. Records subsequently introduced in this matter indicate that the Bakers were in contact with A.M.H.'s doctor during this period regarding A.M.H.'s high fever, cough, and congestion. The Hes became more insistent and demanded to take their daughter to have a family portrait made. When the Bakers refused, Father instructed them to call the police, which the Bakers did. Two sheriff's deputies arrived at the Bakers' residence and spoke to the Hes and the Bakers. Deputy John Astor ("Deputy Astor") subsequently stated that he found the Hes to be "irate," and they were outside the Bakers' home yelling and screaming. Deputy Astor spoke to Father and advised him to speak to an attorney. According to Deputy Astor, he instructed the Hes to refrain from

returning to the Bakers' home that day. Mother subsequently stated that, based on Father's translation, she understood Deputy Astor's statement to mean that they could never return to the Bakers' home or they would be arrested. Mr. Baker stated that he memorialized the events of January 28, 2001 in Mrs. Baker's journal shortly after the incident because Mrs. Baker was too upset to write.

After the January 28, 2001 incident, the Hes never returned to the Bakers' home to visit A.M.H. According to Father, they did not return or call because they were afraid of being arrested, and they were also concerned about possible deportation and his pending criminal charges. Mrs. Baker stated that, after the incident, she called the Exchange Club to arrange for any future visits to be conducted there. However, the Bakers did not call and inform the Hes that future visits would be conducted through the Exchange Club. In fact, Mrs. Baker subsequently admitted that the Bakers did nothing after the January 28, 2001 incident to promote a relationship between A.M.H. and the Hes. The Bakers did not hear from the Hes again until April 2, 2001. On that day, Mother called and left a message on the Bakers' answering machine instructing the Bakers to come to their home and "get [their] baby bed, we are moving, thank you, bye bye."[7] Mother subsequently stated that they also sent postcards to A.M.H. in April or May of 2001, but they were returned.

In February of 2001, the Hes contacted the juvenile court asking for assistance in regaining custody of A.M.H. from the Bakers. On February 15, 2001, Father faxed a letter dated February 1, 2001, to the juvenile court setting forth a brief history of the case, the incident on January 28, 2001, and the Hes' desire to "take our child back and go back to China." Father also sent a copy of the letter to the media. On April 9, 2001, the Hes went to juvenile court where they met with Candice Brown ("Ms. Brown"), a probation counselor. Ms. Brown described Mother's behavior that day as "hysterical," and she appeared to be genuinely upset about regaining custody of her daughter. Ms. Brown recounted that the Hes told her that they did not understand the American system, and they did not understand what they were doing when they signed the original consent order giving the Bakers custody of A.M.H. Ms. Brown explained to the Hes that, since the Bakers were not there to agree to a change of custody, they would need to file a petition and go before a judge to ask for a modification of the custody arrangement. Ms. Brown prepared a petition on April 9, 2001, wherein the Hes stated that they were presently able to care for A.M.H. Only Mother signed the petition. Ms. Brown subsequently stated that Father was present that day, but she was new to the position and only had Mother sign the petition. The Hes' petition to modify the custody arrangement was filed in the juvenile court on May 29, 2001, and the petition was set for a hearing in June of 2001. Father subsequently admitted that, as with the previous petition they filed in May of 2000, the Hes were contacted by immigration officials around the time they filed the May 2001 petition, but he could not remember the exact dates of those calls. Father stated that they received the calls from immigration officials between March and May of 2001.

---

[7] During a subsequent deposition, Father testified that he too called and left a message with the Bakers asking about visitation. He also stated that he mailed A.M.H. a card after January 28, 2001, but he did not receive a response. Father offered no such testimony at trial, and the trial court made no mention of this fact in its order apparently due to the trial court's findings regarding Father's credibility.

At some point in May of 2001, the Hes sent their son Andy, who was seven months old at the time, to China to live with Mother's relatives. They paid their babysitter, a Chinese immigrant, to take Andy to China. According to the Hes, they sent Andy to China because they feared he could be taken from them if Father was ultimately convicted of the criminal charges pending against him. They also hoped that Mother's father, a "traditional medicine doctor," could treat Andy's ear. While Andy was in China, the Hes sent approximately $1,000.00 each month to her family.

## *F.*
## *The Bakers' Petition to Terminate the Hes' Parental Rights*

After the Hes filed their petition to modify the original custody order in juvenile court in May of 2001, the Bakers once again met with Mr. Weaver. Mr. Weaver recommended that the Bakers file a petition to terminate the Hes' parental rights to A.M.H. to stop the juvenile court proceedings. When the Hes appeared in juvenile court on June 6, 2001 for the hearing on their petition, the juvenile court rescheduled the hearing until June 22, 2001 because Mr. Weaver was unable to attend. Two days before the scheduled June 22, 2001 hearing, the Bakers filed a "Petition for Adoption and Termination of Parental Rights" in the Chancery Court of Shelby County. The Bakers' petition, which Mr. Weaver filed on their behalf, stated that the Hes abandoned A.M.H. by willfully failing to visit her and willfully failing to support her. The Hes were subsequently informed of the petition and the necessity to transfer the case to the chancery court. Soon thereafter, the Hes secured the services of attorney Dennis J. Sossaman ("Mr. Sossaman") to represent them in the matter. The case was initially assigned to Chancellor D.J. Alissandratos.

On June 27, 2001, the chancery court appointed Mid-South as next friend to conduct an investigation into the merits of the Bakers' adoption petition. Ms. Chunn conducted the investigation on behalf of Mid-South and opened an "adoptive family file." Ms. Chunn subsequently filed her report outlining the history between the Hes and the Bakers, and she concluded that A.M.H. "is continuing to thrive in the Baker home." On July 24, 2001, the chancery court, pursuant to the agreement of the parties, entered an order appointing attorney Kimbrough B. Mullins ("Ms. Mullins") to serve as the guardian ad litem for A.M.H. The order also provided that the parties agreed to waive any hearsay objections to any statements contained in Ms. Mullins' reports, and they stipulated that Ms. Mullins would be deemed an expert regarding any subsequent opinions she may form in the case. On September 24, 2001, the Bakers filed a notice with the chancery court that they were substituting attorney Larry E. Parrish ("Mr. Parrish") as counsel to replace Mr. Weaver.

On October 10, 2001, Ms. Mullins filed her first interim report with the chancery court. In preparing her report, Ms. Mullins conducted interviews with the Hes, assisted by Pastor Yau translating; the Bakers; Ms. Chunn; and Ms. Cloud. Ms. Mullins indicated in her report that Ms. Chunn informed her that, prior to the birth of A.M.H., Father questioned his paternity of A.M.H., and Ms. Mullins' report noted that Father confirmed this assertion. Based on her interviews with Father, Ms. Mullins noted that Father was in favor of her suggestion that he undergo a DNA test to

establish paternity. Accordingly, she included in her report a recommendation that Father undergo a DNA test to establish whether he was the biological father of A.M.H. Father subsequently denied telling Ms. Chunn he questioned paternity of A.M.H., and he denied telling Ms. Mullins he wanted a DNA test. Ms. Mullins also recommended that the parties undergo psychological testing. She recommended that the court appoint a child psychologist to evaluate A.M.H. for the psychological impact removing her from the Bakers would have and the effect of losing her cultural heritage if the Hes' parental rights were ultimately terminated. Ms. Mullins recommended Dr. David Goldstein ("Dr. Goldstein"), a licensed clinical psychologist, to perform this role. According to Ms. Mullins, the chancery court entered a consent order in October of 2001 appointing Dr. Goldstein to evaluate A.M.H.[8] Dr. Goldstein focused his evaluation on three issues: (1) the psychological status of A.M.H., (2) the effect removing A.M.H. from the Bakers would have on the child, and (3) the effect severing A.M.H.'s relationship with the Hes would have on the child.[9]

In October of 2001, Father filled out a credit application to purchase a new Mazda vehicle. In the section of the application requesting the name and address of a closest living relative, Father inserted the names "Jack Johnson" and "Jeff He"indicating they were his cousins. Father subsequently admitted that these were fictitious names he occasionally used to refer to himself. According to Father, the salesperson pressured him into buying the vehicle and encouraged him to use the fictitious names. The application reflects that the Hes made a $1,500.00 down payment on the vehicle which cost approximately $18,000.00, and they financed the rest by making payments of approximately $300.00 per month beginning in November of 2001.

On January 7, 2002, the Hes were legally married in Memphis, Shelby County, Tennessee. Around that time, Father took a DNA test which established that he was indeed the biological father of A.M.H. Shortly thereafter, he filed a "Voluntary Acknowledgment of Paternity." Mother became pregnant with the Hes third child around this time as well.

On January 23, 2002, the Bakers filed a motion requesting that the chancery court order the Hes to pay Ms. Mullins' fees, deposit a sum with the court sufficient to pay for future costs associated with psychological evaluations, expert testimony, and DNA testing. In support of their motion, the Bakers relied on the following testimony from Father's deposition, wherein he stated:

---

[8] In a subsequent report filed in September of 2003, Ms. Mullins indicated that the chancery court did in fact appoint Dr. Goldstein to perform a psychological evaluation of A.M.H. The record does not contain an order to that effect, and we find no transcript of any hearing discussing such an order in the record on appeal. In any event, the parties do not dispute that the trial court appointed to Dr. Goldstein to conduct the evaluation.

[9] Dr. Goldstein never evaluated the Hes or the Bakers in this case. When he was initially contacted by Ms. Mullins, Dr. Goldstein would not agree to conduct an evaluation of the adults because he felt that, due to the cultural issues involved and the costs associated with performing such a complex evaluation, he wanted to gather a neutral team of professionals to conduct the evaluation. According to Ms. Mullins, counsel for both parties objected to her request to evaluate the Bakers and the Hes citing the costs associated with such an evaluation, therefore, the chancellor decided to defer a decision on an evaluation of the parties.

Q. Is you [sic] your understanding that you have the responsibility to pay at least initially half of the cost for Ms. Mullins service as guardian ad litem?

A. I do not understand it.

Q. Okay. Are you prepare [sic] to pay half of her fees when they are due?

A. Let me put it this way, money is nothing compared with the human being.

Q. Okay.

A. Compared with having our daughter back. Money is nothing if in the money is justified, if the expense.

Q. Well, if the Court ordered you to pay stay [sic] $3,000 toward the guardian ad litem's fee, are you able and willing to make that payment?

A. I'm able, but I'm not necessarily willing.

Q. So it may be that you would have the money, but just because the Court told you to pay it, you wouldn't necessarily pay it, right?

A. I will wait and see. I cannot make decisions right now. I will wait and see.

Q. But you do reserve to yourself the right to make a judgment about whether you will or will not follow the order?

A. I will consult a few other people before I make my decision.

. . . .

Q. Okay. Now, when you say that you are able, do you mean you have the money in the bank?

A. I have part of the money in the bank, but, you know, as a Chinese, Chinese tradition is different from American tradition. I can borrow money very easily from my friends, my relatives.

Q. All right?

A. Yes.

Q. How much money do you have in the bank?

A. Right now I have $2,500 and 60-something most recent information.

. . . .

Q. Now, you say you can borrow money from friends and relatives; is that correct?

A. Yes.

-22-

Q. Okay. Give me the names of the friends for whom you would borrow money if you needed to borrow money?
A. Most of them in China. I can give it to you.
Q. Please.
A. My relatives such as my wife's brother . . . .
Q. Okay.
A. Her brother is a very successful young man. Younger brother.

. . . .

Q. And how much capacity would he have to lend you money, if you needed money from him?
A. I think he can easily loan us one million.
Q. One million?
A. Yes. One million.
Q. Okay. All right. You are talking about dollars?
A. Yes.
Q. Okay. And who else?
A. And then that's for my wife's brother, younger brother. And then for from my relatives, my sister just now mentioned, she is an attorney. She can loan me about $10,000. U.S. Dollars.
Q. Okay. And who else?
A. And some of my previous co-workers the Chong Qing University . . . .
Q. Okay. And he's at —
A. He is an architect.
Q. Architect?
A. Yes.
Q. And how much do you think you could borrow from him if you needed?
A. $10,000.
Q. Okay. Anybody else?
A. I think that's sufficient to see through this case.
Q. And you think you would need to do anything to borrow the money from the other than just ask them and tell them how much you need?
A. I would tell them and if — I know — I know they will. They will be very happy to do so. I know that. Because we are fighting for our daughter back.

Father also mentioned that he could secure the funds within a month and that he could receive these loans interest free. Mother subsequently testified that Mr. Sossaman, their attorney at the time of Father's deposition, instructed Father to testify at his deposition that they had more money than they

actually did. However, Father subsequently testified that Mr. Sossaman did not ask him to misrepresent their income. Although he admitted to lying about their income during his deposition, Father asserted that Mr. Parrish trapped him into saying how much money they could acquire.

On February 7, 2002, the chancellor conducted a hearing on the Bakers' motion. At the hearing, Ms. Mullins requested that the chancery court take custody of A.M.H.'s passport. The Hes informed the chancellor that the passport was at their apartment, and the chancellor ordered the Hes to surrender the passport to the court by 4:00 p.m. that day. The chancellor also appointed an attorney ad litem to represent Ms. Mullins.[10] Regarding the Bakers' motion, the chancellor ordered the Hes to deposit $10,000 with the chancery court to cover future guardian ad litem fees, to pay for the DNA test, and to deposit $5,000 to cover the projected costs associated with psychologically evaluating the parties and A.M.H.

The Hes did not comply with the chancellor's ruling by tendering A.M.H.'s passport to the court on February 7, 2002. When subsequently questioned about his communication with a reporter after the hearing, Father provided the following testimony:

> Q. And do you recall [the reporter] asking you whether you were going to produce the passport or not produce the passport?
> A. About the passport, I think I told her that we did not want to give the passport. That's what I said.
> Q. Okay, are you denying that you said to her, "Which would make a better story for you"?
> A. I could not remember exactly what I said, but the point is that I did not want to give the passport. That's my point.
> Q. Did you say to her words that, "I may do either one. Which one will make the best story for you?"
>
> . . . .
>
> Q. Are you denying that you said that?
> A. I do not deny it. I could not remember that. That's what I said.

Father went on to testify that there was a sixty percent chance he made the statement versus a forty percent chance that he did not make the statement. According to Father, he "was trying to get the media's attention in order to help me to get my daughter back." On February 8, 2002, the chancellor entered an "Order to Show Cause" reflecting that the court received a call from the guardian ad

---

[10] On February 12, 2002, the chancellor entered an order *nunc pro tunc* to February 7, 2002 addressing the oral orders entered at the February 7, 2002, hearing. The court entered an order on April 2, 2004, *nunc pro tunc* to February 2, 2002, appointing attorney Linda L. Holmes as the attorney ad litem for Ms. Mullins.

litem, counsel for the Hes, and counsel for the Bakers on February 7, 2002, at approximately 4:00 p.m. informing the court that the Hes did not intend to comply with the chancellor's order.

The chancellor entered another order on February 8, 2002, appointing the Bakers guardians of A.M.H., and the chancellor ordered that the Hes have no contact with A.M.H. until the court entered an order directing otherwise. The order indicated that the chancellor based his decision on the entire record, including the recommendation of the guardian ad litem. The Certificate of Service on the order indicated that it was presented to Mr. Sossaman, counsel for the Hes, and Ms. Mullins, the guardian ad litem for review. However, Mr. Parrish, counsel for the Bakers, was the only attorney who signed the order indicating his approval. The Bakers never requested such an order, and the record on appeal contains no transcript of any hearing addressing the need for such an order. In fact, Mr. Parrish subsequently testified at trial that, as everyone was preparing to leave the hearing on February 7, 2002, the chancellor instructed him to draft the order. According to Mr. Parrish, the chancellor instructed him to forgo having the other attorneys sign the order. Mr. Parrish stated that Mr. Sossaman was no longer the Hes' attorney at the time, and he admitted that he did not show the order to Mr. Sossaman prior to presenting it to the chancellor for his approval. Mr. Parrish was the only lawyer present in the courtroom when the chancellor read the order and signed it.

It was not until February 14, 2002 that Mr. Sossaman filed his "Motion to Withdraw" with the chancery court citing a conflict of interest. That same day, the chancellor conducted a hearing on the previous "Show Cause Order" and Mr. Sossaman's "Motion to Withdraw" as counsel for the Hes. Mr. Sossaman informed the court that a conflict had developed between the Hes regarding the manner in which the case should proceed after the February 7, 2002 hearing. The chancellor required Mr. Sossaman to remain as counsel for Father during the hearing, and Mother chose to represent herself. During the hearing, Mother informed the chancellor that she would not comply with the court's previous order to surrender the passport. Father testified that, after the previous hearing, he tried to get the passport from Mother, who had control of the document, but she refused to tell him where she put it. At the conclusion of the hearing, the chancellor determined that Father was not a credible witness, that both Mother and Father had control of the passport, and that Father was "a willful, knowing, perjurer on these points." The chancellor ordered the Hes to surrender the passport by 9:00 a.m. the following morning or face incarceration.[11] That same day, the chancery court entered an order permitting Mr. Sossaman to withdraw from representing the Hes in this matter. On February 15, 2002, attorney David A. Siegel ("Mr. Siegel") filed a notice with the chancery court indicating that he would be taking over representation of the Hes in the matter.

---

[11] The chancellor had previously instructed the Hes to produce proof of their marriage in China and proof of their Tennessee marriage. At the hearing on February 14, 2002, the chancellor found that the Hes never married in China. On February 15, 2002, the chancellor ordered the Hes to produce a copy of their Tennessee marriage license. This order was the subject of a separate contempt proceeding.

The court also entered a subsequent show cause order requiring the Hes to appear and explain why they failed to pay the $15,000.00 the court previously ordered them to pay. The Hes subsequently complied with the court's order and entered a notice of their payment of $15,000.00 to the court.

On February 20, 2002, the Hes filed a motion requesting that the chancellor order immediate visitation with A.M.H. and vacate its previous order directing them to refrain from contacting their daughter. On February 22, 2002, the chancellor entered an order *nunc pro tunc* to February 14, 2002, finding the Hes in civil contempt for refusing to surrender A.M.H.'s passport, and the court ordered them incarcerated until such time as they purged themselves of the contempt by producing the passport. The Hes subsequently complied by delivering the passport to the court.

On March 7, 2002, the chancellor conducted a hearing on the Hes' petition requesting visitation. Regarding the chancellor's prior order directing no contact between the Hes and A.M.H., the following exchange occurred:

THE COURT: Why did I issue a no contact order?

MR. PARRISH: The guardian ad litem asked you to. The Hes were here with counsel at the time and didn't object.

THE COURT: Let me say this, I need to have an evidentiary hearing so I can see whether or not I need to reverse myself, stick with what I have done, whatever it is, because I don't remember why I did it. It sounds more logical, which is — because it's not like me to sit and go, I'm looking at an overcast day, I think I will deny, think I will deny you visitation. I usually do things for a reason. People might disagree, but I am a person who reasons through things.

MR. SIEGEL: I realize that.

THE COURT: Obviously what happened was the guardian ad litem made a recommendation the other side remained silent on and didn't offer proof, and I went on ahead, and I went on, said my job is to be decisive, not just ride the fence being indecisive.

So, I made a decision, one side said, I would like for you to decide this way, which is to deny visitation, and the other side was heard for whatever short time it was or long time it was or whatever, then I made a decision. Now, having done that, I'm more than happy to revisit it, but if I'm going to revisit it now, I'm going to need to hear from the guardian ad litem, and witnesses, anybody

-26-

they want to call, because the law is not absolute on this.

As previously mentioned, the record on appeal does not contain any motion by the Bakers or Ms. Mullins asking for a ruling on visitation or a no contact order, and the record does not contain a transcript of any evidentiary hearing addressing the entry of the order. According to Mr. Parrish's subsequent testimony at trial, no prior hearing was ever conducted on this issue. In fact, Ms. Mullins' interim report filed on October 10, 2001 only contained a recommendation that any visitation between the Hes and A.M.H. be supervised. Ms. Mullins subsequently stated that there was no pending motion on this issue, but she believed the chancery court had enough evidence before it to justify the order. In any event, the trial court declined to consider the Hes' motion on the day of the hearing.

On March 8, 2002, the Bakers filed a motion to amend their petition to allege that Father was not the legal parent of A.M.H. but only her biological father with no basis to allege he had parental rights to A.M.H. The chancery court subsequently granted the Bakers' motion to amend their petition. Thereafter, the parties filed numerous motions with the trial court. On April 22, 2002, the Bakers filed a motion for default judgment. On April 25, 2002, the Hes filed a motion for summary judgment arguing that the record, as a matter of law, failed to establish that the Hes abandoned A.M.H. On May 1, 2002, the Bakers filed a motion for partial summary judgment alleging Father had no parental rights to A.M.H., but they subsequently withdrew the motion.

In July of 2002, Dr. Goldstein filed his report with the chancery court. Dr. Goldstein concluded that A.M.H. was thriving with the Bakers, and she viewed the Bakers as her "psychological parents." After acknowledging that he could not predict how a specific individual would respond to an interruption in attachment, he concluded that, based on his research, a child who experiences loss in early childhood is at a greater risk of developing serious psychological disorders in the future. He opined that, if A.M.H. were removed from the Bakers, she would experience separation anxiety and possibly develop a depressive disorder. While he found the research involving transcultural adoptions to be sparse, he concluded that such adoptions do not appear to have any significant differences from normal adoptions. Dr. Goldstein subsequently admitted that, as of the date he filed his report, he had not investigated the attachment between A.M.H. and the Hes. However, he opined that A.M.H. would have very little attachment to the Hes based on his observation of her interactions with the Bakers and the fact that the Hes had only visited her approximately eighty times for one hour each time. On August 30, 2002, the chancellor entered a consent order releasing Dr. Goldstein's preliminary report to the attorneys, and the court limited their disclosure of the report to the attorneys, the parties, any other experts to be utilized by the parties.

On September 9, 2002, Mother gave birth to the Hes third child, Avita. On November 8, 2002, the Hes filed a notice with the Tennessee Attorney General of their intent to challenge the constitutionality of certain Tennessee statutes, specifically certain provisions contained in section 36-1-102 and section 36-1-113 of the Tennessee Code. Thereafter, Assistant Attorney General Douglas E. Dimond ("Mr. Dimond") entered an appearance in the chancery court to defend the

constitutionality of the statutes. On June 23, 2003, the Hes filed a motion requesting a jury trial, and a motion to bifurcate the proceedings into a separate determination of the grounds justifying termination and a decision on the best interest analysis.

On September 4, 2003, the chancery court conducted a hearing on the Hes' motion contesting the constitutionality of certain Tennessee statutes. On September 10, 2003, attorney Richard A. Gordon ("Mr. Gordon") entered a notice of appearance as co-counsel for the Hes. That same day, the Hes filed a motion asking the chancellor to set aside its prior order appointing Mid-South and Ms. Chunn as next friend to investigate the Bakers' adoption petition. On September 12, 2003, the Bakers filed a motion in limine requesting a ruling that any parental rights Father may have as to A.M.H. are subject to termination pursuant to section 36-1-113(g)(9) of the Tennessee Code. The Bakers also filed a motion asking the chancery court to consolidate the Bakers' petition to terminate the Hes' parental rights with Mother's petition filed in the juvenile court on May 29, 2001, asking the juvenile court to modify the June 4, 1999 custody order. That same day, the Hes filed a motion, pursuant to Rule 60.02 of the Tennessee Rules of Civil Procedure, asking the chancery court to set aside the consent order issued in juvenile court on June 4, 1999. On September 15, 2003, the Hes filed a motion for default judgment against the Bakers on Mother's May 19, 2001 petition filed in juvenile court requesting a modification of the custody order.

On September 23, 2003, Dr. Goldstein conducted a videotaped "attachment session" with A.M.H., the Hes, and the Bakers. The video recording of the incident is included in the record on appeal. Dr. Goldstein met with the parties prior to the meeting to explain the purpose of the meeting and the parameters of permissible conduct at the meeting, which included keeping the contents of the meeting confidential. According to Dr. Goldstein, the video demonstrated the high level of attachment A.M.H. has to the Bakers. The Hes brought food items and gifts to the meeting which, according to Dr. Goldstein, they used to encourage A.M.H. to interact with them. Dr. Goldstein did not attribute A.M.H.'s willingness to approach the Hes to retrieve an item to mean she still had a level of attachment to the Hes. Dr. Goldstein stated that, the day after the session, he observed a news interview with the Hes wherein the Hes stated that A.M.H. thought they abandoned her.

On September 24, 2003, Ms. Mullins filed another report wherein she opined that the Hes abandoned A.M.H. by failing to visit and failing to support her. Ms. Mullins cited A.M.H.'s level of attachment to the Bakers and concluded that she should remain in the Bakers' custody. On September 25, 2003, the Hes filed an amended motion to set aside the consent order awarding custody of A.M.H. to the Bakers entered in June of 1999. That same day, the Hes filed a motion asking the chancery court to set aside its previous order appointing the Bakers the guardians of A.M.H. On September 26, 2003, the chancery court entered an order denying the Hes' motion challenging the constitutionality of certain provisions in section 36-1-102 and section 36-1-113 of the Tennessee Code. On September 29, 2003, the Hes filed a motion requesting immediate visitation with A.M.H.

On October 2, 2003, the Hes filed a motion pursuant to section 36-1-119(d) of the Tennessee Code requesting that the trial court dismiss the Bakers' petition for adoption because the adoption

proceeding had been pending beyond the statutorily allowed period. On October 23, 2003, Ms. Mullins filed an addendum to her previous report filed on September 24, 2003.

On November 5, 2003, the Bakers filed a motion in limine requesting that the chancery court issue a ruling on the meaning of the word "willfully" as used in section 36-1-102(1)(A)(i) of the Tennessee Code. On November 6, 2003, Chancellor Alissandratos received a letter from attorney Chad A. Massey notifying him that the Hes filed a complaint with the Tennessee Court of the Judiciary alleging judicial misconduct. On November 7, 2003, the Hes filed a renewed motion for emergency visitation with the trial court. On November 14, 2003, Mr. Gordon filed a notice with the chancery court of his intention to withdraw from representing Father and solely represent Mother. That same day, Mr. Siegel notified the chancery court of his intention to withdraw from representing Mother and solely represent Father. Also on November 14, 2003, Chancellor Alissandratos convened a hearing wherein he informed the parties that, due to an ethical complaint filed by the Hes and "to avoid even the appearance of impropriety," he would recuse himself from the case. Shortly thereafter, the Chief Justice of the Tennessee Supreme Court entered an order assigning Robert L. Childers of the Shelby County Circuit Court to hear the case by interchange.

On December 1, 2003, the Hes' second child, Andy, returned to the United States. After picking up Andy at the airport, the Hes proceeded to Wal-Mart where they encountered Hope Baker, the Bakers' older daughter, A.M.H., Aimee, and another child Mrs. Baker was babysitting. Mrs. Baker was in another part of the store shopping, and Hope was watching over the other children. Upon seeing A.M.H., Mother approached A.M.H., touched the child, and said loudly, "That's my daughter. Give me my daughter." Hope grabbed A.M.H. and began screaming for help. A Wal-Mart manager heard the scream for help and approached the group. Father subsequently approached the group and told another manager who arrived at the scene that the Hes wanted to take A.M.H. and leave. One of the Wal-Mart managers called the police to deal with the situation.

On January 22, 2004, Judge Childers convened a hearing to ascertain the status of the case and any pending motions, and he inquired about moving the case to trial as soon as possible. At a hearing on January 27, 2004, the Hes made an oral motion requesting a visit with A.M.H. the following day, her birthday. At the conclusion of the hearing, the trial court orally ordered that the Hes were to have no contact with A.M.H. until after a trial in the matter. On January 28, 2004, the trial court entered separate orders, all *nunc pro tunc* to September 4, 2003, denying the Hes' motion for summary judgment, denying their motion to bifurcate the proceedings, and denying their motion for a jury trial.

On February 6, 2004, the trial court entered an order addressing the Hes' previous request for visitation on A.M.H.'s birthday and denied any future contact between the Hes and A.M.H. until the completion of the trial in this matter, effectively denying the Hes' previous motions requesting visitation. On February 23, 2004, the trial court entered a "Joint Pretrial Order" setting forth the disputed and undisputed facts in the case. On February 27, 2004, the trial court, recognizing that no order had been entered allowing Mr. Weaver to withdraw as counsel for the Bakers, entered an order *nunc pro tunc* to September 30, 2001 permitting Mr. Weaver to withdraw from the case.

The trial on the Bakers' petition for adoption and termination of the Hes' parental rights to A.M.H. and the Hes' petition to modify the June 4, 1999 custody order got underway on February 23, 2004 and continued until March 2, 2004. During that time, the trial court frequently held court well into the night and heard testimony from twenty-eight (28) witnesses and admitted seventy-nine (79) trial exhibits into evidence.

In addition to the aforementioned facts, the Hes testified that they never intended to place A.M.H. for adoption or permanently relinquish custody of A.M.H. to the Bakers. The Hes took the position that the Bakers intended to adopt A.M.H. from the very beginning of the parties' relationship. Father testified that Chancellor Alissandratos, Ms. Mullins, Dr. Goldstein, and Mr. Parrish engaged in a conspiracy against the Hes.

The Hes presented their own experts at trial to refute the testimony of Dr. Goldstein. Dr. John F. Cooper ("Dr. Cooper"), a professor of international studies at Rhodes College, testified regarding the manner in which Chinese citizens view children and the family. He testified that the extended family plays a pivotal role in Chinese culture, and it is not uncommon for students to ask family members to care for their children while they pursue a higher education. According to Dr. Cooper, the child is returned to the biological parents at their request. He testified that China does not have a legal concept comparable to the Tennessee statutes governing termination of parental rights. Dr. Cooper acknowledged his familiarity with the "one-child" rule in China, and noted that the Chinese government will typically require the mother to get an abortion upon becoming pregnant a second time. He also stated that the Chinese government may impose fines on the biological parents who have extra children, but these fines are only imposed on children born in China. Under cross-examination, Dr. Cooper admitted that it is possible that fines could be imposed on a parent who had children in another country and returned to China with more than one child, but he stated that doing so is not the general policy. Counsel for the Bakers also questioned Dr. Cooper on cross-examination concerning an opinion issued by a federal bankruptcy court finding him to be an untruthful witness and imposing sanctions against him and the attorney representing him in the matter.

Dr. John Hutson ("Dr. Hutson"), a psychologist, reviewed Dr. Goldstein's report and records, and he testified that Dr. Goldstein did not perform his duties appropriately in this matter. Upon reviewing the video of the "attachment session" conducted by Dr. Goldstein on September 23, 2003, Dr. Hutson concluded that the video revealed that Mrs. Baker was "controlling" A.M.H. and "holding onto her." According to Dr. Hutson, there was "a great deal of comfort" between A.M.H. and the Hes. However, Dr. Hutson subsequently admitted that, after reviewing the video in court once more, he did not see Mrs. Baker "clasping" the child during the meeting. He also admitted that

he could not form an opinion as to A.M.H.'s attachment to either the Hes or the Bakers based on the video.

Dr. John V. Ciocca ("Dr. Ciocca"), another psychologist, reviewed the video of the "attachment session" and concluded that A.M.H. responded "very favorably" to the Hes, and the "connection between the biological parents and this child had survived." He opined that A.M.H. had a positive reaction to the Hes which signified that a prior connection survived despite their prolonged absence from her life. Dr. Yih-Jia Chang ("Dr. Chang"), a clinical psychologist practicing in California, performed psychological evaluations on the Hes in September of 2003. According to her test results, the Hes did not present any abnormal psychological traits. Regarding the testing procedures used to evaluate the Hes, Dr. Chang stated that the Hes were rotated during the test to conduct personal interviews. While admitting that this is not the best way to administer the tests, Dr. Chang stated that it was the best method given the circumstances.

Dr. Goldstein testified that Father filed a complaint with the ethics committee during the pendency of these proceedings to complain of the manner in which he fulfilled his duties to the court. Prior to giving his testimony in the case, Dr. Goldstein stated that Father approached him in the hallway of the courthouse and informed him that he did not intend to pursue the complaint. In response to the Hes' experts, Dr. Goldstein testified that what Dr. Hutson characterized as "controlling behavior" he viewed as "healthy attachment behavior" between a mother and her child. His view of the "attachment session" was that the Hes used food and gifts to encourage A.M.H. to interact with them, but he did not view A.M.H.'s willingness to approach them as evidence of an attachment to the Hes. He noted that, during the session, the Bakers encouraged A.M.H. to interact with the Hes, but he opined that A.M.H. did not have the attachment to the Hes that she did to the Bakers. According to Ms. Mullins, A.M.H. viewed the Hes as "special friends."

In March of 2004, after the evidence had been presented to the trial court, the parties began to file various motions asking the court to exclude or strike the testimony of various experts and witnesses. On March 22, 2004, Ms. Mullins filed a motion asking the trial court to allow her to reopen the proof and present evidence regarding the issuance of the guardianship and no-contact order. In her affidavit attached to the motion, Ms. Mullins stated that, after reviewing Mr. Parrish's testimony at trial regarding the issuance of the no-contact order and his notes from the event, she determined that Mr. Parrish's recollection of the events as testified to at trial was incorrect. According to Ms. Mullins, when she learned from the Hes' attorney at the time that they were not going to deliver A.M.H.'s passport to the court as ordered, she asked Chancellor Alissandratos to issue the order to protect the child from being removed to China during the pendency of the proceedings. Mr. Parrish subsequently filed a response to Ms. Mullins' motion stating that his recollection of the events surrounding the issuance of the order now conformed to that of Ms. Mullins.

On March 29, 2004, the trial court entered an order granting the Bakers' motion to consolidate their petition to terminate the parental rights of the Hes with Mother's petition to modify the June 4, 1999 custody order entered by the juvenile court. That same day, the trial court entered

a consent order admitting Ms. Mullins' affidavit and Mr. Parrish's notes from the conference call with Chancellor Alissandratos into evidence.

On April 5, 2004, Mr. Dimond filed, on behalf of the Attorney General, a motion to intervene in the proceedings to defend the constitutionality of any statutes which may be placed at issue. On April 6, 2004, the trial court entered several orders addressing the parties' pending motions: the court denied the parties' motions to exclude certain testimony from the record; the trial court entered an order denying the Hes' motion filed on September 10, 2003, to set aside the order appointing Mid-South next friend to conduct an investigation into the adoption petition; the trial court entered an order denying the Hes' motion for default judgment on their petition to modify the June 4, 1999 order entered by the juvenile court; the trial court denied the Hes' motion to set aside the June 4, 1999 consent order; the trial court denied the Hes' motion to set aside the order appointing the Bakers guardians of A.M.H.; and the trial court denied the Hes' motion to dismiss the Bakers' adoption petition filed on October 2, 2003. These orders effectively dealt with all of the pending motions filed by the parties in this case.

### H.
### *The Trial Court's Judgment*

On May 12, 2004, the trial court entered its seventy-two (72) page memorandum opinion granting the Bakers' petition to terminate the Hes' parental rights to A.M.H. and denying Mother's petition to modify the custody order entered on June 4, 1999 by the juvenile court, stating:

> Specifically, this Court finds that (1) the Hes willfully abandoned AMH for a period exceeding four (4) months, (2) the Hes provided no support for a period exceeding four (4) months, (3) the Hes only sought custody of AMH to prevent the Hes' deportation, and (4) it would be in AMH's best interest to terminate the Hes' parental rights and to remain with the Bakers. The Court will hold the Bakers' Petition For Adoption in abeyance until the Court's decision on the Petition to Terminate Parental Rights and the Petition to Modify Custody is final.

Throughout the order, the trial court set forth its extensive findings of fact, conclusions of law, and credibility determinations.

Regarding the credibility of the Bakers and the Hes, the trial court's order provides, in relevant part, as follows:

### I. GENERALLY SIGNIFICANT FACTS

. . . .

20.    Mr. He questioned whether he was the biological father of AMH and requested that the guardian ad litem arrange blood testing for Mr. He, Mrs. He, and AMH to determine paternity of AMH.

21.    Mr. He filed an acknowledgment of paternity on March 15, 2002.

. . . .

29.    All parties, including Mr. and Mrs. He, knowingly and voluntarily signed the June 4, 1999, Consent Order Awarding Custody, without being induced by any fraud or undue influence.

. . . .

## II.    LITIGANT CREDIBILITY

The Court has carefully scrutinized the testimony of the Hes and the Bakers. Because they have an interest in the outcome of the case, the reliability of their testimony has been viewed in relation to other evidence and the entire record in this cause, for corroboration and/or inconsistency and the Court has weighed their testimony accordingly.

The Court observed Mr. Baker testify for approximately three (3) hours of live testimony at trial. Mrs. Baker testified for approximately five (5) hours of live testimony at trial. Mrs. He testified for approximately ten (10) hours of live testimony at trial. Mr. He testified for approximately seven (7) hours of live testimony at trial. The Court also observed Mr. He testify for approximately six (6) hours, by a video-tape deposition that was admitted as Trial Exhibit 20.

The Court was physically present with the Bakers and the Hes in the courtroom for over ninety-one (91) hours of trial testimony, over fifteen (15) hours of arguments on motions after the conclusion of proof, and six (6) hours of closing arguments. The Court observed each of them throughout the trial proceedings and interacted, through counsel, with them as the trial proceeded to conclusion. The Court makes the following findings of fact regarding credibility of the witnesses:

32.    Mr. Baker impressed the Court as a man who has a great deal of love, care, and concern for children in general, but who has

an enormous amount of love, care, and concern for his own natural born children and for AMH. He testified in an honest, straightforward, sincere manner. Mr. Baker impressed the Court with his sincerity and the concern he expressed for AMH's welfare and safety. Mr. Baker has demonstrated concern for and a willingness to help others who are in need, including the Hes. As one example, Mr. Baker helped Mr. He when Mr. He's vehicle was in the shop for repairs.

33. Mrs. Baker impressed the Court as a sincere, honest, credible witness. She too has demonstrated that she has a great deal of love, care, and concern for children in general, but she also has an enormous amount of love, care, and concern for her own natural born children and for AMH. Mrs. Baker also impressed the Court with her care and concern for AMH's welfare and safety. Mrs. Baker has demonstrated concern for and a willingness to help others who are in need, including the Hes. For example, she took Mrs. He to obtain social services and to apply for TennCare insurance coverage for the Hes' second child, Andy, who was born in October 2000. She took Mrs. He and Andy home from the hospital after Andy's birth. She loaned the Hes a baby bed for Andy. She went to the Hes' apartment to show Mrs. He how to feed, burp, bathe, and change Andy's diapers. She took Andy to the doctor's office because Mr. He was too busy, and she took Andy to other appointments because Mr. He was too busy.

34. Both of the Bakers demonstrated their concern and care, and lack of any animosity toward the Hes, by foregoing their church and other regular activities to accommodate the Hes' visits with AMH. The Bakers also served the Hes dinner on several of their visits, and allowed the Hes to bring friends with them to the Bakers' home for visits, serving the friends dinner as well . . . .

35. Mr. He is highly educated, both in the Peoples Republic of China and in the United States, and exhibits a high level of intelligence. He has demonstrated that he also has a high level of knowledge of the culture in the United States, that he is familiar with the justice system in Shelby County, Tennessee, and that he is proficient in his knowledge and use of the English language. . . . He has an aggressive personality and shows no propensity to be deterred or intimidated. He is a thoughtful and deliberate person who exhibits a proclivity to calculate, plan, and carefully predetermine his action and behaviors. At all times relevant to this case, Mr. He has

demonstrated the ability to access knowledgeable advisors in any area in which he needs assistance, to scrutinize the advice given, and, if dissatisfied with the advice, reject the advice and seek out other advisors.

36. Since 1998, Mr. He has repeatedly engaged in a pattern of conduct marked by deceitfulness and dishonesty, without remorse, repentance, or conscience, and has shown a propensity to justify all means, including perjury, for what Mr. He deems to be justifiable ends.

37. Mr. He admitted that he lied about his income, under oath, in his December 21, 2001, deposition and that he said things he knew were not the truth . . . . The Court has previously found that Mr. He committed perjury while under oath in Court hearings and pleadings filed in this cause.

38. The Court reaffirms and incorporates herein by reference the findings made by the Court relative to the perjury of Mr. He in testimony given before the Court on February 14, 2002, as memorialized in the February 22, 2002, order entitled "Judgment On Order To Show Cause Pertaining To Passport" and the order entitled "Judgment On Order To Show Cause Pertaining To Documentation Of Marriage In The Republic Of China."

. . . .

40. Mr. He made material false statements on a loan application, dated October 18, 2001, relative to his employment, his income, his status as a student, and his personal references for the purpose of securing a loan for the purchase of a new vehicle.

. . . .

42. Mrs. He is an impetuous person not subject to being intimidated or deterred in achieving whatever she sets as her goal. The evidence shows that she is calculating, almost theatrical, in her actions. The evidence further shows that she is dishonest and manipulative, and has a history of acting in an unstable manner when it serves her own self-interest. For example, during cross-examination, Mrs. He would begin sobbing when asked difficult questions. However, Mrs. He would immediately regain her composure when asked subsequent questions. It appears to the Court that Mrs. He's

courtroom hysterics were calculated by Mrs. He in an effort to avoid answering the difficult cross-examination questions.

43. Though Mrs. He speaks sufficient English to carry on her daily affairs in the United States, she is not as proficient as Mr. He in knowledge or use of the English language and, unlike Mr. He, sometimes needs assistance with translation in technical and extraordinary use of the English language. She has confidence in Mr. He, prefers Mr. He as her translator, has no desire to part company with Mr. He for any reason and intends to cooperate fully with Mr. He to remain together with him as a family and believes Mr. He has never failed to keep her fully and honestly informed about the legal matters involving AMH.

44. Although Mrs. He does not speak the English language fluently, she appears to speak and understand English better than she professes. For example, Mrs. He spoke English during some of the Hes' visits with AMH at the Bakers' home and when Mrs. He took the Hes' other children for medical treatment . . . . During the trial, in response to a question from attorney Linda Holmes, Mrs. He responded to the question by speaking English, before the interpreter had begun interpreting Ms. Holmes' question to Mrs. He. Mrs. He said, "Mr. Parrish filed legal motion," then she stopped speaking English and began responding to the question in Chinese.

. . . .

48. Mrs. He only seems to be interested in regaining custody of AMH when deportation seems imminent. This fact is evidenced by Mrs. He filing the two (2) petitions to modify custody in close proximity to receiving calls from the United States Immigration & Naturalization Service ("INS"), regarding Mr. and Mrs. Hes' immigration status.

49. From the totality of the credible proof at trial, both Mr. and Mrs. He have shown themselves to be persons who do not consider themselves to be bound by the rule of law. Mr. and Mrs. He have demonstrated that they will do and say anything in order to achieve their desired goals.

The trial court also made credibility determinations regarding the other witnesses at trial. As for the expert witnesses, the trial court determined that Dr. Cooper's testimony was "totally lacking in credibility," citing the court's agreement with the bankruptcy court's findings regarding his credibility in that matter. Moreover, the trial court concluded that "Dr. Cooper is not an expert in

Chinese adoption law, nor is he an expert on termination of parental rights." The trial court determined that the underlying facts or data relied upon by Dr. Chang in forming her opinions were untrustworthy as to Mother, and the court gave no weight to her findings as to Father because of her reliance on his answers to her questions. As for Dr. Hutson, the trial court found his testimony to be of little assistance because he did not personally evaluate A.M.H., and he only viewed the videotape of the "assessment session" in reaching his opinions. The court found Dr. Ciocca's testimony to be of little value given his testimony that he could not offer an opinion as to A.M.H.'s level of attachment to the Bakers or the Hes after viewing the videotape. Finally, the trial court determined that Dr. Goldstein was "a very knowledgeable, honest and forthright witness." Regarding the other witnesses at trial, the trial court determined each to be a credible witness. Specifically, the trial court found Mr. Weaver, Ms. Mullins, Ms. Chunn, Ms. Cloud, and Pastor Yau to be credible witnesses.

In light of these credibility determinations, the trial court addressed the merits of the parties' petitions. Beginning with the due process claims, the trial court made the following relevant findings:

63. Both before and after June 4, 1999, the Hes engaged the services of at least two attorneys in Memphis . . . to advise and represent the Hes in civil litigation arising from physical injuries Mrs. He allegedly sustained in November of 1998. The Hes also spoke to another attorney that Ms. Chunn referred them to . . . about civil litigation. Neither of the Hes ever mentioned to any of these three attorneys the need for representation or advice regarding placing or retaining custody of AMH.

64. Both before and after June 4, 1999, Mr. He engaged the services of at least three attorneys to advise him and represent him in defense of the criminal charges brought by the State . . . Neither of the Hes ever mentioned to any of these attorneys the need for representation or advice relative to AMH's custody. In fact, the Hes never told these three attorneys about the existence of AMH.

. . . .

67. On June 2, 1999, attorney Kevin Weaver met with Mr. He and the Bakers and fully advised Mr. He and the Bakers of the legal ramifications of filing a petition for custody and of signing a consent order awarding custody of AMH. Mrs. He, after being fully advised of the meeting and of the purpose of the meeting by Mr. He, waived her right to be present at the meeting and told Mr. He to tell the others at the meeting that

she was ready to proceed. Mr. Weaver answered all of Mr. He's and the Bakers' questions during the meeting. Mr. He later advised Mrs. He of the information that Mr. Weaver imparted at the meeting.

68. On June 3, 1999, Ms. Chunn and Mr. Kenny Yao, an experienced interpreter in English and Mandarin Chinese, met with Mrs. He, alone, in the Hes' apartment . . . . Mrs. He indicated that she understood everything that Ms. Chunn had told her through Mr. Yao.

69. On June 4, 1999, Ms. Sarah Cloud, with the assistance of a qualified interpreter, privately met with Mrs. He, without Mr. He, and fully explained the legal ramifications of both the Petition for Custody and the Consent Order Awarding Custody, both of which Mrs. He later voluntarily signed.

70. . . . . Although the Hes had consulted with attorneys in the past regarding other legal matters, the Hes never inquired at Juvenile Court about getting an attorney to provide the Hes legal advice concerning the original transfer of custody of AMH.

71. A few months after the Hes signed the June 4, 1999, Consent Order Awarding Custody, the Hes went to Juvenile Court and spoke with Ms. Cloud about getting assistance to file a petition to regain custody of AMH . . . . Ms. Cloud advised the Hes that they should hire an attorney for legal advice and representation, and Ms. Cloud recommended the services of the Memphis Area Legal Services, if the Hes could not afford to hire an attorney.

Accordingly, the trial court concluded that there was no conspiracy to deprive the Hes of their right to due process regarding the custody of A.M.H., and the Hes did not suffer a deprivation of their constitutional rights during the course of transferring custody of A.M.H. to the Bakers.

Next, the trial court made findings regarding the Bakers' petition to terminate the Hes' parental rights. The Bakers filed their petition on June 20, 2001, four (4) months and twenty (20) days after the incident at the Bakers' home on January 28, 2001 which, consequentially, was the last time the Hes visited with AMH prior to the petition being filed. Regarding the Bakers' allegation that the Hes abandoned AMH by failing to support her, the trial court concluded that, between January 28, 2001 and June 20, 2001, the Hes had the ability to pay child support for AMH. The trial court found their ability to provide child support to be evidenced by their May 2001 petition to modify custody wherein they stated as much; the fact that they sent $1,000 to China to provide support for their son Andy; the Hes purchased a new computer shortly after sending their son to China; the Hes took vacations to various American cities between June 4, 1999 and June 20, 2001; and their ability to pay $625 monthly rent during the relevant time period. Although there was no

court order requiring the Hes to pay child support, the trial court concluded that the Hes knew they had an obligation to support AMH. The court found that the Bakers' refusal to accept monetary compensation from the Hes did not relieve the Hes of their obligation to support AMH because the Bakers could not accept money pursuant to their agreement with Mid-South, and they did not expect the Hes to provide support because they agreed to raise AMH until she turned eighteen. As for the items the Hes brought to AMH during their visits, the trial court determined the items to be "of insubstantial economic value and amounted to token support." The trial court deemed such token support to be "consistent with the Hes' intent to absolve themselves of all parental responsibilities to AMH."

Next, the trial court examined the Bakers' allegation that the Hes abandoned AMH by failing to visit her during the four months preceding the petition to terminate the Hes' parental rights. The court noted the following relevant facts: the Hes did not visit AMH between January 28, 2001 and June 20, 2001; the trial court found the Hes' reasons for not returning to the Bakers' home after January 28, 2001 to visit AMH to be lacking in credibility; while the Bakers were willing to allow the Hes to visit, the Hes never called and requested any visitation with AMH after January 28, 2001; although Mother called the Bakers' home on April 2, 2001, her telephone call did not ask for visitation; and immigration officials contacted Father in March, April, or May of 2001, around the time the Hes filed the April 2001 petition to modify the custody order.

Based on the aforementioned facts, the trial court concluded that the Hes abandoned AMH by willfully failing to visit and willfully failing to support her during the four months prior to the Bakers' filing their petition to terminate the Hes' parental rights. The trial court then engaged in a lengthy analysis of the best interest factors and concluded that terminating the Hes' parental rights was in the best interest of A.M.H. Thereafter, the Hes filed a timely notice of appeal to this Court seeking appellate review of the trial court's rulings in this case.

## II.
### ISSUES PRESENTED

The Appellants have presented sixteen issues to this Court setting forth numerous alleged errors by the trial court. The Appellees have joined the Appellants by raising numerous issues of their own which, upon review, merely constitute counter-arguments to the issues put forth by the Appellants. We have chosen to restate the issues raised by the Appellants on appeal as follows:

1.      Whether the trial court erred in denying several pre-trial motions filed by the Appellants, specifically:

<blockquote>
(A)     Did the trial court err in denying the Appellants' motion, pursuant to Rule 60.02 of the Tennessee Rules of Civil Procedure, to set aside the June 4, 1999 consent custody order entered by the juvenile court;

(B)     Did the trial court err in denying the Appellants' motion to dismiss the Appellees' petition for adoption;

(C)     Did the trial court err in denying the Appellants' motion to bifurcate the proceedings below;
</blockquote>

2.     Whether sections 36-1-102 and 36-1-113 of the Tennessee Code violate the Fifth and Fourteenth Amendments to the United States Constitution because they fail to require that natural parents receive prior actual notice of certain information related to the termination of parental rights in the context of a private custody agreement;

3.     Should the aforementioned statutes be deemed constitutional, whether the trial court erred in failing to apply the notice provisions found in section 37-2-403 of the Tennessee Code when the child at issue was placed in the foster care of an agency;

4.     Whether the trial court erred in failing to apply the "superior parental rights doctrine" to Mother's petition to modify the custody June 4, 1999 custody order entered by the juvenile court, thereby rendering a decision on the termination of Mother's parental rights moot;

5.     Whether the trial court erred in applying the statutory grounds for terminating a biological parent's parental rights and in finding the existence of clear and convincing evidence to support such grounds, specifically:

<blockquote>
(A)     Did the trial court err in its application and interpretation of Tennessee law governing the "settled purpose doctrine";

(B)     Did the trial court err by finding that the Appellants' willfully abandoned their daughter by willfully failing to visit and willfully failing to support her for the requisite statutory period; and

(C)     Did the trial court err in finding that Father was not the "legal parent" of the child when the Appellees' filed their petition to terminate his parental rights;
</blockquote>

6.     Whether the trial court erred in finding that termination of the Appellants' parental rights is in the best interest of the child in this case.

The Appellees have raised, as we perceive them, two independent issues for our review:

7.     Whether the trial court erred in consolidating Mother's petition to modify the June 4, 1999 consent custody order with the Appellees' petition to adopt the child and to terminate the Appellants' parental rights; and

8.     Whether the trial court erred in finding that the "persistent conditions" ground for termination did not apply in the instant case because the ground requires the removal of the child by a state agency.

In addition to the arguments raised by the parties on appeal, we are presented with the additional arguments of amici curiae arguing various issues in favor of the Hes on appeal. Specifically, the Childlaw Center of the Loyola University Chicago School of Law, Vanderbilt

School of Law Legal Clinic, The University of Memphis School of Law Child Advocacy Clinic, and the Tennessee Alliance for Legal Services (hereinafter collectively referred to as "Amici") have submitted a combined brief and were permitted to present oral argument to this Court. Their brief primarily addresses the bifurcation issue, the persistent conditions issue, and the standard to be applied to a determination of abandonment. We have also been presented with a brief filed by the Greater Seattle Chapter of the Organization of Chinese Americans, Inc., (hereinafter referred to as "Greater Seattle") addressing social science information specific to the cultural issues present in this appeal. The Embassy of the People's Republic of China (hereinafter referred to as the "Chinese Embassy") has also submitted a letter to this Court expressing its position regarding the "one-child policy" in effect in China.

In reaching a decision on the various issues presented in this case, we have reviewed all of the briefs and materials filed in this Court, the voluminous record created by the trial in this matter, and the arguments of counsel presented at oral argument. Upon doing so, we affirm in part and reverse in part the trial court's decisions in this case.

### III.
#### STANDARD OF REVIEW

"A biological parent's interest in the care, custody, and control of his or her child is among the oldest of the judicially recognized fundamental liberty interests." *Ray v. Ray*, 83 S.W.3d 726, 731 (Tenn. Ct. App. 2001) (citing *Troxel v. Granville*, 530 U.S. 57, 65 (2000)). This fundamental right is protected not only by the Due Process Clause of the Fourteenth Amendment, *Santosky v. Kramer*, 455 U.S. 745, 753 (1982); *Stanley v. Illinois*, 405 U.S. 645, 651 (1972), but also by Article I, section 8 of the Tennessee Constitution as well, *Blair v. Badenhope*, 77 S.W.3d 137, 141 (Tenn. 2002); *Hawk v. Hawk*, 855 S.W.2d 573, 579 (Tenn. 1993). However, the right to the care, custody, and control of one's children is not absolute, and "[i]t continues without interruption only as long as a parent has not relinquished it, abandoned it, or engaged in conduct requiring its limitation or termination." *In re S.M.*, 149 S.W.3d 632, 638–39 (Tenn. Ct. App. 2004) (citations omitted); *see also In re C.W.W.*, 37 S.W.3d 467, 473 (Tenn. Ct. App. 2000).

"The grounds for terminating parental rights in Tennessee are defined by statute." *Jones v. Garrett*, 92 S.W.3d 835, 838 (Tenn. 2002); *see also* Tenn. Code Ann. § 36-1-113(g) (2003). "Termination of a person's rights as a parent is a grave and final decision, irrevocably altering the lives of the parent and child involved and 'severing forever all legal rights and obligations' of the parent." *Means v. Ashby*, 130 S.W.3d 48, 54 (Tenn. Ct. App. 2003) (citing Tenn. Code Ann. § 36-1-113(*l*)(1) (2003)). Because of the gravity of the consequences associated with terminating a biological parent's parental rights to a child, the individuals or entities seeking to terminate the parental rights of the biological parents must prove the existence of the statutory grounds for termination by clear and convincing evidence. *In re Drinnon*, 776 S.W.2d 96, 97 (Tenn. Ct. App. 1988) (citing *Santosky*, 455 U.S. at 769–70); *see also* Tenn. Code Ann. § 36-1-113(c)(1) (2003); *In*

*re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002) (noting that clear and convincing evidence as to any one of the statutorily enumerated grounds will justify the termination of a biological parent's parental rights to a minor child); ***In re M.J.B.***, 140 S.W.3d 643, 653 (Tenn. Ct. App. 2004). The statute also requires that parties seeking to terminate a biological parent's parental rights demonstrate that doing so is in the best interest of the child. *See* Tenn. Code Ann. § 36-1-113(c)(2) (2003); ***In re S.M.***, 149 S.W.3d at 639.

The heightened clear and convincing standard of proof applicable to these cases serves to prevent the unwarranted termination of the biological parents' parental rights in their minor children. ***In re M.W.A.***, 980 S.W.2d 620, 622 (Tenn. Ct. App. 1998). "The 'clear and convincing evidence' standard defies precise definition." ***Means***, 130 S.W.3d at 54. This Court has formulated the following explanation of the standard when reviewing cases of this nature:

> This court recently attempted to describe the clear and convincing evidence standard, explaining that[:]
>
> > [A]lthough it does not require as much certainty as the "beyond a reasonable doubt" standard, the "clear and convincing evidence" standard is more exacting than the "preponderance of the evidence" standard. *O'Daniel v. Messier*, 905 S.W.2d 182, 188 (Tenn. App. 1995); *Brandon v. Wright*, 838 S.W.2d 532, 536 (Tenn. App. 1992). In order to be clear and convincing, evidence must eliminate any serious or substantial doubt about the correctness of the conclusions to be drawn from the evidence. *Hodges v. S.C. Toof & Co.*, 833 S.W.2d 896, 901 n.3 (Tenn. 1992); *O'Daniel v. Messier*, 905 S.W.2d at 188. Such evidence should produce in the fact-finder's mind a firm belief or conviction as to the truth of the allegations sought to be established. *O'Daniel v. Messier*, 905 S.W.2d at 188; *Wiltcher v. Bradley*, 708 S.W.2d 407, 411 (Tenn. App. 1985). In contrast to the preponderance of the evidence standard, clear and convincing evidence should demonstrate that the truth of the facts asserted is "highly probable" as opposed to merely "more probable" than not. *Lettner v. Plummer*, 559 S.W.2d 785, 787 (Tenn. 1977); *Goldsmith v. Roberts*, 622 S.W.2d 438, 441 (Tenn. App. 1981); *Brandon v. Wright*, 838 S.W.2d at 536.

*In re C.W.W.*, 37 S.W.3d 467, 473–74 (Tenn. Ct. App. 2000) (quoting *In re M.C.G.*, No. 01A01-9809-JV-00461, 1999 Tenn. App. LEXIS 327, at *6 (Tenn. Ct. App. May 26, 1999) (no perm. app. filed)); *see also Means*, 130 S.W.3d at 54–55.

"Because of the gravity of their consequences, proceedings to terminate parental rights require individualized decision making." *In re M.J.B.*, 140 S.W.3d 643, 653 (Tenn. Ct. App. 2004) (citing *In re Swanson*, 2 S.W.3d 180, 188 (Tenn. 1999)). To that end, the trial court is required to "enter an order which makes specific findings of fact and conclusions of law within thirty (30) days of the conclusion of the hearing." Tenn. Code Ann. § 36-1-113(k) (2003). These findings facilitate appellate review[12] of parental termination cases, and in the absence of such findings, we must vacate the judgment and remand the case to the trial court for the entry of findings of fact and conclusions of law in compliance with the statute. *See White v. Moody*, No. M2004-01295-COA-R3-PT, 2004 Tenn. App. LEXIS 890, at *11–14 (Tenn. Ct. App. Dec. 30, 2004) (perm. app. denied, 2005 Tenn. LEXIS 265 (Mar. 21, 2005)); *In re M.J.B.*, 140 S.W.3d at 654; *In re Adoption of Muir*, No. M2002-02963-COA-R3-CV, 2003 Tenn. App. LEXIS 831, at *8–10 (Tenn. Ct. App. Nov. 25, 2003) (no perm. app. filed).

Based on the aforementioned principles of law, this Court has formulated the following standard of review to govern appellate review of parental termination cases:

> Because of the heightened burden of proof required by Tenn. Code Ann. § 36-1-113(c)(1), we must adapt Tenn. R. App. P. 13(d)'s customary standard of review for cases of this sort. First, we must review the trial court's specific findings of fact *de novo* in accordance with Tenn. R. App. P. 13(d). Thus, each of the trial court's specific factual findings will be presumed to be correct unless the evidence preponderates otherwise. Second, we must determine whether the

---

[12] We are cognizant of the following statutory duty placed upon this Court by the legislature regarding appellate review of parental termination cases:

> In all cases which are appealed from the decision of a trial court, the appellate court shall, consistent with its rules, expedite the contested termination of parental rights or adoption case by entering such scheduling orders as are necessary to ensure that the case is not delayed, and such case shall be given priority over all other civil litigation in reaching a determination on the status of the adoption, other than child protective services cases arising under title 37, chapter 1, parts 1, 4 and 6.

Tenn. Code Ann. § 36-1-124(b) (2003). On May 12, 2005, Mr. Parrish, counsel for the Bakers, filed the "Appellees' Motion to Dismiss Appeal" with this Court arguing that the Hes' appeal should be dismissed pursuant to the statute of repose codified at section 36-1-113(q) of the Tennessee Code. Mr. Parrish asserted that, since one year had elapsed since the trial court issued its order in this case, this Court no longer possessed subject matter jurisdiction to entertain the appeal. On May 17, 2005, this Court issued an Order denying the Bakers' motion. We concluded that the legislature did not intend for section 36-1-113(q) to divest the appellate courts of this state of subject matter jurisdiction to evaluate a parental termination order that was timely filed in the appellate court.

> facts, either as found by the trial court or as supported by the preponderance of the evidence, clearly and convincingly establish the elements required to terminate a biological parent's parental rights. *Jones v. Garrett*, 92 S.W.3d at 838; *In re Valentine*, 79 S.W.3d at 548-49; *In re Adoption of Muir*, 2003 Tenn. App. LEXIS 831, 2003 WL 22794524, at \*2; *In re Z.J.S.*, 2003 Tenn. App. LEXIS 415, No. M2002-02235-COA-R3-JV, 2003 WL 21266854, at \*10 (Tenn. Ct. App. June 3, 2003) (No Tenn. R. App. P. 11 application filed); *Ray v. Ray*, 83 S.W.3d at 733; *In re L.S.W.*, 2001 Tenn. App. LEXIS 659, No. M2000-01935-COA-R3-JV, 2001 WL 1013079, at \*5 (Tenn. Ct. App. Sept. 6, 2001), *perm. app. denied* (Tenn. Dec. 27, 2001).

*In re M.J.B.*, 140 S.W.3d at 654. Moreover, we are mindful that cases of this nature often hinge on the testimony of the witnesses at trial and, in turn, the trial court's findings regarding the credibility of those witnesses. Accordingly, we are bound by the following additional principle of law:

> Unlike appellate courts, trial courts are able to observe witnesses as they testify and to assess their demeanor, which best situates trial judges to evaluate witness credibility. *See State v. Pruett*, 788 S.W.2d 559, 561 (Tenn. 1990); *Bowman v. Bowman*, 836 S.W.2d 563, 566 (Tenn. Ct. App. 1991). Thus, trial courts are in the most favorable position to resolve factual disputes hinging on credibility determinations. *See Tenn-Tex Properties v. Brownell-Electro, Inc.*, 778 S.W.2d 423, 425-26 (Tenn. 1989); *Mitchell v. Archibald*, 971 S.W.2d 25, 29 (Tenn. Ct. App. 1998). Accordingly, appellate courts will not re-evaluate a trial judge's assessment of witness credibility absent clear and convincing evidence to the contrary. *See Humphrey v. David Witherspoon, Inc.*, 734 S.W.2d 315, 315-16 (Tenn. 1987); *Bingham v. Dyersburg Fabrics. Co.*, Inc., 567 S.W.2d 169, 170 (Tenn. 1978).

*Wells v. Tenn. Bd. of Regents*, 9 S.W.3d 779, 783 (Tenn. 1999); *see also Jones v. Garrett*, 92 S.W.3d 835, 838 (Tenn. 2002); *In re C.T.S.*, 156 S.W.3d 18, 22 (Tenn. Ct. App. 2004).


## IV.
### DISCUSSION


The crux of this appeal is whether the trial court erred in finding that the Bakers proved, by clear and convincing evidence, that the Hes abandoned A.M.H. by willfully failing to visit and willfully failing to support her for the four months immediately preceding the filing of the Bakers'

petition to terminate the Hes' parental rights. However, before we are able to reach the issues related to the trial court's findings in that regard, we must address other issues presented by the parties.

## A.
### *Order Consolidating the Bakers' Petition with Mothers' Petition to Modify Custody*

On May 29, 2001, Mother filed her petition in the juvenile court requesting a modification of the June 4, 1999 consent custody order. On June 20, 2001, the Bakers filed their "Petition for Adoption and Termination of Parental Rights" in the chancery court. This effectively vested the chancery court with "exclusive jurisdiction of all matters pertaining to the child . . . except for allegations of delinquency, unruliness or truancy of the child pursuant to title 37." Tenn. Code Ann. § 36-1-116(f) (2003); *see also State v. R.S.*, No. M2002-00919-COA-R3-CV, 2003 Tenn. App. LEXIS 657, at *65 (Tenn. Ct. App. Sept. 11, 2003) (no perm. app. filed). ("The exclusive jurisdiction of juvenile court is superseded when a petition for termination of parental rights is filed in another court with concurrent jurisdiction to make that determination."). On September 13, 2003, the Bakers filed a motion asking the chancery court to consolidate, for joint trial, their petition to terminate the Hes' parental rights with Mother's petition to modify the June 4, 1999 consent order entered by the juvenile court. On March 29, 2004, after the parties finished presenting evidence in this case, the chancery court entered an order granting the Bakers' motion to consolidate.

Strangely enough, the Bakers now ask this Court to determine whether the trial court erred in granting their motion at trial. Rule 6(a)(1) and (a)(3) of the Rules of the Court of Appeals of Tennessee provides that written argument by a party shall contain a statement indicating the erroneous action by the trial court and how the party was prejudiced by such error. The section of the Appellees' brief addressing this issue fails to assert any basis for finding error on the part of the trial court in granting their motion. Instead, the Appellees devote their entire argument in this section of the brief to issues unrelated to the question they ask this Court to decide. Accordingly, we find this issue to be wholly without merit.

## B.
### *Propriety of the Chancery Court's Rulings on Certain Pre-Trial Motions Filed by the Hes*

On appeal, the Hes take issue with the chancery court's rulings on various matters prior to the trial in this matter. In turn, we will address the merits of these issues collectively in this section of the Opinion.

## 1.
### Motions to Set Aside the June 4, 1999 Consent Custody Order Pursuant to Rule 60.02

On appeal, the Hes argue that the chancery court erred in denying their motions to set aside the juvenile court's June 4, 1999 consent order awarding custody of A.M.H. to the Bakers. On September 12, 2003, the Hes filed a motion with the trial court asking the chancery court to set aside, pursuant to Tenn. R. Civ. P. 60.02,[13] the June 4, 1999 consent order. In this motion, the Hes conceded that the June 4, 1999 order provides that the Hes "have been fully advised of their legal rights and that a hearing before the Court is hereby expressly waived." However, they argued that, in reality, they were not fully advised of their legal rights prior to signing the order. They point to the following facts to support this assertion: Mother did not receive legal advice prior to signing the order; Mr. Weaver met with Father on June 2, 1999, but he did not meet with Mother prior to the date they signed the order; on the day they went to juvenile court to sign the order, Ms. Chunn, Ms. Cloud, and Pastor Yau, all unlicensed attorneys, attempted to advise Mother of the document's meaning, but they did not read it to her; and the juvenile court did not conduct a hearing to ensure that the Hes understood what they had been told up to that point or to explain the purpose and effect of the order. According to the Hes, these facts establish that they were not fully advised of their rights and did not expressly waive their right to a hearing as the order states, therefore, the consent order should be deemed void *ab initio*. On September 25, 2003, the Hes filed an amended motion wherein they argued that, in addition to the arguments contained in the aforementioned motion, the consent order should be vacated because the juvenile court failed to comply with sections 34-2-101, 34-2-103, 34-2-104, and 32-2-105 of the Tennessee Code. These arguments were aimed at addressing the "guardianship of the person" language which Ms. Cloud testified she inserted into the order based on her understanding of the facts.

On April 7, 2004, the chancery court entered an order denying the Hes' first motion concluding, in relevant part, as follows:

> The Consent Order Awarding Custody, signed by both Respondents, entered in Juvenile Court on June 4, 1999, states that the parties were fully advised of their legal rights. The Court finds that Mr. He was fully advised of his legal rights by Attorney Weaver. The Court also finds that Mrs. He voluntarily waived her right to receive legal advice by not attending the meeting, by telling Mr. He that she was ready to proceed, and by relying on Mr. He to communicate Attorney Weaver's explanation of the parties' rights to her. Thus, the Consent Order Awarding Custody entered on June 4,

---

[13] The Hes relied on the following provisions of the rule in support of their motion:

On motion and upon such terms as are just, the court may relieve a party or the party's legal representative from a final judgment, order or proceeding for the following reasons: . . . (3) the judgment is void; . . . or (5) any other reason justifying relief from the operation of the judgment. The motion shall be made within a reasonable time . . . .

Tenn. R. Civ. P. 60.02 (2004).

1999, is not facially defective, nor is it void ab initio or voidable pursuant to Rule 60.02(3) and (5) of the Tennessee Rules of Civil Procedure.

. . . .

The Consent Order Awarding Custody was entered by the Juvenile Court on June 4, 1999. There was no motion filed to set aside the Consent Order. The Respondents filed their first Petition to Modify the custody order in Juvenile Court on May 3, 2000, and Respondents made no request in that Petition to set aside the Consent Custody Order. The Juvenile Court denied the May 3, 2000, Petition to Modify on June 28, 2000. No appeal was taken by Respondents to the Order Denying the Petition to Modify. The Respondents filed a second Petition to Modify the Consent Custody Order in Juvenile Court on April 9, 2001. Again, the Respondents made no request to set aside the Consent Custody Order. The Petitioners herein, the Bakers, then filed their Petition for Adoption and Termination of Parental Rights on June 20, 2001, and the matter was transferred to this court. Respondents filed an answer and an amended answer to the Petition for Adoption and Termination of Parental Rights and neither the answer nor the amended answer contained a request to set aside the June 4, 1999, Consent Custody Order pursuant to Rule 60.02. Then the Respondents filed the instant motion on September 12, 2003, approximately four years and three months after the entry of the June 4, 1999 Consent Order Awarding Custody. T.R.C.P. 60.02 requires that this type of motion be made within a reasonable time. The Court finds that this motion was not filed within a reasonable time. Furthermore, the Court finds that Respondents' Motion Pursuant to Rule 60.02 to Set Aside Consent Order Awarding Custody Entered June 4, 1999, is barred by res judicata, collateral estoppel and the doctrine of laches.

On May 12, 2004, the chancery court entered another order addressing the Hes' amended petition, wherein the chancery court denied the Hes' amended motion and concluded that the juvenile court complied with the applicable statutes when entering the order.

Rule 60.02 is "designed to strike a proper balance between the competing principles of finality and justice." *Jerkins v. McKinney*, 533 S.W.2d 275, 280 (Tenn. 1976). "The relief provided under Rule 60.02 is an exceptional remedy," *Nails v. Aetna Ins. Co.*, 834 S.W.2d 289, 294 (Tenn. 1992) (citing *Toney v. Mueller Co.*, 810 S.W.2d 145, 146 (Tenn. 1991)), "the purpose of which 'is to alleviate the effect of an oppressive or onerous final judgment,'" *Black v. Black*, 166 S.W.3d 699, 703 (Tenn. 2005) (quoting *Killion v. Dep't of Human Services*, 845 S.W.2d 212, 213 (Tenn. 1992)).

"Rule 60.02 acts as an escape valve from possible inequity that might otherwise arise from the unrelenting imposition of the principle of finality embedded in our procedural rules." ***Thompson v. Firemen's Fund Ins. Co.***, 798 S.W.2d 235, 238 (Tenn. 1990). However, due to the importance of finality in cases, "the 'escape valve' should not be easily opened." ***Banks v. Dement Constr. Co., Inc.***, 817 S.W.2d 16, 18 (Tenn. 1991)( quoting ***Toney v. Mueller***, 810 S.W.2d 145, 146 (Tenn. 1991)).

"To set aside a judgment under rule 60.02 the burden is upon the movant to prove that he is entitled to relief, and there must be proof of the basis on which relief is sought." ***Id***; ***see also Henry v. Goins***, 104 S.W.3d 475, 482 (Tenn. 2003). When reviewing a trial court's decision to grant or deny relief pursuant to Rule 60.02, we employ the following standard of review:

> [W]e give great deference to the trial court. *See Underwood v. Zurich Ins. Co.*, 854 S.W.2d 94, 97 (Tenn. 1993). Consequently, we will not set aside the trial court's ruling unless the trial court has abused its discretion. *See id.* An abuse of discretion is found only when a trial court has "'applied an incorrect legal standard, or reached a decision which is against logic or reasoning that caused an injustice to the party complaining.'" *State v. Stevens*, 78 S.W.3d 817, 832 (Tenn. 2002) (quoting *State v. Shuck*, 953 S.W.2d 662, 669 (Tenn. 1997)). The abuse of discretion standard does not permit an appellate court to merely substitute its judgment for that of the trial court. *See Eldridge v. Eldridge*, 42 S.W.3d 82, 85 (Tenn. 2001).

***Henry***, 104 S.W.3d at 479; ***see also Banks***, 817 S.W.2d at 18.

The Hes go to great efforts to explain their lack of notice and lack of adequate counsel prior to signing the order at issue. However, we are cognizant of the fact that these issues were a matter of contention at trial. Both parties presented testimony addressing the issue of whether the Hes understood the purpose and effect of the June 4, 1999 consent order awarding custody of A.M.H. to the Bakers. Based on the testimony offered at trial, the chancery court held that the Hes were adequately informed of the order's purpose and effect, and the Hes either had adequate counsel or had an opportunity to seek counsel regarding this issue. We give these credibility determinations great weight on appeal, and we find no clear and convincing evidence in the record to justify reaching a different conclusion regarding such testimony. ***See Wells v. Tenn. Bd. of Regents***, 9 S.W.3d 779, 783 (Tenn. 1999).

Of the most significance to our analysis of this issue is the realization that Rule 60.02 requires that the motion "shall be made within a reasonable time." Tenn. R. Civ. P. 60.02 (2004). What constitutes a reasonable time is a question of fact, and not a question of law. ***See Thompson***, 798 S.W.2d at 238; ***Rogers v. Estate of Russell***, 50 S.W.3d 441, 445 (Tenn. Ct. App. 2001). On appeal, the Hes fail to offer any justification for why they waited in excess of four years to file their Rule 60.02 motion. Any argument that they did not understand the need to file the motion or did not

have adequate representation to advise them to file such a motion must fail. As the trial court noted in its order, the Hes had access to legal representation (as evidenced by the various attorneys representing them in their civil and criminal matters) both before and after the June 4, 1999 custody order was entered. Even after the June 4, 1999 order had been entered, Ms. Cloud instructed the Hes during a subsequent visit to juvenile court to hire a lawyer or seek counsel through legal services, which they chose not to do. Moreover, after the Bakers filed their petition to terminate the Hes' parental rights on June 20, 2001, the Hes' attorney, Mr. Sossaman, filed an answer on their behalf shortly thereafter. Despite having a lawyer dedicated solely to addressing the Bakers' petition at this stage in the litigation, the Hes waited until September 12, 2003, over one year after the Bakers filed their petition, to file their Rule 60.02 motion in this case. Accordingly, we find that the Hes did not file their Rule 60.02 motion within a reasonable time as required by the rule, and we affirm the trial court's ruling on this issue.

### 2.
### Order Denying Hes' Motion to Dismiss Bakers' Petition for Adoption

The Hes filed a motion with the trial court on October 2, 2003, asking the court to enter an order dismissing the Bakers' adoption petition. In support of their petition, the Hes relied on section 36-1-119(d) of the Tennessee Code, which provides as follows:

> If no appeal has been taken from any order of the court, the court *must* complete or dismiss the *adoption proceeding* by entering a final order *within two (2) years of the filing of the petition*, unless the petitioner shows good cause why such final order should not be entered.

Tenn. Code Ann. § 36-1-119(d) (2003) (emphasis added). The Bakers filed their petition to adopt A.M.H. and terminate the Hes' parental rights to A.M.H. on June 20, 2001. As of June 20, 2003, their petition had been pending for two years. The Hes argue that the Bakers failed to request an extension of time under Rule 6.02 of the Tennessee Rules of Civil Procedure, which provides:

> When *by statute* . . . an act is required or allowed to be done at or within a specified time, the court *for cause shown* may, at any time in its discretion, (1) with or without motion or notice order the period enlarged if request thereof is made before the expiration of the period originally prescribed or as extended by a previous order, or (2) upon motion made after the expiration of the specified period permit the act to be done, *where the failure to act was the result of excusable neglect* . . . .

Tenn. R. Civ. P. 6.02 (2004) (emphasis added). The Hes argued at trial, and again on appeal, that, since the Bakers did not file a request for an extension of time under Rule 6.02, they cannot show "good cause" for extending the two year period and that they cannot establish that their failure to file such request constitutes "excusable neglect." Accordingly, the Hes urged the trial court, and now this Court, to find that the Bakers' adoption petition must be dismissed pursuant to the statute. On April 6, 2004, the trial court entered an order denying the Hes' motion noting that the court had before it a petition for adoption coupled with a petition to terminate the Hes' parental rights.

Prospective adoptive parents have standing to petition a court to terminate the parental rights of the biological parents, and they may include in their petition for adoption a request that the parental rights of the biological parents be terminated. *See* Tenn. Code Ann. § 36-1-113(b) (2003). Thus, the chancery court properly had before it an adoption petition containing a request to terminate the Hes' parental rights. Section 36-1-113 of the Tennessee Code, governing termination of parental rights, recognizes that a petition for adoption and petition for termination of parental rights are two distinct legal processes. *See* Tenn. Code Ann. § 36-1-113(b), -113(d)(4), -113(*l*)(1), -113(*l*)(2), -113(m), -113(p) (2003). "The conclusion is that the state and federal constitutions require that the natural [parent's] parental rights be determined before the court may proceed with the issue of adoption." *Nale v. Robertson*, 871 S.W.2d 674, 680 (Tenn. 1994) (finding invalid a statute which allowed a court to enter a decree of adoption based on the best interest of the child without first determining if the biological parent's parental rights should be terminated); *see also Jones v. Garrett*, 92 S.W.3d 835, 840 (Tenn. 2002) (reaffirming the Court's prior statement in *Nale*). Section 36-1-119 of the Tennessee Code requires the trial court to "complete or dismiss the *adoption* proceeding . . . within two (2) years of the filing of the petition." Tenn. Code Ann. § 36-1-119(d) (2003) (emphasis added).

The Hes have cited to a decision by our supreme court in *Clements v. Morgan*, 296 S.W.2d 874 (Tenn. 1956), in support of their position on appeal. In *Clements*, the supreme court, when dealing with the precursor to the present statute, held that the statute required an adoption petition to be completed or dismissed within two years, and the statute "must be strictly complied with." *Clements*, 296 S.W.2d at 96–97. However, the decision in *Clements* is easily distinguished from the facts in the present case. In *Clements*, the only petition filed in the trial court was one for adoption. *Id*. at 95. There was no need to adjudicate the issue of terminating the biological parent's parental rights because the biological parents filed a written consent agreeing to allow the petitioners to adopt the child. *Id*. It was only when the Tennessee Department of Children's Services sought to intervene in the case that the adoption petition was delayed beyond the two year statutory period. *Id*. at 96. In the present case, the trial court was faced with a petition to terminate the parental rights of the Hes along with a petition to adopt A.M.H. As our supreme court instructed in *Nale*, the trial court must necessarily determine if a termination of parental rights is warranted before it may proceed to the adoption petition. Accordingly, we affirm the trial court's decision to deny the Hes' motion.

**3.**

**Motion to Bifurcate the Proceedings**

On June 23, 2003, the Hes filed a motion asking the trial court to bifurcate the proceedings in this matter. Specifically, the Hes asserted that, pursuant to the statutory and case law governing termination of parental rights, the trial court was required first to determine whether the Bakers proved that the Hes' willfully abandoned A.M.H. by clear and convincing evidence. After concluding a proceeding on the grounds for termination, only then could the court conduct a separate proceeding to address the best interest analysis. After conducting a hearing on the Hes' motion, the chancery court entered an order on January 28, 2004, *nunc pro tunc* to September 4, 2003, denying the Hes' motion.

Section 36-1-113(c) of the Tennessee Code provides as follows:

> (c) Termination of parental or guardianship rights must be based upon:
>> (1) A finding by the court by clear and convincing evidence that the grounds for termination or parental or guardianship rights have been established; and
>> (2) That termination of the parent's or guardian's rights is in the best interests of the child.

Tenn. Code Ann. § 36-1-113(c) (2003). On appeal, the Hes argue that section 36-1-113(c) of the Tennessee Code implies that a court must conduct a separate evidentiary hearing to address the grounds for termination and the best interest of the child before it may terminate parental rights. They also cite to a decision by this Court, wherein we stated that "[b]efore the court may inquire as to whether termination of parental rights is in the best interest of the child, the court first must determine that the grounds for termination have been established by clear and convincing evidence." *K.S.O.H. v. J.W.B., Jr.*, No. E2001-00055-COA-R3-CV, 2001 Tenn. App. LEXIS 740, at *11 (Tenn. Ct. App. Oct. 4, 2001) (no perm. app. filed). The Hes contend that a bifurcated proceeding would ensure that the trial court could decide the existence of grounds for termination without being influenced by evidence tending to prove that termination is in the best interest of the child.

The Hes' argument is echoed by the Amici in their brief. In addition, the Amici argue that federal precedent requires bifurcation, directing our attention to the United States Supreme Court's decision in *Santosky v. Kramer*, 455 U.S. 745 (1982). In *Santosky*, the Court made the following observation:

> The State bifurcates its permanent neglect proceeding into "factfinding" and "dispositional" hearings. Fam. Ct. Act §§ 622, 623. At the factfinding stage, the State must prove that the child has been "permanently neglected," as defined by Fam. Ct. Act §§ 614.1.(a)-(d) and Soc. Serv. Law § 384-b.7.(a). *See* Fam. Ct. Act § 622. The

> Family Court judge then determines at a subsequent dispositional hearing what placement would serve the child's best interests. §§ 623, 631.

*Santosky*, 455 U.S. at 748. It is clear, however, that the Court in *Santosky* was summarizing a state statute *requiring* bifurcation. Section 36-1-113(c) of the Tennessee Code does not contain a similar requirement.

The Amici also assert that "national precedent" favors bifurcation, and they contend that "[o]ne of the most in-depth rationales for bifurcation" can be found in *Champagne v. Welfare Division of the Nevada State Department of Human Resources*, 691 P.2d 849 (Nev. 1984). In *Champagne*, the Nevada Supreme Court made the following statement:

> We borrow from Ketcham and Babcock to state the general proposition in these terms: "The jurisdictional question is whether the biological parent, by behavior, has forfeited all rights in the child. The dispositional question is whether terminating parental rights would be in the best interest of the child. The first question focuses on the action, or inaction, of the natural parent. The second focuses on the placement which will be most beneficial to the child. If it is first decided that the parent has forfeited his rights in the children, then the court moves on to the second question. On the other hand, if it is decided that the biological parent's behavior does not violate minimum standards of parental conduct so as to render the parent unfit, then the analysis ends and termination is denied. In these latter instances, the court never reaches the question of whether the child's future well-being would be better served by placement with the substitute or psychological parent."

*Champagne*, 691 P.2d at 647. However, our independent research has revealed that the Nevada Supreme Court overruled its decision in *Champagne* in 2000, holding as follows:

> [T]his court in *Champagne* interpreted the statute and announced a two-step analysis to be applied when deciding whether to terminate parental rights. According to *Champagne*, the first step in the analysis requires that there be what the court characterized as "jurisdictional" grounds for termination. *Id*. at 640, 691 P.2d at 849 . . . . If jurisdictional grounds for termination are not established, the inquiry ends. *Id*. at 647, 691 P.2d at 854. If jurisdictional grounds are established, the analysis turns to whether dispositional grounds exist for termination.
>
> . . . .

-52-

In 1987, the legislature responded to our decision in *Champagne*, and again amended the termination statute . . . . The legislative history indicates that the legislature was concerned that the *Champagne* decision bifurcated the issues regarding children's rights and parent's rights in termination proceedings. *See* Hearing on A.B. 308 Before the Nevada Assembly Committee on Judiciary, 64th Leg. (Nev., March 20, 1987).

. . . .

Our adherence to the *Champagne* standard has resulted in the improper application of the termination statute. The amendments to NRS 128.105 demonstrate the legislature's frustration with *Champagne* and its progeny, which place too much emphasis on the conduct of the parents instead of on the best interests of the child. Clearly, the legislative amendments of NRS 128.105 illustrate the legislature's concern with protecting the best interests of the child.

. . . .

Accordingly, we now abandon *Champagne's* strict adherence to a finding of parental fault to terminate parental rights before the district court considers the best interests of the child. Application of the *Champagne* standard may have resulted in an artificial determination by the district court concerning parental fault, because such a determination cannot be made without considerations of how the parents' conduct has impacted the child. The impact of parental conduct on the child is, in turn, one consideration in determining the best interests of the child. We will no longer require district courts, in the name of determining parental fault, to consider rigidly and formulaically the conduct of the parents in a vacuum, without considering the best interests of the child. Instead, in conformance with NRS 128.105, we adopt a best interests/parental fault standard for termination cases. Accordingly, the district court in determining whether to terminate parental rights must consider both the best interests of the child and parental fault.

***In re Termination of Parental Rights as to N.J.***, 8 P.3d 126, 130–32 (Nev. 2000).

We are unaware of any case law, and neither the Appellants or the Amici cite to this Court any authority, holding that the federal or state constitutions require that parental termination proceedings in this state must be bifurcated. At present, the legislature of this state has deemed it the policy of this state that parental termination proceedings not be bifurcated. ***See*** Tenn. Code Ann.

§ 36-1-113(c) (2003) (noting the absence of any directive to the courts of this state to bifurcate termination proceedings).  "The Legislature is more or less the body who forms our public policy." *McKesson & Robinson, Inc. v. Gov't Employees Dep't Store, Inc.*, 365 S.W.2d 890, 894 (Tenn. 1963).  As such, we find the following statement by our supreme court to control our resolution of this issue:

> There is nothing in our Constitution from which it can be inferred that a policy different from that stated should never be adopted by the legislature.  That being so, the legislative department of the State government has exclusive and ample power to determine the State's policy.  When the legislature, acting within its constitutional powers, has spoken upon a particular subject, its utterance is the public policy of the State upon that subject, and the courts are without power to read into the Constitution a restraint of the legislature with respect thereto.  The prohibition must be expressed or necessarily implied from that which is expressed. We fail to find any such restraint in our Constitution.
> . . . ["]All questions of policy are for the determination of the legislature, and not for the courts, and there is no public policy which prohibits the legislature from doing anything which the Constitution does not prohibit.  Hence the courts are not at liberty to declare a law void as in violation of public policy. . . . Where courts intrude into their decrees their opinion on questions of public policy, they in effect constitute the judicial tribunals as lawmaking bodies in usurpation of the powers of the legislature."  6 R. C. L., section 108, pp. 108, 109.

*Cavender v. Hewitt*, 239 S.W. 767, 768 (Tenn. 1921); *see also Crawford v. Buckner*, 839 S.W.2d 754, 759 (Tenn. 1992); *Smith v. Gore*, 728 S.W.2d 738, 746 (Tenn. 1987).  As the legislature of Nevada chose to act in light of the Nevada Supreme Court's decision in *Champagne*, so too may the Tennessee legislature act, if it chooses, to require the courts of this state to conduct a bifurcated proceeding in parental termination cases. In the absence of such direction, however, we affirm the trial court's decision to deny the Hes' motion to bifurcate the proceedings at trial.

### C.
### *Constitutionality of section 36-1-102 and section 36-1-113 of the Tennessee Code*

The Hes argue that the trial court erred by failing to find that section 36-1-102 and section 36-1-113 of the Tennessee Code violate the protections afforded them by the United States Constitution by failing to require that biological parents receive actual notice of the following: the statutory definition of abandonment; the criteria and procedures used for terminating parental rights; information concerning the law of abandonment; information regarding the necessity for the

assistance of counsel; and a warning that failure to visit or failure to support the child for the statutory period may constitute grounds for terminating their parental rights. Specifically, the Hes assert that the lack of notice in this case violated their constitutional rights protected by the Fifth and Fourteenth Amendments to the United States Constitution.

The Hes make reference to the notice provisions found in Title 37, Chapter 2, Part 4 of the Tennessee Code which govern the placement of juveniles. Specifically, the Hes direct our attention to section 37-2-403(a)(2) of the Tennessee Code, which provides, in relevant part, as follows:

> (2) (A) The permanency plan for any child in foster care shall include a statement of responsibilities between the parents, *the agency* and the caseworker of such *agency*. Such statements shall include the responsibilities of each party in specific terms and shall be reasonably related to the achievement of the goal specified in subdivision (a)(1). The statement *shall include the definitions of "abandonment" and "abandonment of an infant" contained in § 36-1-102 and the criteria and procedures for termination of parental rights*. Each party shall sign the statement and be given a copy of it. The court must review the proposed plan, make any necessary modifications and ratify or approve the plan within sixty (60) days of the foster care placement . . . .
>
> (B) (i) The parents or legal guardians of the child shall receive notice to appear at the court review of the permanency plan or the plan of care and *the court shall explain on the record the law relating to abandonment contained in § 36-1-102, and shall explain that the consequences of failure to visit or support the child will be termination of the parents' or guardians' rights to the child, and the court will further explain that the parents or guardians may seek an attorney to represent the parents or guardians in any termination proceeding*. If the parents or legal guardians are not at the hearing to review the permanency plan or plan of care, the court shall explain to the parents or guardians at any subsequent hearing regarding the child held thereafter, that the consequences of failure to visit or support the child will be termination of the parents' or guardians' rights to the child and that they may seek an attorney to represent the parents or guardians in a termination proceeding.

Tenn. Code Ann. § 37-2-403(a)(2) (2003) (emphasis added). An examination of section 36-1-102 and 36-1-113 of the Tennessee Code, which govern adoptions, reveals the absence of similar notice provisions in those statutes.

In assessing the Hes' arguments related to the constitutionality of the two adoption statutes at issue, we are mindful of the following:

> When faced with such a constitutional assault on a statute, this court must indulge every presumption and resolve every doubt in favor of the constitutionality of the legislative enactment. *See Riggs v. Burson*, 941 S.W.2d 44, 51 (Tenn.), *cert. denied*, 522 U.S. 982, 139 L. Ed. 2d 380, 118 S. Ct. 444 (1997); *Vogel v. Wells Fargo Guard Servs.*, 937 S.W.2d 856, 858 (Tenn. 1996). The party challenging the constitutionality of a statute "bears a heavy burden of overcoming that presumption." *Helms v. Tennessee Dep't of Safety*, 987 S.W.2d 545, 550 (Tenn. 1999).

*In re Adoption of M.J.S.*, 44 S.W.3d 41, 61 (Tenn. Ct. App. 2000); *see also Gallaher v. Elam*, 104 S.W.3d 455, 459 (Tenn. 2003); *In re Adoption of Female Child*, 42 S.W.3d 26, 31–32 (Tenn. 2001).

The Hes assert that, since they have a fundamental right to the care, custody, and control of their daughter, *see Troxel v. Granville*, 530 U.S. 57, 65 (2000); *Santosky v. Kramer*, 455 U.S. 745, 753 (1982); *Hawk v. Hawk*, 855 S.W.2d 573, 579 (Tenn. 1993), the Fifth and Fourteenth Amendments to the United States Constitution require that the notice provisions applicable to cases involving the Tennessee Department of Children's Services apply with equal force to non-agency custody arrangements between private individuals as well. The parties do not dispute that the Hes never received any of the forms of notice required by section 37-2-403(a)(2) of the Tennessee Code at any time before or after the juvenile court entered the consent order on June 4, 1999 transferring custody of A.M.H. to the Bakers. The Hes contend that, had they received this information, they would have taken additional steps to prevent the termination of their parental rights.

In support of their position on appeal, the Hes cite to the following statement by the United States Supreme Court in *Santosky v. Kramer*:

> The fundamental liberty interest of natural parents in the care, custody, and management of their child does not evaporate simply because they have not been model parents or have lost temporary custody of their child *to the State*. Even when blood relationships are strained, parents retain a vital interest in preventing the irretrievable destruction of their family life. If anything, persons faced with forced dissolution of their parental rights have a more critical need for procedural protections than do those resisting *state intervention* into ongoing family affairs. When *the State* moves to destroy weakened familial bonds, it must provide the parents with fundamentally fair procedures.

*Santosky*, 455 U.S. at 753–54 (emphasis added). The Hes also seek to persuade this Court to apply a notice requirement similar to that found in section 37-2-403(a)(2) of the Tennessee Code to private custody agreements by citing to the decisions of this Court applying that statute and holding that a parent's failure to receive the required statutory notice warranted a reversal of the trial court's finding of abandonment. *See In re S.M.*, 149 S.W.3d 632, 637–38 (Tenn. Ct. App. 2004); *State v. Demarr*, No. M2002-02603-COA-R3-JV, 2003 Tenn. App. LEXIS 569, at *29–32 (Tenn. Ct. App. Aug. 13, 2003) (no perm. app. filed); *In re J.J.C.*, 148 S.W.3d 919, 926–27 (Tenn. Ct. App. 2004); *In re C.L.H.*, No. M2000-02799-COA-R3-JV, 2001 Tenn. App. LEXIS 424, at *13–15 (Tenn. Ct. App. June 5, 2001) (no perm. app. filed); *Pierce v. Bechtold*, 448 S.W.2d 425, 429–30 (Tenn. Ct. App. 1969).

The Fourteenth Amendment to the United States Constitution provides as follows: "nor shall *any State* deprive any person of life, liberty, or property without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws."[14] U.S. Const. amend. XIV, §1. In addressing claims premised upon the Fourteenth Amendment, the Tennessee Supreme Court has noted:

> It is well established that the due process protections of the Fourteenth Amendment do not come into play *unless there is some action on the part of the State. See Shelley v. Kraemer*, 334 U.S. 1, 13, 92 L. Ed. 1161, 68 S. Ct. 836 (1948); *State ex rel. Hawkins v. Luttrell*, 221 Tenn. 32, 424 S.W.2d 189, 190 (Tenn. 1968); *State ex rel. Johnson v. Heer*, 219 Tenn. 604, 412 S.W.2d 218, 219 (Tenn. 1966). Therefore, in order to state a cause of action for a due process violation under the Fourteenth Amendment, *state action must be alleged*.

*City of Cookeville v. Humphrey*, 126 S.W.3d 897, 906 (Tenn. 2004) (emphasis added); *see also State ex rel. Johnson v. Heer*, 412 S.W.2d 218, 219 (Tenn. 1966) ("[I]n order for the defendant's rights under the Fourteenth Amendment to come into play, there must be some action on the part of the State that deprives him of due process of law and/or equal protection of the law.").

The Hes focus their arguments on appeal to a lack of notice regarding the abandonment ground for terminating parental rights, however, they do not specifically state which individuals or entities were constitutionally required to provide them notice. Section 36-1-102(1) of the Tennessee Code, which defines "abandonment," requires the courts of this state to focus on the biological parents' conduct within the four (4) months immediately preceding the filing of the petition to terminate their parental rights. *See* Tenn. Code Ann. § 36-1-102(1)(A) – (E) (2001). Thus,

---

[14] We also note that the Hes have asserted a violation of the Fifth Amendment to the United States Constitution as well. The Fifth Amendment has been repeatedly held to apply to actions by the federal government, not the state government. *See Camden Fire Ins. Ass'n v. Haston*, 284 S.W. 905, 908 (Tenn. 1925); *State v. Norvell*, 191 S.W. 536, 539 (Tenn. 1916). The Hes fail to demonstrate any action on the part of the federal government regarding their lack of notice in this case. Accordingly, this component of their argument is without merit.

assuming for purposes of our discussion here that a party did have a duty to provide notice to the Hes during this period of time, we must necessarily focus our attention on those individuals or entities which had the ability to influence the behavior of the parents during this statutory period. When Mid-South ceased its involvement in this case on June 4, 1999 (the date of the juvenile court's consent custody order), the Bakers took over responsibility for A.M.H. Thus, it is apparent that the Hes are asserting that the Bakers, private individuals, violated their due process rights by failing to provide them with notice comparable to that required by section 37-2-403 of the Tennessee Code.

Regarding the Bakers, the Hes are unable to establish the requisite state action necessary to pursue their due process claims in this case. Moreover, their reliance on the aforementioned cases actually undermines their position on appeal. In *In re J.J.C.*, *Demarr*, and *In re C.L.H.*, the Tennessee Department of Children's Services, a *state agency*, had custody of the children and filed the petition to terminate the parents' parental rights, and this Court addressed the *state's* failure to provide the required statutory notice to the parents in each of those cases. ***In re J.J.C.***, 148 S.W.3d at 921; ***Demarr***, 2003 Tenn. App. LEXIS 569, at \*3–4; ***In re C.L.H.***, 2001 Tenn. App. LEXIS 424, at \*4–5. Thus, in those cases we were dealing specifically with action on the part of the state which affected the parental rights of a parent to their minor child. In *Santosky*, the United States Supreme Court expressly stated that, "[w]hen *the State* moves to destroy weakened familial bonds, *it* must provide the parents with fundamentally fair procedures." ***Santosky***, 455 U.S. at 753–54 (emphasis added). In *In re S.M.*, a licensed child-placement agency filed the petition to terminate the parental rights of the biological parents, but this Court did not address any failure on the part of the agency to provide notice when ruling that the parent did not willfully abandon the child. ***In re S.M.***, 149 S.W.3d at 643–44 (finding that the agency failed to present clear and convincing evidence that the biological parent willfully abandoned the child). Our decision in *Pierce* is not persuasive because our decision in that case constitutes a common law ruling which, as the Hes acknowledge in their brief, was handed down prior to the codification of the notice provisions in section 37-2-403 of the Tennessee Code. ***See Pierce***, 448 S.W.2d at 429–30.

In addressing the Fourteenth Amendment to the United States Constitution, the United States Supreme Court has stated as follows:

> It is State action of a particular character that is prohibited. *Individual invasion of individual rights is not the subject-matter of the amendment*. It has a deeper and broader scope. It nullifies and makes void all State legislation, and State action of every kind, which impairs the privileges and immunities of citizens of the United States, or which injures them in life, liberty or property without due process of law, or which denies to any of them the equal protection of the laws.

***The Civil Rights Cases***, 109 U.S. 3, 11 (1883) (emphasis added).  Accordingly, the Hes have no basis to assert that the Bakers, private individuals, violated their Fourteenth Amendment rights regarding A.M.H. by failing to give them the notice which they claim they were entitled to. [15]

Without explicitly stating as much, the Hes impliedly argue in their brief that the juvenile court also violated their constitutional rights under the Fourteenth Amendment by failing to ensure that they received some form of notice comparable to that found in section 37-2-403 of the Tennessee Code when it entered the June 4, 1999 consent order transferring custody of A.M.H. to the Bakers.  The United States Supreme Court has recognized that state action may take the form of judicial enforcement of private agreements, stating:

> That the action of state courts and *judicial officers* in their official capacities is to be regarded as action of the State within the meaning of the Fourteenth Amendment, is a proposition which has long been established by decisions of this Court . . . .  "A state acts by its legislative, its executive, or its *judicial* authorities.  It can act in no other way."  In the Civil Rights Cases, 109 U.S. 3, 11, 17 (1883), this Court pointed out that the Amendment makes void "State action of every kind" which is inconsistent with the guaranties therein contained, and extends to manifestations of "State authority in the shape of laws, customs, or *judicial* or executive proceedings."

***Shelley v. Kraemer***, 334 U.S. 1, 14 (1948) (emphasis added).

---

[15] We address the Hes' lack of notice more fully when addressing the grounds for termination *infra*.  However, we pause here to note that our independent research has revealed one decision rendered by this Court after the appeal in the instant case was filed wherein we addressed a *private* custody agreement and a parent's lack of notice regarding abandonment, stating:

> When the Department of Children's Services or other child-placing agency obtains custody of children removed from the parents' home, it is required to notify the parents of the statutory definitions of abandonment and the criteria and procedures for termination of parental rights.  Tenn. Code Ann. § 37-2-403(a)(2)(A).  In such situations, a court cannot terminate a parent's rights on the ground of abandonment unless such notice, including the consequence of abandonment, has been given by the agency petitioning for termination or the court itself.  Tenn. Code Ann. § 37-2-403(a)(2)(B).  *In the case before us, neither DCS nor another agency was involved, so the statute does not apply*.  Nonetheless, Mother's knowledge of a duty or expectation that she provide support and visit is *a factor in determining willfulness*.  We find nothing in the record to indicate she was ever told she was expected to provide support or face termination of her parental rights.

*In re W.B., IV*, No. M2004-00999-COA-R3-PT, 2005 Tenn. App. LEXIS 262, at *38 (Tenn. Ct. App. Apr. 29, 2005) (no perm. app. filed) (emphasis added).  While a parent's knowledge of a duty to visit or support may have a bearing when determining willfulness, we cannot say that the Fourteenth Amendment to the United States Constitution mandates that a private individual provide the notifications urged upon the Court by the Appellants in this case.

In any event, we cannot entertain any arguments, even if expressly stated, which attempt to satisfy the state action requirement by pointing to the juvenile court's enforcement of the parties' private custody agreement by entering an order solidifying that agreement. Although the order was the result of a consent agreement regarding custody of A.M.H., the Hes retained their right to appeal the June 4, 1999 order to this Court, as well as the subsequent order denying their first petition to modify that order, and present any alleged constitutional infirmities for resolution. *See* Tenn. Code Ann. § 37-1-159(g) (2003) ("Appeals in all other civil matters heard by the juvenile court shall be governed by the Tennessee Rules of Appellate Procedure."). The Hes failure to file an appeal divests this Court of the ability to review the constitutional validity of the June 4, 1999 order. Once a custody order is final, it becomes *res judicata* and can only be modified in a subsequent proceeding upon a showing that there had been a material change in circumstances making a change of custody in the child's best interest. ***See In re E.J.M.***, No. W2003-02603-COA-R3-JV, 2005 Tenn. App. LEXIS 146, at *46 (Tenn. Ct. App. Mar. 10, 2005) (no perm. app. filed); ***Rushing v. Rushing***, No. W2003-01413-COA-R3-CV, 2004 Tenn. App. LEXIS 708, at *14 (Tenn. Ct. App. Oct. 27, 2004) (no perm. app. filed).[16] Accordingly, we find the Hes argument in this regard to be without merit.

### D.
### *Application of the Notice Provisions in Section 37-2-403 of the Tennessee Code*

The Hes make the alternative argument that, even if the aforementioned statutes are deemed constitutional, the trial court erred by failing to find that the notice provisions found in section 37-2-403 of the Tennessee Code should apply in this case because A.M.H. was in the "foster care"[17] of

---

[16] Our supreme court has stated that a custody order may not constitute a final judgment with the accompanying *res judicata* effect when the juvenile court intends the order to be of temporary effect. ***See In re Askew***, 993 S.W.2d 1, 4 (Tenn. 1999). We discuss the other related issues raised by the Hes in an attempt to invalidate the June 4, 1999 order *infra*.

[17] "Foster care", for purposes of section 37-2-403 of the Tennessee Code, is defined as follows:

> "Foster care" means the temporary placement of a child in the custody of the department of children's services or *any agency*, institution or home, *whether public or private*, for care outside the home of a parent or relative (by blood or marriage) of the child, whether such placement is by court order, voluntary placement agreement, surrender of parental rights or otherwise. Foster care shall cease at such time as the child is placed with an individual or individuals for the purpose of the child's adoption by the individual or individuals or at such time as a petition to adopt is filed, whichever occurs first, or at such time as the child is returned to or placed in the care of a parent or relative . . . .

Tenn. Code Ann. § 37-2-402(5) (2003) (emphasis added).

an "agency"[18] prior to the date the Bakers filed their petition to terminate the Hes' parental rights. The Hes assert that, while "AMH was not 'technically' in the foster care of an agency following the end of the 90-day foster care period through Mid-South Christian Services," she was in the type of foster care contemplated by section 37-2-403(a)(2) of the Tennessee Code between June 4, 1999 and the date the Bakers filed their petition in this case because the transfer of responsibility for A.M.H. between Mid-South and the Bakers was "seamless." Furthermore, in an effort to demonstrate that Mid-South remained involved after the conclusion of the three month foster care period, the Hes cite to the fact that Mr. Weaver, Mid-South's lawyer, subsequently represented the Bakers in their attempts to contest the Hes' petitions to modify the custody order and filed the petition to terminate the Hes' parental rights. Therefore, they contend that Mid-South remained "interested" in the outcome of the proceedings even though the Hes signed a form acknowledging that Mid-South would no longer be involved in the case.

Just prior to the end of the initial three month foster care period, Ms. Chunn met with Father to discuss the Hes' future plans for A.M.H. When Father indicated that they wanted A.M.H. to remain with the Bakers, Ms. Chunn advised Father of the adverse effects such an arrangement could have on A.M.H. and counseled against it. At this point, Father met with the Bakers and discussed a *private* arrangement without any involvement of Mid-South. Thereafter, Father and the Bakers called Ms. Chunn to inform her of the parties' decision. Admittedly, Ms. Chunn did facilitate the meeting with Mr. Weaver to discuss the process of transferring custody. However, on June 4, 1999, the day the parties signed the consent order transferring custody, the Hes signed a form which provided as follows:

> Upon signing this form and receiving said child(ren), I (we) assume full responsibility for the child(ren), and discharge Mid-South Christian Services from any further care of the child(ren) beyond this date.

After this date, Mid-South's responsibility for A.M.H. ceased. While the record demonstrates that Ms. Chunn did communicate with the Bakers after that date, we cannot find that this conduct amounts to a continuing effort to provide "foster care." Likewise, we cannot say that the Bakers' independent decision to have Mr. Weaver represent them at a later date equates to a "continuing

---

[18] It is undisputed that Mid-South is a licensed child placement agency. The legislature defines "agency" for purposes of Title 37, Chapter 2, Part 4 as "a child care agency, as defined in title 71, chapter 3, part 5, or in title 37, chapter 5, part 5, regardless of whether such agency is licensed or approved, and includes the department of children's services." Tenn. Code Ann. § 37-2-402(1) (2003). Section 37-5-501 of the Tennessee Code states:

> As used in this part, unless the context otherwise requires: "child care agency" includes: "child abuse agency," "child caring institution," "child placing agency," "detention center," "family boarding home or foster home," "group care home," "maternity home," or "temporary holding resource" as defined in subsection (b).

Tenn. Code Ann. § 37-5-501(a) (2003).

interest" in the case on the part of Mid-South. There is simply no evidence in the record suggesting that Mid-South directed Mr. Weaver to represent the Bakers or encouraged the Bakers to select Mr. Weaver to represent them. Thus, A.M.H. did not remain in "foster care" with an "agency" beyond June 4, 1999.[19] Accordingly, we find the Hes arguments in this regard to be without merit as well.

### E.
### *Superior Parental Rights Doctrine*

At the conclusion of the initial three month foster care period, the Hes signed a "Petition for Custody," wherein they asked that "[c]ustody of [A.M.H.] be awarded to <u>Jerry & Louise Baker, non-relative</u>[.]" On June 4, 1999 the juvenile court entered a "Consent Order Awarding Custody," wherein the juvenile court noted that the Hes admitted the following:

> 1.  That they have been fully advised of their legal rights and that a hearing before the Court is hereby expressly waived.
>
> 2.  That all parties agree that it is in the best interest of the child(ren) for custody *and guardianship of the person of said child* to be awarded to <u>Jerry and Louise Baker, non-relatives</u>.
>
>     . . . .
>
> IT IS THEREFORE ORDERED, ADJUDGED, AND DECREED that custody and *guardianship of the person* of said child(ren) be and is hereby awarded to <u>Jerry and Louise Baker, non-relatives</u> with authority to make appropriate plans for the care and supervision of said child(ren).

(emphasis added).[20] On May 29, 2001, Mother filed a "Petition to Modify Order" in the juvenile court alleging that a change in circumstances warranted a change in the custody arrangement set forth

---

[19] In a similar vein, any attempt by the Hes to assert a violation of the Fourteenth Amendment on the part of Mid-South would not be meritorious. As of June 4, 1999, Mid-South no longer had any involvement in this case, and they have not been made a party to the instant controversy. Moreover, the Hes did not appeal the juvenile court's June 4, 1999 order or the subsequent denial of their original petition to modify that order, which would necessarily include an evaluation of Mid-South's conduct up to that point in time.

[20] As previously noted, Ms. Cloud typed the italicized language into the order above the phrase "custody to be awarded" and "custody of said child(ren)."

in the June 4, 1999 order.[21]  As previously noted, after the Bakers filed their petition to terminate the Hes' parental rights to A.M.H. in the chancery court, the court consolidated Mother's petition with the Bakers' petition at the request of the Bakers.

On appeal, Mother argues that the trial court erred by not applying the "superior parental rights doctrine" when analyzing Mother's May 29, 2001 petition which, if done, would have rendered the Bakers' petition to terminate Mother's parental rights moot.  Specifically, Mother asserts that, pursuant to certain enumerated exceptions in our supreme court's decision in *Blair v. Badenhope*, 77 S.W.3d 137 (Tenn. 2002), the "superior parental rights doctrine" must be applied to her petition to modify the custody order at issue.  Conversely, the Bakers contend that the "superior parental rights doctrine" does not apply to the facts in the instant case.[22]

Due to the constitutionally protected right of biological parents to the care, custody and control of their children, our supreme court has instructed that, in an initial custody determination between a parent and a non-parent, the following standard must be applied to protect the biological parents' fundamental constitutional rights:

---

[21] Ms. Cloud testified that, while Father was present at juvenile court when the May 29, 2001 petition was drafted, only Mother signed the petition seeking a modification of the juvenile court's earlier order.

[22] The Bakers attempt to distinguish *Blair* by pointing to the fact that the non-parent in *Blair* was never awarded guardianship of the minor child as was done in this case.  They argue that they have been adjudicated guardians of A.M.H., therefore, the following statute applies:

> A custodian to whom legal custody has been given by the court under this part has the right to the physical custody of the child, the right to determine the nature of the care and treatment of the child, including ordinary medical care and the right and duty to provide for the care, protection, training and education, and the physical, mental and moral welfare of the child, *subject to the conditions and limitations of the order and to the remaining rights and duties of the child's parents or guardian*. A custodian is also responsible for providing notices as required in § 49-6-3051, to the principal of the school in which the child is enrolled.

Tenn. Code Ann. § 37-1-140(a) (2003).  The Bakers assert that, unlike a "custody" determination which is modifiable, an order appointing a "guardian" for a minor child becomes final and unappealable.  As a result, they contend that the Hes were required to file a petition to terminate the Bakers' guardianship rights, and they were required to prove grounds for termination by clear and convincing evidence.  *See* Tenn. Code Ann. § 36-1-113(a), -113(d) (2003) (setting forth the jurisdiction and venue of the courts in terminating parental or *guardianship rights* to a child).

    The Bakers cite to no Tennessee case law, and our independent research has likewise failed to locate any authority, which requires the result they urge this Court to adopt in the present case.  Moreover, requiring biological parents to seek to terminate the guardianship rights of a non-parent, as the Bakers suggest, would stand in direct contravention of a biological parent's fundamental right to the care, custody, and control of their children.  *See Santosky v. Kramer*, 455 U.S. 745, 753 (1982); *Hawk v. Hawk*, 855 S.W.2d 573, 579 (Tenn. 1993).  To adopt such an approach would be, in essence, to sanction *de facto* adoptions without the need of protecting the biological parents' constitutionally protected right to their minor child.  This we decline to do.

[I]n a contest between a parent and a non-parent, a parent cannot be deprived of the custody of a child unless there has been a finding, after notice required by due process, of substantial harm to the child. Only then may a court engage in a general "best interest of the child" evaluation in making a determination of custody.

*In re Adoption of Female Child*, 896 S.W.2d 546, 548 (Tenn. 1995). The supreme court reaffirmed this principle in *Blair v. Badenhope*, stating:

The law is now well-settled that the Tennessee Constitution protects the fundamental right of natural parents to have the care and custody of their children. *See Nale v. Robertson*, 871 S.W.2d 674, 680 (Tenn. 1994); *Hawk v. Hawk*, 855 S.W.2d 573, 579 (Tenn. 1993). Through Article I, section 8 and its implicit recognition of parental privacy rights, our Constitution requires that courts deciding initial custody disputes give natural parents a presumption of "superior parental rights" regarding the custody of their children. *See In re Askew*, 993 S.W.2d 1, 4 (Tenn. 1999). Simply stated, this presumption recognizes that "parental rights are superior to the rights of others and continue without interruption unless a biological parent consents to relinquish them, abandons his or her child, or forfeits his or her parental rights by some conduct that substantially harms the child." *See O'Daniel v. Messier*, 905 S.W.2d 182, 186 (Tenn. Ct. App. 1995).

*Blair*, 77 S.W.3d at 141.

In *Blair*, our supreme court was asked to address the standard to be applied to a biological parent's petition to *modify* a previous custody order awarding custody of the child to a non-parent. *Blair*, 77 S.W.3d at 139. The mother of the child succumbed to cancer in 1990. *Id*. Prior to her death, the mother and the child were cared for by the child's grandmother. *Id*. After the mother's death, the child continued to live with the grandmother. *Id*. The grandmother subsequently petitioned for custody of the child, and the trial court awarded temporary custody of the child to the grandmother. *Id*. After the biological father established his paternity to the child, he contested the trial court's award of custody to the grandmother. *Id*. However, before the trial court could reach a decision in the matter, the father and the grandmother agreed to allow the grandmother to retain custody of the child. *Id*. The trial court entered a consent order to solidify the agreement. *Id*.

Thereafter, in 1995, the father petitioned the trial court to modify the custody order, however, the court found that a material change in circumstances did not warrant a change in custody. *Id*. In 1997, the father once again petitioned the trial court for a modification of its previous custody order alleging that a material change in circumstances warranted such a change. *Id*. at 140. The father also asserted that he enjoyed a presumption that his parental rights were superior to those of the

grandmother, a non-parent, therefore, the trial court could not deny him custody of his daughter unless he was shown to be an unfit parent. *Id.* The trial court, while acknowledging that the father was a fit parent, concluded that a material change in circumstances did not exist to warrant a change in custody. *Id.* This Court affirmed, and the supreme court reversed. *Id.* at 141.

At the outset, the supreme court examined the prior Tennessee cases addressing parent versus non-parent custody disputes and made the following observation:

> *Examining the principles applied in each of these cases* with respect to custody modification issues, a natural parent enjoys the presumption of superior rights under four circumstances: (1) when no order exists that transfers custody from the natural parent; (2) when the order transferring custody from the natural parent is accomplished by fraud or without notice to the parent; (3) when the order transferring custody from the natural parent is invalid on its face; and (4) when the natural parent cedes only temporary and informal custody to the non-parents. *Consequently, when any of these circumstances are present in a given case, then protection of the right of natural parents to have the care and custody of their children demands that they be accorded a presumption of superior parental rights against claims of custody by non-parents.*

*Id.* at 143 (emphasis added). In *Blair*, the supreme court noted that it was also being asked to decide whether a "fifth circumstance" warranted the same result; "when the order transferring custody from the natural parent is valid in all respects, even though it results from the natural parent voluntarily surrendering full and [sic] custody of the child to the non-parent." *Id.*

In concluding that this "fifth circumstance" did not warrant an application of the "superior parental rights doctrine" to the father's petition in *Blair*, our supreme court stated:

> Though we have broadly recognized that the right of parental privacy in this state is fundamental, *see*, *e.g.*, *Hawk*, 855 S.W.2d at 579, nothing in the language of our Constitution, nor in the volumes of our case law, suggests that the superior rights doctrine should assist a parent to obtain custody of a child when a valid court order properly transferred custody from that parent in the first instance. Nor is there any suggestion from these sources that our right to privacy extends so far as to warrant application of the superior rights doctrine even when that valid order results from the natural parent voluntarily consenting to give custody of the child to a non-parent. Because all of our prior cases discussing awards of custody to a natural parent from a non-parent have been those in which the initial transfer of custody from the natural parent was not accomplished with a valid court order

or was not consensual, these cases cannot be properly used to "say what the law is" on this issue in Tennessee.

*Id*. After examining similar cases from sister states, the supreme court concluded as follows:

> As these cases demonstrate, parents in the initial custody proceedings enjoy a strong presumption that they are entitled to the physical custody of their children. However, having once protected the rights of natural parents to the care and custody of their children, no constitutional principle demands that natural parents again be afforded a presumption of superior rights in a subsequent modification proceeding. Of course, where an initial order does not exist, or is otherwise invalid, then the Constitution requires a court to apply the superior rights doctrine. However, because these circumstances do not exist in this case, we disagree that the Tennessee Constitution compels application of that doctrine in the face of a lawful and valid court order vesting custody of [the child] in her grandmother.

*Id*. at 146.

The supreme court then turned its attention to the effect the father's voluntary consent to relinquish custody of his daughter to the grandmother had on his ability to assert his superior parental rights in a proceeding to modify the previous custody order. *Id*. The supreme court found that the father's voluntary relinquishment of custody "undermine[d] his argument that the Constitution commands application of the superior rights doctrine in this custody modification proceeding." *Id*. In fact, the court concluded that a "parent's voluntary transfer of custody to a non-parent, *with knowledge of the consequences of that transfer*, effectively operates as a waiver of these fundamental parental rights." *Id*. at 147 (emphasis added). In response to the arguments put forth by the dissent in *Blair*, the majority made the following observation:

> Importantly, the dissent maintains that "parents in many cases may make custodial decisions without fully understanding the legal ramifications of their choices." Characterizing the voluntary waiver of parental rights as a "trap for the unwary," the dissent expresses concern that parents may not fully understand the effect of such a waiver.
>
> We fully agree with the dissent in this regard, and *we emphasize here, as above, that a parent's voluntary relinquishment of custody must be made with knowledge of the consequences of that decision*. Where a natural parent voluntarily relinquishes custody without knowledge of the effect of that act, then it cannot be said that these rights were accorded the protection demanded by the

Constitution. As such, application of the superior rights doctrine in a subsequent modification proceeding would be justified. However, no such allegation has been made by [the father] in this case.

*Id*. at 147–48 n.3.

Mother relies on three of the "circumstances" enumerated by our supreme court in *Blair* in support of her argument that the "superior parental rights doctrine" should apply to her petition to modify the custody order. First, she alleges that the June 4, 1999 order entered by the juvenile court was accomplished by fraud or without providing notice to her. Second, Mother asserts that, through the June 4, 1999 order, she only ceded temporary and informal custody to the Bakers. Finally, she asserts that the June 4, 1999 order is invalid on its face. We will address each of these arguments in turn.

## 1.
### Alleged Fraud and Lack of Notice

The chancery court concluded that "[a]ll parties, including Mr. and Mrs. He, knowingly and voluntarily signed the June 4, 1999, Consent Order Awarding Custody, without being induced by any fraud or undue influence." All of the arguments put forth by Mother on appeal addressing this issue fail to demonstrate how the trial court erred in finding a lack of fraud in the inducement of the order. Moreover, Mother offers no argument regarding a lack of notice of the hearing on the order, and she would be hard pressed to make such an argument given the fact that she agreed to an order transferring custody and appeared at juvenile court on June 4, 1999.

Instead, Mother contends that she did not receive proper legal advice and did not enter into the agreed order "with knowledge of the consequences of that transfer." Mother primarily points to the fact that, while Father attended the meeting with Mr. Weaver prior to the order being entered, she was not present at that meeting. On the day the parties met at juvenile court to sign the order, Mother, Ms. Cloud, Ms. Chunn, and Pastor Yau met in a separate room to discuss the order. Mother asserts that this meeting resulted in her receiving legal advice from non-lawyers. Based on these facts, Mother argues that she was not fully advised of her legal rights, and therefore, did not "consent" to the transfer of custody or "expressly waive" her right to a hearing.

The trial court concluded that, based on the evidence at trial, Ms. Chunn, Ms. Cloud, and Pastor Yau "fully explained the legal ramifications of both the Petition for Custody and the Consent Order Awarding Custody, both of which Mrs. He later voluntarily signed." There was conflicting testimony offered at trial on the level of Mother's understanding regarding the transfer of custody. Mother testified that she did not understand the ramifications of the order. The trial court noted that, both prior to and before June 4, 1999, the Hes engaged the services of at least three attorneys to advise them in Mother's civil case for the alleged assault in November of 1998 and Father's criminal

trial. However, the Hes never sought advice from these attorneys about the custody issue, and, in fact, never mentioned the existence of A.M.H. to any of these attorneys. Regarding the meeting with Mr. Weaver, Father denied ever calling Mother from the meeting to inquire if they should proceed in her absence. In light of the testimony of the Bakers, Mr. Weaver, and Ms. Chunn to the contrary, the trial court concluded that the call did, in fact, take place, and Mother waived her right to attend. Since Mother did not attend this meeting, Ms. Chunn took Pastor Yau with her to meet with Mother at the Hes' apartment prior to the meeting in juvenile court to sign the order. Pastor Yau testified that Ms. Chunn wanted to ensure that Mother understood the custody arrangement, and Mother indicated that she understood the order and the process. Regarding the meeting in juvenile court on June 4, 1999, both Pastor Yau and Ms. Chunn testified that Mother indicated that she understood the order and the process.

The trial court's findings in relation to this issue are based solely upon the credibility of the witnesses. The record does not contain clear and convincing evidence that Mother lacked knowledge as to the consequences of the transfer of custody. *See Wells v. Tenn. Bd. of Regents*, 9 S.W.3d 779, 783 (Tenn. 1999). Accordingly, we must conclude that Mother's attempts to argue that the "superior parental rights doctrine" should apply for the above stated reasons must fail.

## 2.
## Temporary Custody

While Mother had "knowledge of the consequences" of the transfer of custody, she contends that her "knowledge" consisted of the understanding that the agreed order only transferred temporary custody of A.M.H. to the Bakers. Mother argues that, pursuant to the June 4, 1999 order, she only intended to cede temporary custody of A.M.H. to the Bakers, therefore, she is entitled to assert her superior parental rights in her petition to modify custody. In support of this position, Mother relies on this Court's decision in *Means v. Ashby*, 130 S.W.3d 48 (Tenn. Ct. App. 2003). In *Means*, the biological mother met her brother and sister-in-law at their attorney's office to sign a custody agreement transferring custody of the mother's child to the brother and sister-in-law. *Means*, 130 S.W.3d at 52–53. Mother subsequently sought a return of custody, and the brother and sister-in-law filed a petition for adoption and to terminate the mother's parental rights. *Id*. at 53. The trial court concluded that the mother did not abandon the child by willfully failing to visit or willfully failing to support her. *Id*. However, the trial court ruled that the child should remain in the custody of the brother and sister-in-law. *Id*. at 53–54. Regarding the trial court's custody determination, this Court, addressing the *Blair* exception relied upon by Mother in the instant case, vacated the trial court's custody determination and remanded the case to the trial court for further consideration in light of the supreme court's decision in *Blair*. *Id*. at 58. In support of our decision, we noted the testimony of the attorney who drafted the order to the effect that "the primary purpose [of the custody agreement] was to allow the minor child to be covered by insurance." *Id*.

In support of her argument that she only intended to cede temporary custody of A.M.H. to the Bakers, Mother relies on the following testimony by Ms. Cloud who drafted the June 4, 1999 order:

Q. All right, and did either Mr. or Mrs. He tell you that they wanted the Bakers to take care of their child on a permanent basis?

A. No.

Q. Did the Hes ever say anything to you that indicated to you that they were interested in either a temporary or permanent arrangement?

A. Temporary.

Q. Can you tell us what you recall?

A. I recall mainly talking to Casey, that she was very concerned that it was not a permanent situation. She did not want it to be a permanent situation.

Q. She made that very clear to you?

A. Yes, sir.

. . . .

Q. When Mr. and Mrs. Baker and Mr. and Mrs. He were before you on June 4th of 1999, did they appear to be in agreement?

A. Yes.

Q. It did not appear to be a contested matter. Is that correct?

A. No.

Q. You understood Ms. He, through the interpreter, to wanting this matter to be temporary only. Is that your understanding?

A. Yes.

Q. Was there any equivocation about that, any language problem about that?

A. Not —

Q. I mean, you understood through the interpreter what she wanted?

A. I believe I did.

Q. And is that what you understood that Mr. and Mrs. Baker wanted?

A. Yes.

Q. If you understood that Mr. and Mrs. Baker wanted language in the consent order that said that, "We will be able to raise this child until she's 18 years of age," would you consider that to be consistent with what Ms. He understood on that day?

A. No.

. . . .

Q.    Ms. Cloud, what was the agreement that you were so sure that all parties had consented to? Was it temporary or permanent?
A.    Temporary.

. . . .

Q.    Temporary because it could be changed; right?
A.    That would be one of the reasons, but I believe Casey was fairly adamant that at some point she wanted her child back.

Regarding the meeting with Mother at juvenile court on June 4, 1999, Pastor Yau offered the following testimony:

Q.    Did you hear any discussion about insurance?
A.    Yes.
Q.    And what was said about insurance?
A.    No detail was mentioned, but because of the need of medical care for the baby, the guardians or the custodians needs to have medical insurance for the baby.
Q.    And were you asked to explain that to Ms. He?
A.    Yes.
Q.    And did you?
A.    Yes.
Q.    Did you explain anything about the word "temporary" to Ms. He?
A.    Yes, I did.
Q.    And what did you tell her about that?
A.    I told her that temporary custody means that someone was willing to look after or take care of the well-being of the baby for a period of time.
Q.    For how long?
A.    No specific time was mentioned.

. . . .

Q.    And what specifically — based on that, what specifically did you explain to Ms. He?
A.    In summary — you know, I can't recall the word for word question — said that because the Hes were unable to financially support the baby at that time, that some family was willing to take care of their baby on their behalf, but because

> of the legal procedure that necessitate to buy insurance or to
> administer medication or whatever to the baby by the
> custodian, Ms. He needs to give the authority to the custodian
> by signing a document.
>
> Q.      Did you hear the word "temporary" in that meeting?
> A.      Yes.
> Q.      And were you asked to explain what the word "temporary"
>         meant for the benefit of Ms. He?
> A.      "Temporary" means a period of time against permanent?

The trial court found both Ms. Cloud and Pastor Yau to be credible witnesses.

While it is true that our supreme court stated in *Blair* that the "superior parental rights doctrine" will apply "when the natural parent cedes only temporary and informal custody," we believe Mother has misconstrued this exception. The four "circumstances" enunciated in *Blair* which the supreme court held would warrant application of the "superior parental rights doctrine" to a modification proceeding were the result of the court's analysis of previous cases addressing parent versus non-parent custody disputes. *Blair*, 77 S.W.3d at 143. It is apparent that the supreme court derived the "temporary and informal custody" exception from its prior decision in *In re Askew*, 993 S.W.2d 1 (Tenn. 1999). In that case, the biological mother was experiencing financial difficulties at the time of giving birth to her daughter. *In re Askew*, 993 S.W.2d at 1. As a result, the mother and the child began to reside with one of the mother's female friends. *Id*. In 1994, the non-parent female petitioned the juvenile court for custody of the child, simply stating in her petition that the child had lived with her since 1991. *Id*. at 2. Thereafter, the juvenile court granted the petition and awarded custody to the non-parent female in a perfunctory order which made no findings regarding the mother's unfitness as a parent. *Id*. The mother subsequently filed for a return of custody citing a change in circumstances and asked that the juvenile court's order be set aside because she did not receive notice of the prior hearing. *Id*. The juvenile court determined that the 1994 order should be set aside because the mother was not given proper notice, but the court awarded "temporary custody" to the non-parent female. *Id*. It its order, the juvenile court stated that, while the mother's interest in her child was superior to that of the non-parent female, the mother had to demonstrate that she was presently able to care for the child before the court would return custody to her. *Id*. The mother subsequently filed a renewed petition to regain custody which the juvenile court denied. *Id*.

The mother filed an appeal to the circuit court, but the circuit court concluded that the mother failed to carry her burden of proving a change in circumstances warranting a change in custody. *Id*. at 3. On appeal, this Court noted that, since the mother did not appeal the 1994 order, the *res judicata* effect of the order made it final. *Id*. The supreme court disagreed, stating:

> In addition, we are also troubled by the Court of Appeals' analysis of
> the *res judicata* effect of this August 1994 order. The order conveys
> *no suggestion of finality* but, instead, characterizes the custody award

as "temporary," stating that "the Court is only delaying restoring custody to the natural parents," and emphasizing that the rights of the natural parents are superior to the interest of [the non-parent female]. We would characterize this order as a continuance of the case until the court heard more proof from [the mother]. Under these circumstances, [the mother] had virtually *no incentive to appeal* what was not a final order, since the juvenile court explicitly indicated that [the child] would soon be returned to the custody of her natural parents.

*Id*. at 4. Thus, when discussing the "temporary" nature of the order in *In re Askew*, our supreme court was concerned with the order's lack of finality.[23]

In the instant case, Mother seeks to argue that the supreme court's reference to "temporary and informal custody" in *Blair* is addressed to the *length* of the custody arrangement set forth in the order. However, this language simply reflected the supreme court's interpretation of then existing precedent. It is clear from the supreme court's discussion in *In re Askew* that the court's interest is in the effect of the order itself (*i.e.*, its finality) as opposed to the length of the custody arrangement. There is nothing in the juvenile court's June 4, 1999 order which signifies a lack of finality. Stated differently, there is no indication in the order that the juvenile court intended to hold the change in custody in abeyance until Mother met certain requirements.

Orders transferring custody of a minor child to another parent or a non-parent are, by their very nature, "temporary" (*i.e.*, as defined by Mother to mean subject to being changed at a later date). The parent relinquishing custody is always free to petition the court to change a prior custody arrangement when circumstances warrant. *See* Tenn. Code Ann. § 36-6-101(a)(1) (2003) ("Such decree shall remain within the control of the court and be subject to such changes or modification as the exigencies of the case may require."); *see also Kendrick v. Shoemake*, 90 S.W.3d 566, 570 (Tenn. 2002) (discussing the standard to apply to a petition to modify a valid order of custody). To hold, as Mother suggests, that the supreme court intended the word "temporary" in *Blair* to refer to "the length of the custody arrangement" would relegate the courts of this state into a perpetual state of defining the meaning of "temporary" as it pertains to custody decisions. In fact, the Hes acknowledge the absurdity of such a result in their brief filed on appeal. In their brief, the Hes assert that "there is no evidence that the parties understood the technical definition of 'temporary,' in the same manner that a lawyer would understand that term." The Hes go on to conclude that the concept of "permanent" custody orders is, in reality, a misnomer since permanent orders of custody actually take the form of adoption proceedings. Thus, if we were to adopt Mother's logic, we would need

---

[23] Ordinarily, "[c]ustody orders are *res judicata* and cannot be modified unless there has been a material change in circumstances that makes a change of custody in the child's best interest." *In re E.J.M.*, No. W2003-02603-COA-R3-JV, 2005 Tenn. App. LEXIS 146, at *46 (Tenn. Ct. App. Mar. 10, 2005) (no perm. app. filed) (citing *Kendrick v. Shoemake*, 90 S.W.3d 566, 570 (Tenn. 2002); *Blair*, 77 S.W.3d at 148)); *see also Rushing v. Rushing*, No. W2003-01413-COA-R3-CV, 2004 Tenn. App. LEXIS 708, at *14 (Tenn. Ct. App. Oct. 27, 2004) (no perm. app. filed).

to engage in an evaluation of the biological parent's subjective understanding of the concept of "temporary" custody each and every time we were asked to evaluate whether the natural parent intended to cede "only temporary and informal custody" to the non-parent. *See Blair*, 77 S.W.3d at 143.

It is apparent that the supreme court's discussion of the "temporary" nature of the order in *In re Askew* was aimed at addressing the mother's failure to appeal that order, and not the "length of the custody" ordered. *See In re Askew*, 993 S.W.2d at 4–5. The primary import of the court's analysis in *In re Askew* focused on the juvenile court's failure to recognize the biological parent's superior rights to her minor child when deciding the initial custody issue. *See id.* at 5. Accordingly, we interpret our supreme court's decisions in *Blair* and *In re Askew* to mean that, when a trial court enters an order which is temporary (*i.e.*, the court has not entered a definitive and unalterable ruling on the custody of the child), and the court has not previously permitted the biological parent to assert her superior parental rights, the superior parental rights doctrine may be asserted by the biological parent in a subsequent modification proceeding.

We are cognizant of Mother's reliance on our decision in *Means* in support of her position on appeal. However, *Means* was decided after the decision in *In re Askew* but before the decision in *Blair*. *Means*, 130 S.W.3d at 57. Moreover, while we noted the lawyer's testimony regarding the "primary purpose" for the custody order at issue in *Means*, we did not reach a decision on the merits as to the correctness of the trial court's custody decision. *Id*. at 58. Instead, we remanded the case to the trial court for further consideration in light of the supreme court's decisions in *Blair* and *In re Askew*. *Id*. Accordingly, we are of the conclusion that this Court's holding in *Means* does not support the proposition urged upon this Court by Mother.

Regardless of whether Mother believed the June 4, 1999 order was "temporary" (*i.e.*, custody of short duration), it is clear from the face of the order and the surrounding facts that all of the parties intended for the order to transfer custody of A.M.H. from the Hes to the Bakers, and it was to remain effective until such time as the Hes sought to file a petition to regain custody. Mr. Weaver testified that he informed Father at their meeting on June 2, 1999 that the Hes would need to file a petition to modify the custody order if they wanted a return of custody in the future. Ms. Cloud testified that she advised the Hes that, if they desired to change the custody arrangement in the future, they would need to petition the court to modify the custody order. Based on this testimony, the trial court concluded that Mother understood the need to file a petition to modify the custody order in the future, and we find nothing in the record to warrant a different conclusion. Accordingly, we find that Mother's argument in this regard is without merit.

**3.**
**Validity of the June 4, 1999 Custody Order**

On appeal, Mother asserts that she was entitled to assert her superior parental rights in the trial court because the June 4, 1999 custody order is invalid on its face. ***See Blair***, 77 S.W.3d at 143. Specifically, Mother asserts that the juvenile court's custody order fails to comply with certain provisions found in Title 34, Chapter 1, Part 1 of the Tennessee Code. First, Mother argues that the trial court did not conduct an open-court hearing to consider any additional person who would be better suited to act as guardians of A.M.H. ***See*** Tenn. Code Ann. § 34-2-103 (2003). Next, Mother asserts that the juvenile court's order fails to comply with the following statutory provision:

> The petition for the appointment of a guardian, which shall be sworn, should contain the following:
>
> . . . .
>
> (3) The name, age, mailing address and relationship of the proposed guardian and, if the proposed guardian is other than the petitioner, a statement signed by the proposed guardian acknowledging awareness of the petition and willingness to serve;
>
> . . . .
>
> (5) An explanation of the reason for seeking appointment of a guardian[.]

Tenn. Code Ann. § 34-2-104 (2003). Mother notes that, while the Hes original petition for custody mentions the Bakers and lists their address, it only mentions them in regards to a transfer of custody, not guardianship. Furthermore, the petition does not explain the reason for seeking the appointment of a guardian. Finally, Mother argues that, "[i]f the court determines a guardian is needed, the court shall enter an order which shall . . . [s]tate any other authority or direction as the court determines is appropriate to properly care for the person and property of the minor." Tenn. Code Ann. § 34-2-105(3) (2003).

At trial, Ms. Cloud, the individual who drafted the petition and resulting custody order, testified that she made the decision to include the guardianship language in the June 4, 1999 custody order based upon her conversations with the parties. It is apparent to this Court that, in arguing her position on appeal regarding this issue, Mother has placed form over substance. We need not decide whether the juvenile court entered the original custody order in compliance with the above cited statutes relied upon by Mother on appeal.

As we noted previously, the enunciation of this "circumstance" in *Blair* resulted from the supreme court's evaluation of its prior decisions addressing custody disputes between the natural parents and non-parent individuals. ***Blair***, 77 S.W.3d at 143. Once again, we turn to the supreme court's decision in *In re Askew* as the source of this "circumstance" warranting the application of the

"superior parental rights doctrine" to a petition to modify a prior custody order. Regarding the invalidity of the initial custody order, the supreme court held as follows:

> It appears that *no valid initial determination was ever made that [the mother's] custody of [the child] would result in "substantial harm" to the child*. Absent such a finding, we conclude that the deprivation of the custody of her child has resulted in an abridgment of [the mother's] fundamental right to privacy. *Bond*, 896 S.W.2d at 548; *Nale*, 871 S.W.2d at 680; *Hawk*, 855 S.W.2d at 577. *In light of the unique circumstances of this case*, we believe that the Court of Appeals has misapplied modification of custody principles when no valid initial order depriving the natural mother of custody existed. *In the absence of such a valid initial order, we believe that it would be unconstitutional for the natural mother to bear the burden of proving the absence of substantial harm*. Because the record does not show that a finding of substantial harm was made in this case, constitutional principles compel us to reverse the decisions of the lower courts.

*In re Askew*, 993 S.W.2d at 5. Thus, in *In re Askew*, the supreme court, when speaking of the original custody order's "invalidity," was concerned with whether the natural parent's constitutional rights were protected in the initial custody hearing (*i.e.*, the lack of a finding of substantial harm to the child). We decline to extend this "circumstance" beyond the import of the supreme court's discussion regarding the invalidity of the initial order in *In re Askew* to include the facts in the present case.[24]

The trial court determined that, based upon the testimony of the witnesses at trial, that Mother was fully advised of the meaning of the June 4, 1999 consent order. As previously noted, we find no justification for disturbing this credibility determination on appeal. The record demonstrates that the parties, including Mother, understood this order to transfer temporary custody of A.M.H. from the Hes to the Bakers. Furthermore, the record demonstrates that Mother was informed that she would need to file a petition with the court to regain custody of A.M.H. at a future date. Armed with this knowledge, Mother voluntarily consented to the entry of the order and waived a hearing on the custody issue. The custody order does not have the indicia of a lack of finality as discussed by our supreme court in *In re Askew*. Accordingly, none of the "circumstances" set forth by our supreme court in *Blair* warrant the application of the "superior parental rights doctrine" to Mother's petition to modify custody in this case, therefore, we are bound by the following statement by our supreme court in *Blair*:

---

[24] Furthermore, Mother's attempts to attack the validity of the June 4, 1999 custody order in this regard amount to an attempt to avoid the consequences of her failure to appeal that order to this Court.

-75-

[P]arents in the initial custody proceedings enjoy a strong presumption that they are entitled to the physical custody of their children. However, having once protected the rights of natural parents to the care and custody of their children, no constitutional principle demands that natural parents again be afforded a presumption of superior rights in a subsequent modification proceeding. Of course, where an initial order does not exist, or is otherwise invalid, then the Constitution requires a court to apply the superior rights doctrine. However, because these circumstances do not exist in this case, we disagree that the Tennessee Constitution compels application of that doctrine in the face of a lawful and valid court order vesting custody of [the child] in her grandmother.

. . . .

Based on our prior case law interpreting Article I, section 8 in this context, and given the overwhelming authority from other jurisdictions on this issue, we conclude that our Constitution does not accord natural parents a presumption of superior rights to modify an existing and valid order of custody, even when that order results from the parent voluntarily agreeing to give custody to the non-parent. Though strong in many respects, no aspect of the fundamental right of parental privacy is absolute, and a parent who is given the opportunity to rely upon the presumption of superior rights in an initial custody determination may not again invoke that doctrine to modify a valid custody order. Absent proof of the custody order's invalidity or proof that the parental rights were not protected in the initial custody proceeding, the child's interest in a stable and secure environment is at least as important, and probably more so, than the parent's interest in having custody of the child returned.

*Blair*, 77 S.W.3d at 146–48. We conclude that the trial court did not err by refusing to apply the "superior parental rights doctrine" to Mother's petition to modify the June 4, 1999 custody order.

### *F.*
### *Grounds for Termination*

### 1.
### Application of the "Settled Purpose Doctrine"

At the outset, we note that the Bakers filed their petition to terminate the Hes' parental rights on June 20, 2001. The applicable statute in effect on the date the Bakers filed their petition provided that "[a]bandonment by the parent or guardian, as defined in § 36-1-102," qualifies as a ground for terminating the biological parent's parental rights. Tenn. Code Ann. § 36-1-113(g)(1) (2001). At issue in this case is the definition of abandonment set forth in section 36-1-102 of the Tennessee Code. Since the petition at issue was filed in 2001, we must evaluate this case under the adoption statutes in effect at that time. *See In re Swanson*, 2 S.W.3d 180, 185 (Tenn. 1999).

In its memorandum opinion, the trial court, perhaps out of an abundance of caution, concluded as follows:

> Although the "settled purpose doctrine" was repealed legislatively in 1996 and no longer has any force or effect as law in Tennessee, a review of the evidence in this cause establishes that the actions of the Hes evince a settled purpose to forego all parental rights and responsibilities.

Prior to 1995, the courts of this state utilized a judicially created standard to evaluate whether a biological parent abandoned his or her child in adoption cases. *In re Swanson*, 2 S.W.3d at 184; *O'Daniel v. Messier*, 905 S.W.2d 182, 186 n.3 (Tenn. Ct. App. 1995). This Court set forth the judicially created standard to be applied in adoption cases by stating:

> So, the issue of abandonment should be resolved by the Circuit Court under the following statement of the law:
>
> > "Abandonment imports any conduct on the part of the parent which evinces *a settled purpose to forego all parental duties and relinquish all parental claims to the child*. It does not follow that the purpose may not be repented of, and, in proper cases all parental rights again acquired. * * * but when abandonment is shown to have existed, it becomes a judicial question whether it really has been terminated, or can be, consistently with the welfare of the child." 1 Am. Jur. Adoption of Children, Section 42.

*Ex parte Wolfenden*, 349 S.W.2d 713, 714 (Tenn. Ct. App. 1959) (emphasis added); *see also In re Adoption of Self*, 836 S.W.2d 581, 582–83 (Tenn. Ct. App. 1992); *Fancher v. Mann*, 432 S.W.2d 63, 65–66 (Tenn. Ct. App. 1968). In 1982, the Tennessee Supreme Court, relying on our decision in *Ex Parte Wolfenden*, reaffirmed that the "settled purpose doctrine" remained the standard applicable to a determination of abandonment in adoption cases. *In re Adoption of Bowling*, 631 S.W.2d 386, 389 (Tenn. 1982).

In 1995, this Court noted in *O'Daniel* that Tennessee lacked a uniform standard for ascertaining whether a biological parent had abandoned his or her child. *O'Daniel*, 905 S.W.2d at 186. At the time we decided *O'Daniel*, the courts of this state applied one of three possible standards to determine abandonment according to the type of proceeding involved. *Id*. at 186 n.3. At the same time we were deciding *O'Daniel*, the Tennessee General Assembly was undertaking an effort to rewrite the then existing adoption laws. *See* 1995 Tenn. Pub. Acts ch. 532; *O'Daniel*, 905 S.W.2d at 187 n.5. However, since the proposed legislation was pending at the time of our decision in *O'Daniel*, we were forced to evaluate whether the mother in that case abandoned her daughter under the existing legal framework (*i.e.*, the "settled purpose doctrine") applicable to adoption proceedings. *O'Daniel*, 905 S.W.2d at 187 (citing *In re Adoption of Bowling*, 631 S.W.2d at 389). In evaluating the line of cases establishing the "settled purpose doctrine" in this state up to that point in time, we made the following observation:

> These decisions demonstrate that the courts consider the following matters when determining whether an abandonment has occurred: (1) the parent's ability to support the child; (2) the amount of support the parent has provided to the child; (3) the extent and nature of the contact between the parent and the child; (4) the frequency of gifts on special occasions; (5) whether the parent voluntarily relinquished custody of the child; (6) the length of time the child has been separated from the parent; and (7) the home environment and conduct of the parent prior to the removal of the child. *See In re Rigsby*, *supra*, slip op. at 10; *Koivu v. Irwin*, 721 S.W.2d at 807. No single factor is controlling. Abandonment inquiries are heavily fact-oriented, so the courts may consider any fact that assists in deciding whether the parent's conduct demonstrates a conscious or willful disregard of all of his or her parental duties. *In re Rigsby*, *supra*, slip op. at 10.

*Id*. at 187. It is this judicially created legal framework which Appellants urge this Court to apply to the present case.

The Tennessee General Assembly's efforts in 1995 to amend the adoption statutes resulted in the creation of a statutory definition of abandonment applicable to adoption cases. *See* 1995 Tenn. Pub. Acts ch. 532, § 1. This definition, which remained in effect when the Bakers filed their petition in the instant case, provided, in relevant part, as follows:

> (1) (A) "Abandonment" means, for purposes of terminating the parental or guardian rights of parent(s) or guardian(s) of a child to that child in order to make that child available for adoption, that:
>
> (i) For a period of four (4) consecutive months immediately preceding the filing of a proceeding or pleading to terminate the

parental rights of the parent(s) or guardian(s) of the child who is the subject of the petition for termination of parental rights or adoption, that the parent(s) or guardian(s) either have willfully failed to visit or have willfully failed to support or make reasonable payments toward the support of the child;

. . . .

(B)  For purposes of this subdivision (1), "token support" means that the support, under the circumstances of the individual case, is insignificant given the parent's means;

(C)  For purposes of this subdivision (1), "token visitation" means that the visitation, under the circumstances of the individual case, constitutes nothing more than perfunctory visitation or visitation of such an infrequent nature or of such short duration as to merely establish minimal or insubstantial contact with the child;

(D) For purposes of this subdivision (1), "willfully failed to support" or "willfully failed to make reasonable payments toward such child's support" means that, *for a period of four (4) consecutive months, no monetary support was paid or that the amount of support paid is token support*;

(E)  For purposes of this subdivision (1), "willfully failed to visit" means the willful failure, for a period of four (4) consecutive months, to visit or engage in more than token visitation;

(F)  Abandonment may not be repented of by resuming visitation or support subsequent to the filing of any petition seeking to terminate parental or guardianship rights or seeking the adoption of a child; and

(G) "*Abandonment*" and "abandonment of an infant" *do not have any other definition except that which is set forth in this section, it being the intent of the general assembly to establish the only grounds for abandonment by statutory definition. Specifically, it shall not be required that a parent be shown to have evinced a settled purpose to forego all parental rights and responsibilities in order for a determination of abandonment to be made. Decisions of any court to the contrary are hereby legislatively overruled*[.]

Tenn. Code Ann. § 36-1-102(1) (2001) (emphasis added).

The Tennessee Supreme Court was ultimately called upon to evaluate the constitutionality of this definition, specifically subsection (D) defining "willfully failed to support." In *In re Swanson*, 2 S.W.3d 180, 182 (Tenn. 1999), the biological father of a minor child appealed this Court's determination that he abandoned his child pursuant to the statutory definition of abandonment. At the outset, the supreme court set forth the aforementioned legal framework which established the "settled purpose doctrine" and led the legislature to amend the adoption statutes in 1995. *Id*. at 184–85. On appeal, the father argued that the statutory definition of "willfully failed to support" was unconstitutional because it did not contain a provision requiring that the parent's failure to pay support to be intentional. *Id*. at 185–86. He asserted that, since the statutory definition created a conclusive presumption that failure to provide support would result in a termination of parental rights, the statute failed to comport with his fundamental constitutional right to the care, custody, and control of his child. *Id*. at 186. The supreme court agreed.

In determining that the definition of "willful failure to support" was unconstitutional, the supreme court noted that the previous definition of abandonment pertaining to failure to support "always contained an element of intent or purposefulness." *Id*. at 187. It was clear to the supreme court that, by enacting the statutory definition of abandonment, the legislature "intended to limit the discretion of trial judges when making a determination as to whether abandonment has occurred." *Id*. at 186. Thus, the supreme court held as follows:

> Since the statutory definitions of "willfully failed to support" and "willfully failed to make reasonable payment toward such child's support" in effect create an irrebuttable presumption that the failure to provide monetary support for the four months preceding the petition to terminate parental rights constitutes abandonment, irrespective of whether that failure was intentional, we hold that those definitions are unconstitutional. The statutory definitions simply do not allow for the type of individualized decision-making which must take place when a fundamental constitutional right is at stake. Therefore, they impermissibly infringe upon a parent's right to the care and custody of his or her children.
>
> The federal and state constitutions require the opportunity for an individualized determination that a parent is either unfit or will cause substantial harm to his or her child before the fundamental right to the care and custody of the child can be taken away. *Stanley*, 405 U.S. at 658-59; *Bond*, 896 S.W.2d at 548.

*Id*. at 188. The court went on to hold that "we are able to elide the unconstitutional portion of the statute, and the remaining provisions of the Act may be enforced." *Id*. Accordingly, the supreme court instructed that "the definition in effect under prior law shall be applied" until the legislature

chooses to amend the statute,[25] stating:

> We wish to make it clear that the definition previously in effect was the definition as it existed in 1994. Under the prior statute, the definition of "abandoned child" contained an element of intent both in failures to visit and failures to support.[26]

*Id*. at 189 n.14.

Despite the supreme court's holding in *In re Swanson*, the Hes argue on appeal that the trial court erred by holding that the "settle purpose doctrine" no longer has the force of law in Tennessee. According to the Hes, the "settled purpose doctrine" remains a viable legal doctrine, and the trial court should have utilized the doctrine to ascertain whether the Hes abandoned A.M.H. Moreover, the Hes assert that, since the "settled purpose doctrine" applies in this case, the trial court erred in finding that the Hes' actions evinced a "settled purpose to forego all parental rights and responsibilities."[27] Conversely, the Bakers assert that the trial court correctly observed that the "settled purpose doctrine" has been legislatively repealed and has no continued viability in Tennessee law. In the alternative, the Bakers assert that, if the doctrine is held to apply to this case, the facts in the record support the trial court's finding that the Hes had a settled purpose to forego all of their parental rights and responsibilities regarding A.M.H. We cannot agree with the position urged upon this Court by the Appellants.

---

[25] The legislature did not choose to act to amend the statute until 2003. Effective June 2, 2003, the statute was amended to include the following language:

> (D) For purposes of this subdivision (1), "willfully failed to support" or "willfully failed to make reasonable payments toward such child's support" means the *willful* failure, for a period of four (4) consecutive months, to provide monetary support or the *willful* failure to provide more than token payments toward the support of the child[.]

Tenn. Code Ann. § 36-1-102(1)(D) (Supp. 2004) (emphasis added); 2003 Tenn. Pub. Acts ch. 231, § 3. Since this amendment was not in effect at the time the Bakers filed their petition to terminate the Hes' parental rights, it is inapplicable to the present appeal. *See In re Swanson*, 2 S.W.3d at 185; *O'Daniel v. Messier*, 905 S.W.2d 182, 187 n.5 (Tenn. Ct. App. 1995).

[26] Under the definition in effect prior to 1995, an "abandoned child" was defined as:

> (i) A child whose parents have *willfully* failed to visit or have *willfully* failed to support or make reasonable payments towards such child's support for four (4) consecutive months immediately preceding institution of an action or proceeding to declare the child to be an abandoned child . . . .

Tenn. Code Ann. § 36-1-102(1)(A) (1994) (emphasis added); *see also* 1978 Tenn. Pub. Acts ch. 704, § 1.

[27] The Hes' position on appeal regarding this issue is, in essence, the same argument espoused by Amici in their brief.

In *In re Swanson*, the supreme court, while noting the history leading to the creation of the judicially created "settled purpose doctrine," did not direct the court's of this state to utilize the doctrine in lieu of the unconstitutional provision in the 1995 statute. Instead, the court expressly directed that the statutory definition of "abandoned child" would remain in effect until the legislature acted to amend the constitutionally defective statute. *Id*. at 189 n.14. Second, our supreme court was careful to note that *only* the definition of "willful failure to support" in the 1995 statutory amendment was unconstitutional, leaving the remainder of the statute in force. *Id*. at 188. Of particular significance is the fact that the following language from section 36-1-102 of the Tennessee Code, which was in effect when he Bakers filed their petition in this case, remained applicable to proceedings of this nature after the supreme court's decision in *In re Swanson*:

> (G) "Abandonment" and "abandonment of an infant" do not have any other definition except that which is set forth in this section, it being the intent of the general assembly to establish the only grounds for abandonment by statutory definition. *Specifically, it shall not be required that a parent be shown to have evinced a settled purpose to forego all parental rights and responsibilities in order for a determination of abandonment to be made. Decisions of any court to the contrary are hereby legislatively overruled*[.]

Tenn. Code Ann. § 36-1-102(1)(G) (2001) (emphasis added); *see also In re Swanson*, 2 S.W.3d at 188–89. Accordingly, we must conclude that reference to the "settled purpose doctrine" is no longer appropriate given the 1995 amendments to section 36-1-102(1) of the Tennessee Code and our supreme court's decision in *In re Swanson*.

To some extent, of course, the meaning of a "settled purpose" overlaps with and is subsumed within the statutory definition of willfulness in effect when the Bakers filed their petition to terminate the Hes' parental rights.[28] However, to the extent that the "settled purpose doctrine"

---

[28] The Hes and the Amici direct our attention to cases decided by this Court after the supreme court's ruling in *In re Swanson* and addressing petitions filed prior to the 2003 amendments to the statute at issue, wherein reference is made to the applicability of the "settled purpose doctrine" in deciding issues related to abandonment. *See State v. R.S.*, No. M2002-00919-COA-R3-CV, 2003 Tenn. App. LEXIS 657, at *25 (Tenn. Ct. App. Sept. 11, 2003); *Dep't of Children's Services v. C.L.*, No. M2001-02729-COA-R3-JV, 2003 Tenn. App. LEXIS 606, at *50–51 (Tenn. Ct. App. Aug. 29, 2003) (no perm. app. filed); *State v. Demarr*, No. M2002-02603-COA-R3-JV, 2003 Tenn. App. LEXIS 569, at *27 (Tenn. Ct. App. Aug. 13, 2003) (no perm. app. filed); *Spencer v. Aydlotte*, No. W2001-00995-COA-R3-CV, 2001 Tenn. App. LEXIS 957, at *9 (Tenn. Ct. App. Dec. 28, 2001) (no perm. app. filed); *Martin v. Martin*, No. M1999-00210-COA-R3-CV, 2000 Tenn. App. LEXIS 178, at *2–3 (Tenn. Ct. App. Mar. 23, 2000) (no perm. app. filed). However, in other cases dealing with petitions filed after *In re Swanson* but before the 2003 amendments to the statute at issue, this Court did not refer to the "settled purpose doctrine" but simply determined whether the biological parent's conduct was willful. *See In re Adoption of S.M.F.*, No. M2004-00876-COA-R9-PT, 2004 Tenn. App. LEXIS 826, at *24 (Tenn. Ct. App. Dec. 6, 2004) (no perm. app. filed); *In re S.M.*, 149 S.W.3d 632, 641–42 (Tenn. Ct. App. 2004); *In re Adoption of Muir*, No. M2002-02963-COA-R3-CV, 2003 Tenn. App. LEXIS 831, at *13–14 (Tenn. Ct. App. Nov. 25, 2003) (no perm. app. filed); *In re L.J.C.*, 124 S.W.3d 609, 620–21 (Tenn. Ct. App. 2003); *In re Adoption of Copeland*, 43 S.W.3d 483, 488 (Tenn. Ct. App. 2000). Regardless of any confusion which may have resulted from these

(continued...)

extends beyond the definition of abandonment set forth in the statute at issue, the statutory definition must be the standard applied by this Court to the present case. Consequently, we must conclude that reference to the "settled purpose doctrine" is no longer appropriate given the 1995 legislative amendments to the statutes governing termination of parental rights. Thus, the proper inquiry for this Court is whether the Hes' conduct, by failing to visit or failing to support A.M.H. during the four months immediately preceding the Bakers' petition, was "willful." *See* Tenn. Code Ann. § 36-1-102(1)(E) (2001) (defining willful failure to visit as "the *willful* failure, for a period of four (4) consecutive months, to visit or engage in more than token visitation"); *In re Swanson*, 2 S.W.3d at 189 n.14 (noting that the prior definition of "abandoned child" required that the biological parent's conduct in failing to support the child be *willful*).

In determining whether a parent's conduct was "willful," the legislature has confined the courts of this state to a particular period of time. The statute in effect on the date that the Bakers filed their petition to terminate the Hes' parental rights defined abandonment, in relevant part, as follows:

> For a period of *four (4) consecutive months immediately preceding the filing of a proceeding or pleading to terminate the parental rights of the parent(s)* . . . of the child who is the subject of the petition for termination of parental rights or adoption, that the parent(s) . . . either have willfully failed to visit or have willfully failed to support or make reasonable payments toward the support of the child[.]

Tenn. Code Ann. § 36-1-1-102(1)(A)(i) (2001) (emphasis added). This Court has previously noted the significance of this legislatively created time period, stating:

> Finally, we note that the trial court, in deciding whether J.M.S. abandoned S.M.F., did not confine itself to consideration of his conduct during the four-month periods immediately preceding the filing of the petition for adoption and termination and S.M.F.'s birth. In doing so, the trial court deviated from the statutory definition of "abandonment" contained in Tenn. Code Ann. § 36-1-102(1)(A)(i) and (iii). In Tennessee, the grounds for terminating parental rights are governed solely by statute, and Tenn. Code Ann. § 36-1-102(1)(G) specifically provides that "abandonment" does "not have any other definition except that which is set forth in this section, it being the intent of the general assembly to establish the only grounds for abandonment by statutory definition." Thus, the trial court erred to

---

[28](...continued)

earlier cases, our supreme court's opinion in *In re Swanson* makes clear that the legislature abrogated the "settled purpose doctrine," and the supreme court instructed that parties seeking to terminate a biological parent's parental rights thereafter must prove that the parent "*willfully*" failed to support the child.

the extent that it based its decision regarding abandonment on J.M.S.'s conduct occurring after the conclusion of the statutory four-month periods.

*In re Adoption of S.M.F.*, No. M2004-00876-COA-R9-PT, 2004 Tenn. App. LEXIS 826, at \*30–31 (Tenn. Ct. App. Dec. 6, 2004) (no perm. app. filed); *see also In re Muir*, No. M2002-02963-COA-R3-CV, 2003 Tenn. App. LEXIS 831, at \*19 (Tenn. Ct. App. Nov. 25, 2003) (no perm. app. filed) (noting that the "pivotal question" when evaluating the willful failure to visit or support is the conduct of the biological parent within the four months preceding the filing of the petition to terminate). The Bakers filed their petition to terminate the Hes' parental rights on June 20, 2001, therefore, we must necessarily direct our attention to the conduct of the Hes within the four months immediately preceding that date. *See In re D.L.B.*, 118 S.W.3d 360, 366 (Tenn. 2003) ("[W]e hold that only a parent's conduct in the four months immediately preceding the filing of a petition then before the court may be used as grounds to terminate parental rights under Tennessee Code Annotated section 36-1-102(1)(A)(i).").

This Court has previously addressed the concept of "willfulness" as it relates to the abandonment ground for terminating a biological parent's parental rights, stating:

> The concept of "willfulness" is at the core of the statutory definition of abandonment. For the purpose of Tenn. Code Ann. § 36-1-102(1)(A)(i), a parent cannot be found to have abandoned a child unless the parent either has "willfully" failed to engage in more than token visitation or has "willfully" failed to provide more than token monetary support to the child for four consecutive months. "Willfully" is a word of many meanings, and so each use of the word must be interpreted with reference to the statutory context in which it appears. *United States v. Sanchez-Corcino*, 85 F.3d 549, 552-53 (11th Cir. 1996); GEORGE W. PATON, A TEXTBOOK ON JURISPRUDENCE 313 n.2 (4th ed. 1972) (suggesting that use of the word should be avoided because of its ambiguities).
>
> "Willfulness" does not require the same standard of culpability required by the penal code. *G.T. v. Adoption of A.E.T.*, 725 So. 2d 404, 409 (Fla. Dist. Ct. App. 1999). Nor does it require malevolence or ill will. *In re Adoption of a Minor*, 343 Mass. 292, 178 N.E.2d 264, 267 (Mass. 1961). Willful conduct consists of acts or failures to act that are intentional or voluntary rather than accidental or inadvertent. *In re Mazzeo*, 131 F.3d 295, 299 (2d Cir. 1997); *United States v. Phillips*, 19 F.3d 1565, 1576 (11th Cir. 1994); *In re Adoption of Earhart*, 117 Ohio App. 73, 190 N.E.2d 468, 470 (Ohio Ct. App. 1961); *Meyer v. Skyline Mobile Homes*, 99 Idaho 754, 589 P.2d 89, 96 (Idaho 1979). Conduct is "willful" if it is the product of free will rather than coercion. Thus, a person acts "willfully" if he

or she is a free agent, knows what he or she is doing, and intends to do what he or she is doing.

. . . .

The willfulness of particular conduct depends upon the actor's intent. Intent is seldom capable of direct proof, and triers-of-fact lack the ability to peer into a person's mind to assess intentions or motivations. *American Cable Corp. v. ACI Mgt., Inc.*, 2000 Tenn. App. LEXIS 615, No. M1997-00280-COA-R3- CV, 2000 WL 1291265, at *4 (Tenn. Ct. App. Sept. 14, 2000) (No Tenn. R. App. P. 11 application filed). Accordingly, triers-of-fact must infer intent from the circumstantial evidence, including a person's actions or conduct. *See Johnson City v. Wolfe*, 103 Tenn. 277, 282, 52 S.W. 991, 992 (1899); *Absar v. Jones*, 833 S.W.2d 86, 89-90 (Tenn. Ct. App. 1992); *State v. Washington*, 658 S.W.2d 144, 146 (Tenn. Crim. App. 1983); *see also In re K.L.C.*, 9 S.W.3d 768, 773 (Mo. Ct. App. 2000). A person's demeanor and credibility as a witness also play an important role in determining intent. Accordingly, trial courts are best suited for making willfulness determinations. *In re D.L.B.*, 118 S.W.3d at 367, 2003 Tenn. LEXIS 983, 2003 WL 22383609, at *6.

***In re Muir***, 2003 Tenn. App. LEXIS 831, at *13–17. Determining whether a biological parent has willfully failed to visit or support his or her child is a fact intensive inquiry, and the courts of this state are required to engage in an "individualized determination" of whether the standard has been met in a given case. ***See In re Swanson***, 2 S.W.3d 180, 188 (Tenn. 1999).

**2.**
**Willful Failure to Support**

Regarding the willful failure to support component of abandonment, the trial court made the following relevant factual findings:

157. The Hes had the ability to pay child support payments for AMH from January 28, 2001, to June 20, 2001.
158. The Hes swore, under oath, in the Petition to Modify custody they signed on May 3, 2000, that "circumstances had changed" and that the Hes were "fully willing and able to properly care and provide for AMH," yet they willfully failed to provide support for AMH after May 3, 2000.
159. Mrs. He swore under oath on April 9, 2001, in the Petition to Modify custody, that the Hes were "able to provide care,

support and proper supervision for AMH," yet, again, they willfully failed to provide support for AMH before and after April 9, 2001.

160. Even though there was no child support order in place, the Hes knew they had an obligation to provide child support for AMH from January 28, 2001, to June 20, 2001, as evidenced by statements made to [the juvenile court referee] and the fact that they provided support for their son, Andy.

161. The Hes paid no support for AMH from January 28, 2001, to June 20, 2001.

162. During the June 28, 2000, hearing before [the juvenile court referee], Mr. He told [the referee] that the Hes would send $25.00 per month to China for AMH's support, if the Hes regained custody of AMH.

163. The Hes paid someone to take their younger son, Andy, to [China] during the month of May 2001. The Hes began sending $1,000.00 per month to China to support their son, Andy, sometime during May 2001.

164. Sometime after sending her son, Andy, to China, Mrs. He purchased a new computer.

165. The Hes took vacation trips to New Orleans, Atlanta, Arizona, Ohio, and California, between June 4, 1999 and June 20, 2001. The Hes also took trips for other purposes to Atlanta and Washington, D.C., during the same time period.

166. The Hes lived in an apartment and paid monthly rental payments of $625.00 during the period from January 28, 2001, to June 20, 2001.

167. The Hes used their economic resources to accumulate and purchase non-necessary possessions and to take multiple vacations for pleasure and several trips for other purposes, all consistent with the Hes' agreement with the Bakers that the Bakers would raise AMH until age eighteen, and evincing the Hes' intention to forego all parental obligations and responsibilities for AMH.

. . . .

168. During the foster care period, February 24, 1999, to May 23, 1999, the Hes put a sum of money, approximately $300.00, on the Bakers' couch during a visit. Mrs. He told the Bakers that the Hes would give the Bakers more money for AMH's support as soon as they were financially able. Mrs. Baker told the Hes that the Bakers could not take the money. The Bakers

were not allowed to accept money for foster children in their care, except for the $6.00 per day that Mid-South paid the Bakers under the foster care agreement with Mid-South.

169. On June 4, 1999, when the Hes signed the Juvenile Court Consent Order Awarding Custody, there was no mention of child support.

170. Because of the agreement with the Hes that the Bakers were to rear AMH to age eighteen, the Bakers did not expect the Hes to make payments to support AMH, and the Bakers never asked the Hes to pay child support for AMH, after the June 4, 1999, Consent Order Awarding Custody was entered.

. . . .

172. During the Hes' approximate eighty (80) visits with AMH, between June 4, 1999, to January 28, 2001, they occasionally brought items for AMH . . . . All of these items were of insubstantial economic value and amounted to token support.

Based on these facts, the trial court concluded that the Hes abandoned A.M.H. by willfully failing to support her for the four consecutive months prior to June 20, 2001.

After reviewing the record, we must conclude that the evidence in the record does not preponderate against the trial court's findings of fact in this case. *See In re M.J.B.*, 140 S.W.3d 643, 654 (Tenn. Ct. App. 2004). Our inquiry at this point must shift to a determination of whether these facts clearly and convincingly establish a willful failure to support A.M.H. on the part of the Hes. *See id*.

This Court has previously addressed the "willfulness" aspect of a parent's failure to support a child, stating:

Failure to support a child is "willful" when a person is aware of his or her duty to support, has the capacity to provide support, makes no attempt to provide support, and has no justifiable excuse for not providing the support.

*In re Muir*, 2003 Tenn. App. LEXIS 831, at *15; *see also In re M.J.B.*, 140 S.W.3d at 654. Upon reviewing the trial court's findings of fact relevant to this issue, we note that many of the facts relied upon by the trial court in deciding that the Hes willfully failed to support A.M.H. constitute actions by the Hes well beyond the four month period immediately preceding the date the Bakers filed their petition in this case. In determining whether a biological parent's conduct in failing to support a child amounts to "willfulness," it may become necessary in a given case to evaluate events occurring

prior to the start of the four month period.[29]  ***See In re Adoption of Kleshinski***, No. M2004-00986-COA-R3-CV, 2005 Tenn. App. LEXIS 275, at \*65 (Tenn. Ct. App. May 4, 2005) ("In the overall circumstances, Father's physical abuse of Mother during their marriage is relevant, since it is the backdrop for the trial court's consideration of Mother's claim of fear of physical abuse.").

The legislature has charged the parents of a minor child with the duty to support the child. *See* Tenn. Code Ann. § 34-1-102(a), (b) (2003); *see also **Smith v. Gore***, 728 S.W.2d 738, 750 (Tenn. 1987); ***In re M.J.B.***, 140 S.W.3d at 655.  The Hes do not deny an awareness of the parents' general responsibility to provide financial support for their child.  The Hes' awareness is evidenced by their payment of $1,000.00 per month for their son's support while in China, their stated intention to pay $25.00 per month for A.M.H.'s care if they regained custody and sent her to China, and their payment of $300.00 to the Bakers during the foster care period.  The facts also demonstrate that the Hes were financially able to support A.M.H. during the relevant four month period.  The Hes stated under oath in their petitions to modify the custody order that they were once again able to provide financially for A.M.H., they purchased a new car in October of 2001, Mother purchased a new computer, and the Hes took trips to several American cities.

The Hes argue, however, that they cannot be found to have willfully failed to support A.M.H. because they were never informed they had a duty to support her while she remained in the Bakers' custody.  In support of this position, the Hes cite to cases in which this Court found that the parent did not willfully fail to support the child when the Tennessee Department of Children's Services failed to inform the parent of a duty to support.  ***See In re J.J.C.***, 148 S.W.3d 919, 927 (Tenn. Ct. App. 2004); ***State v. DeMarr***, No. M2002-02603-COA-R3-JV, 2003 Tenn. App. LEXIS 569, at \*38 (Tenn. Ct. App. Aug. 13, 2003) (no perm. app. filed).  They also note that the June 4, 1999 custody order did not mention a duty to support A.M.H., citing to cases in which this Court noted the lack of a court order directing the parent to pay support when finding that a parent did not willfully fail to support the child.  ***See DeMarr***, 2003 Tenn. App. LEXIS 569, at \*38; ***Hickman v. Hickman***, No. E2000-00927-COA-R3-CV, 2000 Tenn. App. LEXIS 653, at \*4 (Tenn. Ct. App. Sept. 28, 2000) (no

---

[29] We are cognizant of our prior statement in *In re S.M.F.*, 2004 Tenn. App. LEXIS 826, at \*30–31, and we agree that an inquiry into whether a parent's conduct is "willful" should generally focus on the four months immediately preceding the filing of a petition to terminate the parental rights of the parent.  *See In re D.L.B.*, 118 S.W.3d 360, 366 (Tenn. 2003).  We note, however, that in *In re S.M.F.*, the trial court "based its decision regarding abandonment on [the parent's] conduct occurring *after the conclusion of the statutory four-month period*."  *In re S.M.F.*, 2004 Tenn. App. LEXIS 826, at \*31 (emphasis added).  Conduct *after* the termination petition is filed is obviously of no value in determining whether a parent's conduct *prior to* the filing of the petition was willful.  In some instances, such as this case, a parent may have done nothing (*i.e.*, provided no support or did not visit) within the four month period.  If we were constrained to considering only this "conduct," it would preclude the courts of this state from considering events occurring prior to the four month period which bear on the "willfulness" of the parent's conduct during the four month period.  *See In re Swanson*, 2 S.W.3d 180, 188 (Tenn. 1999) (noting that the federal and state constitutions "require the opportunity for an individualized determination" before a parent's fundamental right to the care, custody, and control of the child may be severed).

The statutory four-month period, besides being legislatively mandated, necessarily limits the inclusion of totally unnecessary and irrelevant facts into the trial court's evaluation of willfulness.  We wish to emphasize that we do not mean to imply that a trial court has carte blanche to evaluate facts outside the four-month statutory period which have no bearing on the determination of a parent's "willfulness."

perm. app. filed); *Martin v. Martin*, No. M1999-00210-COA-R3-CV, 2000 Tenn. App. LEXIS 178, at *4 (Tenn. Ct. App. Mar. 23, 2000) (no perm. app. filed). According to the Hes, these cases stand for the proposition that "without notice, their can be no willfulness." The Hes argument in this regard is closely akin to their previous argument regarding the constitutionality of the adoption statutes. We have previously dealt with the Hes' constitutional arguments, and we need not return to those arguments in this section of the Opinion.

For purposes of our discussion here, however, we note that both *In re J.J.C.* and *DeMarr* involved the failure on the part of the Tennessee Department of Children's Services, a state agency, to provide the parent with notice of a duty to support in cases where the child was taken from the parent's custody by the department. *See* Tenn. Code Ann. § 37-2-403 (2003) (governing the duty of an "agency" to provide parental notification of the law governing abandonment). The adoption statutes contain no reciprocal requirement. *See* Tenn. Code Ann. § 36-1-101 *et seq.* (2003). At the time the Hes appealed the present controversy to this Court, no Tennessee case had addressed the effect of a parent's lack of notice regarding a duty to support in the context of a private agreement transferring custody of a child to a non-parent. Since that time, however, this Court has had occasion to address the issue, stating:

> When the Department of Children's Services or other child-placing agency obtains custody of children removed from the parents' home, it is required to notify the parents of the statutory definitions of abandonment and the criteria and procedures for termination of parental rights. Tenn. Code Ann. § 37-2-403(a)(2)(A). In such situations, a court cannot terminate a parent's rights on the ground of abandonment unless such notice, including the consequence of abandonment, has been given by the agency petitioning for termination or the court itself. Tenn. Code Ann. § 37-2-403(a)(2)(B). In the case before us, neither DCS nor another agency was involved, so the statute does not apply. Nonetheless, Mother's knowledge of a duty or expectation that she provide support and visit is *a factor in determining willfulness*. We find nothing in the record to indicate she was ever told she was expected to provide support or face termination of her parental rights.

*In re W.B., IV*, No. M2004-00999-COA-R3-PT, 2005 Tenn. App. LEXIS 262, at *38 (Tenn. Ct. App. Apr. 29, 2005) (no perm. app. filed) (emphasis added). Accordingly, we decline the Hes' invitation to formulate a *per se* rule to defeat a finding of willfulness when a biological parent voluntarily relinquishes custody of a child to a non-parent pursuant to a private agreement. Such a rule would thwart the individualized decision making required in cases of this nature, *see In re Swanson*, 2 S.W.3d at 188, especially when the facts establish that the biological parents are clearly aware of their duty to support their child despite the lack of formal notice.

Instead, the biological parents' lack of notice regarding the duty to support their minor child is merely a *factor* to consider when determining if that failure was "willful." *See In re W.B., IV*, 2005 Tenn. App. LEXIS 262, at *38; *In re Adoption of Kleshinski*, 2005 Tenn. App. LEXIS 275, at *53–57. Thus, a determination of whether the aforementioned evidence clearly and convincingly establishes that the Hes "willfully" failed to support A.M.H. hinges upon whether they "voluntarily and intentionally [chose] not to provide financial support without a justifiable excuse." *In re M.J.B.*, 140 S.W.3d at 654 (citing *In re Muir*, 2003 Tenn. App. LEXIS 831, at *15). The determinative fact in this case is the Bakers' refusal to accept any money offered by the Hes for the support of A.M.H. During the initial three month foster care period, the Bakers refused the $300.00 offered by the Hes. At trial, the Bakers testified that they did not expect the Hes to pay child support because they believed they would be responsible for raising A.M.H. until she became an adult. We cannot say that a parent's failure to pay child support is "willful" when any attempt to offer such support is rebuffed. We find that the evidence in the record does not clearly and convincingly establish that the Hes "willfully" failed to support A.M.H. during the four month period immediately preceding the Bakers' petition to terminate the Hes' parental rights. Accordingly, we reverse the trial court's decision on this issue.

### 3.
### Willful Failure to Visit

Regarding the willful failure to visit component of the abandonment ground, the trial court made the following findings of fact and conclusions of law:

> 150. On January 28, 2001, AMH's second birthday, the Hes came to the Bakers' home to visit AMH and requested of the Bakers that the Hes be allowed to take AMH with them to have a family portrait made. The Bakers refused the Hes' request because AMH had been ill for several days prior to January 28, 2001. The Hes then became upset and angry, started raising their voices, and Mrs. He started screaming and crying. AMH then became upset and the Bakers asked the Hes to leave the Bakers' home. The Hes refused to leave. Mr. He became very pushy and told Mr. Baker to call the police. Mr. He told the Bakers, "I won't leave here." The Bakers then called the police to have the Hes removed from the Bakers' home.
>
> 151. Shelby County Sheriff's [Deputy Astor ] . . . came to the Bakers' home in response to the January 28, 2001, disturbance call. When the Deput[y] arrived at the Bakers' home, Mr. and Mrs. Baker were calm and Mr. and Mrs. He were very irate and agitated. The Hes continued to be upset

and agitated while the deput[y] conducted [his] investigation of the incident. During the investigation, the Hes were outside the Bakers' home yelling, screaming, and causing a disturbance.

152. . . . After spending approximately forty-five minutes to one hour at the Bakers' home on January 28, 2001, Deputy Astor told the Hes to leave the Bakers' home and not to come back that day. The reason Deputy Astor told the Hes not to come back to the Bakers' home that day was because he wanted to neutralize the situation and because he did not want Mrs. He to be arrested. Deputy Astor advised the Hes that their disagreement with the Bakers was a civil matter, and he advised the Hes to seek legal advice from an attorney about the matter.

153. Both Mr. and Mrs. He testified that they did not return to the Bakers' home to visit AMH after the January 28, 2001, incident because they were afraid that they would be arrested by the police. However, this Court finds this testimony lacking in credibility, since there have been numerous instances when the police were called due to Mrs. He's inappropriate behavior. . . .

. . . .

174. The Hes did not attempt to otherwise call, write, or make any other attempt to contact the Bakers about visiting AMH, or to inquire about AMH's well-being from January 29, 2001, to June 20, 2001.

175. The Hes willfully failed to visit AMH from January 29, 2001, to June 20, 2001.

176. The Hes testified that they did not visit AMH after January 28, 2001, because they feared for their personal safety if they returned to the Bakers' home for a visit. The Court finds the Hes' testimony to be lacking in credibility.

177. After January 28, 2001, the Hes willfully made the decision not to visit AMH.

178. Between January 28, 2001, and June 20, 2001, the Hes never visited AMH and never made a request to the Bakers to visit AMH.

179. The Hes right to visit AMH was never restricted by any court until February 8, 2002, when this Court entered an order prohibiting the Hes from attempting "to have any contact, direct or indirect, in person, or otherwise, with AMH," until

further order of the Court. The Court entered the February 8, 2002, "no-contact" order because, on February 7, 2002, the Court had ordered the Hes to deliver AMH's passport to the Clerk & Master by 4:00 P.M. that day. At 4:00 P.M. on February 7, 2002, the Hes' counsel telephoned the Court and advised the Court that the Hes had no intention of complying with the Court's order, and the Court then entered the "no-contact" order the next day.

180. The Bakers were willing to allow the Hes to have visits with AMH after the January 28, 2001, disturbance in the Bakers' home, but the Hes never contacted the Bakers and requested any visitation with AMH.

181. Immediately after the January 28, 2001, disturbance, the Bakers decided that all future visits by the Hes would have to be arranged at a location other than the Bakers' home because of the August 1, 2000, and January 28, 2001, disturbances.

182. Immediately after January 28, 2001, in futherance of the necessity to arrange future visitations at a site other than the Bakers' home, Mrs. Baker telephoned the Exchange Club Family Center to inquire about its ability to provide visitation services and facilities for any future visits with AMH by the Hes.

183. The Bakers were willing to allow the Hes to have visits with AMH, through the facilities of the Exchange Club Family Center, even after Mrs. He signed her second Petition to Modify custody.

184. The only contact the Hes made with the Bakers after January 28, 2001, occurred on April 2, 2001. On that date, Mrs. He called the Bakers' home and left the following message on the Bakers' telephone answering machine: "Come to my home and get your baby bed, we are moving, thank you, bye bye."

185. The Bakers did not respond to Mrs. He's April 2, 2001, telephone call because Mrs. He did not say anything about AMH or about wanting to visit AMH. The Bakers did not go to the Hes' apartment after Mrs. He's April 2, 2001, telephone call.

186. The INS contacted Mr. He about the Hes' immigration status in March, April, or May, 2001.

187. Mrs. He signed a second Petition to Modify the Consent Order Awarding Custody on April 9, 2001, that was subsequently filed in Juvenile Court on May 29, 2001. The Court notes that Mrs. He did not request visitation with AMH when she filed the petition to modify custody. It is well-

settled that a parent may always petition to have visitation reinstated upon a showing of changed circumstances. Mrs. Hes' [sic] willful failure to seek reinstatement of visitation with AMH demonstrates that her goal in filing the Petition to Modify to regain custody was for the sole purpose of remaining in the United States and avoiding deportation. Mrs. Hes' failure to ask the Court to reinstate visitation with AMH, when she could have easily done so, evinces Mrs. Hes' [sic] willful abandonment of AMH.

(citations omitted). After reviewing the record, we cannot say that the evidence in the record preponderates against the trial court's findings of fact, *see In re M.J.B.*, 140 S.W.3d at 654, many of which resulted from the trial court's conclusions regarding the credibility of the witnesses. *See Wells v. Tenn. Bd. of Regents*, 9 S.W.3d 779, 783 (Tenn. 1999) (noting that we will not re-evaluate the trial court's findings regarding the credibility of a witness absent clear and convincing evidence warranting a different result). Thus, as we did when evaluating the Hes' alleged willful failure to support A.M.H., we must now determine whether these facts constitute clear and convincing evidence of the Hes' willful failure to visit A.M.H. *See In re M.J.B.*, 140 S.W.3d at 654.

The aforementioned facts do not constitute all of the findings of fact made by the trial court regarding this issue. In a separate section of its opinion, the trial court included numerous findings related to the Hes' visitation with A.M.H. between June 4, 1999 (the date of the juvenile court's consent order awarding custody of A.M.H. to the Bakers) and January 28, 2001 (the last time the Hes visited A.M.H.).[30] As we previously noted, we must constrain our focus to whether the Hes' failure to visit within the four months immediately preceding the date the Bakers' filed their petition to terminate the Hes' parental rights was willful. *See In re S.M.F.*, No. M2004-00876-COA-R9-PT, 2004 Tenn. App. LEXIS 826, at *30–31 (Tenn. Ct. App. Dec. 6, 2004) (no perm. app. filed). However, to properly examine the willfulness, or lack thereof, of a biological parent's failure to visit within the four month period, it may become necessary in a given case to look to facts occurring outside the four month period. *See In re Adoption of Kleshinski*, No. M2004-00986-COA-R3-CV, 2005 Tenn. App. LEXIS 275, at *65 (Tenn. Ct. App. May 4, 2005) (no perm. app. filed). In discussing the Hes' visitation during the period between June 4, 1999 and January 28, 2001, the trial

---

[30] On appeal, the Hes raise, as a separate issue, whether the trial court erred by recognizing a purported agreement which contravenes the public policy of Tennessee. The Hes continue to dispute that they entered into an oral agreement with the Bakers whereby the Bakers would raise A.M.H. until she turned eighteen. The trial court, after hearing the conflicting testimony, found that the parties did enter into the oral agreement. We find no clear and convincing evidence in the record to disrupt this finding by the trial court. *See Wells v. Tenn. Bd. of Regents*, 9 S.W.3d 779, 783 (Tenn. 1999). The Hes assert that, by terminating their parental rights for willfully abandoning A.M.H., the trial court, in essence, enforced an illegal contract violating the public policy of this state.

The trial court's order, when discussing the Hes' willful failure to visit and willful failure to support, merely lists this agreement as one of the facts in support of the trial court's finding of willfulness on the part of the Hes. To the extent the trial court considered the agreement as a factor in deciding willfulness, we find no error. However, the record before this Court does not support the Hes' assertion that the trial court sought to enforce the parties' "contract." Accordingly, we find this issue to be without merit.

court made findings related to the substance, length, and token nature of those visits. Since many of these findings have no bearing on the Hes' "willfulness" during the four month period at issue, they do not warrant mention. *See* Tenn. Code Ann. § 36-1-102(1)(E) (2001) (defining "willful failure to support" as "the willful failure, for a period of four (4) consecutive months, to visit or engage in more than token visitation"); *see also In re D.L.B.*, 118 S.W.3d 360, 366 (Tenn. 2003) ("[W]e hold that only a parent's *conduct* in the four months immediately preceding the filing of a petition then before the court may be used as grounds to terminate parental rights under Tennessee Code Annotated section 36-1-102(1)(A)(i).").

On appeal, the Hes assert that there are additional facts contained in the record which warrant consideration when evaluating this issue. The Hes cite to our decision in *In re Z.C.G.*, No. M2000-02939-COA-R3-CV, 2001 Tenn. App. LEXIS 783, at *19 (Tenn. Ct. App. Oct. 22, 2001) (no perm. app. filed), wherein we acknowledged the validity of the trial court's credibility determinations, but we reversed the finding that the father had willfully failed to visit his child by making reference to several uncontroverted facts overlooked by the trial court. However, our decision in *In re Z.C.G.* is distinguishable from the present case because that case involved the biological mother's attempt to overtly impede the father's visitation, and we noted that the father called the mother to inquire about his visitation. *See id*. at *19–20. In the present case, it is undisputed that the Hes did not call the Bakers to inquire about visitation during the four month period at issue. Moreover, any evidence tending to show that the Bakers attempted to impede the Hes' visitation at certain times prior to the four month period at issue fails to demonstrate why the Hes did not visit A.M.H. during the four month period.

"The question of intent or willfulness is fact specific and depends on the totality of the circumstances." *In re W.B., IV*, No. M2004-00999-COA-R3-PT, 2005 Tenn. App. LEXIS 262, at *28 (Tenn. Ct. App. Apr. 29, 2005). As with the willful failure to support component of abandonment, the Hes again argue that they did not receive notice that their failure to visit A.M.H. could result in a termination of their parental rights, therefore, their failure to visit cannot be deemed willful. The parties do not dispute that the Hes never received such notice. However, as we previously noted, the Hes lack of knowledge regarding the need to visit A.M.H. is merely "a factor in determining willfulness." *Id*. at *38. Thus, we must look to the other factual findings of the trial court to determine if they constitute clear and convincing evidence of the Hes' willful failure to visit A.M.H.

The trial court determined that, upon responding to the incident at the Bakers' home on January 28, 2001, Deputy Astor instructed the Hes to refrain from returning to the Bakers home *that day*. At trial, the Hes testified that they understood Deputy Astor's instructions to mean do not ever return. The Hes also stated that they feared arrest or physical harm if they returned to the Bakers' residence after that date. Stated differently, the Hes seek to assert that they were complying with the instructions of an authority figure and felt intimidated. However, the Hes have demonstrated on several occasions that they are not intimidated by the authority of others. The Bakers called the police on August 1, 2000 when Mother refused to leave their home after causing a disturbance. After the police arrived and instructed her to leave, Mother left the Bakers' residence. However, she

subsequently returned and continued her weekly visits with A.M.H. On another occasion Mother picketed the Bakers' home and a neighbor asked Mother to move her car. When Mother refused, the neighbor called the police. After the police instructed Mother to move the vehicle, Mother complied and returned to picketing the Bakers' home. On April 2, 2001, Mother called the Bakers' home to instruct them to come retrieve a baby bed that Mrs. Baker had loaned the Hes. However, Mother did not leave a message requesting to visit A.M.H., further evidencing her lack of fear in contacting the Bakers. Finally, when ordered by Chancellor Alissandratos to surrender A.M.H.'s passport to the court, the Hes refused to comply. These incidences demonstrate that the Hes' justification for not returning to the Bakers' home after January 28, 2001 is not well founded.

The Hes engaged in several courses of conduct during the four month period immediately preceding the date the Bakers filed their petition to terminate the Hes' parental rights which are relevant to resolving this issue. In February of 2001, Father faxed a letter to the juvenile court and the media expressing a desire to regain custody of A.M.H. In April of 2001, the Hes went to the juvenile court and spoke with Ms. Brown. Ms. Brown stated that Mother appeared genuinely interested in regaining custody of A.M.H., and Ms. Brown prepared a petition for Mother asking the juvenile court to modify the June 4, 1999 custody order. This petition, which was filed in May of 2001, asked for a modification of custody, but it did not ask for visitation. During March, April, or May of 2001, immigration officials contacted Father about the Hes' immigration status. The trial court concluded that the Hes' attempts to regain custody of A.M.H. during this period were for the sole purpose of avoiding deportation.

The Hes assert that the record does not support the trial court's conclusion since there is no evidence showing a connection between the calls from immigration officials and the Hes' desire to have A.M.H. returned to them. We cannot conclude that the record does not support this conclusion. The trial court determined that, at the end of the initial three month foster care period, the Hes met with the Bakers and asked them to raise A.M.H. until she turned eighteen, but they wanted to retain their parental rights in order to remain in this country. In May of 2000, the Hes filed their first petition seeking to modify the June 4, 1999 custody order. Father testified that he had been contacted by immigration officials before the Hes filed this petition. After filing the May 2000 petition, Father met with Mr. Baker at the Hes' apartment to discuss the petition. One of the options presented by Father included the Bakers promising to refrain from any action which would cause the Hes to be deported. The CASA assigned to investigate the Hes' May 2000 petition filed a report with the juvenile court expressing concern that the Hes were seeking to regain custody to avoid deportation. Thus, the Hes' desire to avoid deportation has been a consistent theme throughout the tortured history of this case.

We once again resort to a prior decision of this Court addressing the concept of "willfulness," wherein we stated:

> The willfulness of particular conduct depends upon the actor's intent. Intent is seldom capable of direct proof, and triers-of-fact lack the ability to peer into a person's mind to assess intentions or

motivations. *American Cable Corp. v. ACI Mgt., Inc.*, 2000 Tenn. App. LEXIS 615, No. M1997-00280-COA-R3- CV, 2000 WL 1291265, at *4 (Tenn. Ct. App. Sept. 14, 2000) (No Tenn. R. App. P. 11 application filed). Accordingly, triers-of-fact must infer intent from the circumstantial evidence, including a person's actions or conduct. *See Johnson City v. Wolfe*, 103 Tenn. 277, 282, 52 S.W. 991, 992 (1899); *Absar v. Jones*, 833 S.W.2d 86, 89-90 (Tenn. Ct. App. 1992); *State v. Washington*, 658 S.W.2d 144, 146 (Tenn. Crim. App. 1983); *see also In re K.L.C.*, 9 S.W.3d 768, 773 (Mo. Ct. App. 2000). A person's demeanor and credibility as a witness also play an important role in determining intent. Accordingly, trial courts are best suited for making willfulness determinations. *In re D.L.B.*, 118 S.W.3d at 367, 2003 Tenn. LEXIS 983, 2003 WL 22383609, at *6.

*In re Muir*, No. M2002-02963-COA-R3-CV, 2003 Tenn. App. LEXIS 831, at *17 (Tenn. Ct. App. Nov. 25, 2003) (no perm. app. filed); *see also In re S.M.F.*, No. M2004-00876-COA-R9-PT, 2004 Tenn. App. LEXIS 826, at *24–26 (Tenn. Ct. App. Dec. 6, 2004) (no perm. app. filed). Based on the record presently before this Court, we conclude that the Bakers proved, by clear and convincing evidence, that the Hes willfully failed to visit A.M.H. during the four months immediately preceding the filing of the Bakers' petition to terminate the Hes' parental rights. Accordingly, we affirm the trial court's finding that the Hes have abandoned A.M.H.

**4.**
**Father's Status as a Legal Parent**

When the Bakers filed their petition to terminate the Hes' parental rights in this case, the following version of section 36-1-113 was in effect:

> The parental rights of any person who is not the legal parent or guardian of a child . . . may also be terminated based upon any one (1) or more of the following additional grounds:
>
> . . . .
>
> (ii) The person has failed, without good cause or excuse, to make reasonable and consistent payments for the support of the child in accordance with the child support guidelines promulgated by the department pursuant to § 36-5-101;
>
> . . . .

(iv) The person has failed to manifest an ability and willingness to assume legal and physical custody of the child;

(v) Placing custody of the child in the person's legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the child; or

(vi) The person has failed to file a petition to establish paternity of the child within thirty (30) days after notice of alleged paternity by the child's mother . . . .

Tenn. Code Ann. § 36-1-113(g)(9)(A) (2001).  In its memorandum opinion, the trial court made the following ruling regarding Father's parental rights to AMH:

> *Tennessee Code Annotated* § 36-1-113(g)(9)(ii), (iv), (v), and (vi):
> The Court concludes, by clear and convincing evidence that, *at the time of the filing of the Petition to Terminate Parental Rights*, Shaio-Qiang (Jack) He, was not the legal parent or guardian of AMH.  The Court further concludes, by clear and convincing evidence, that Shaio-Qiang (Jack) He's parental rights should be terminated because:
> (1) Mr. He has failed, without good cause or excuse, to make reasonable and consistent payments for the support of AMH in accordance with his ability to pay;
> (2) Mr. He has engaged in only token visitation with AMH;
> (3) Mr. He has failed to manifest an ability and willingness to assume legal and physical custody of AMH; and
> (4) Placing custody of AMH in Mr. He's legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the child.

(emphasis added).

On appeal, Father argues that the trial court erred in relying on the above cited statute to terminate his parental rights.  He cites to the voluntary acknowledgment of paternity he executed on March 15, 2002 and contends that this acknowledgment, consistent with our supreme court's decision in **Jones v. Garrett**, 92 S.W.3d 835 (Tenn. 2002), makes the aforementioned statute inapplicable to the present case.  Conversely, the Bakers argue that, since Father did not file a petition to establish paternity as required by section 36-1-113(g)(9)(A)(vi) of the Tennessee Code within thirty (30) days after he received notice he was the biological father of AMH, the aforementioned statute does apply in this case.  The Bakers also assert that no Tennessee court has ever ruled that a voluntary acknowledgment of paternity is on equal footing with the statutorily required "petition to establish paternity," therefore, the statute applies since there has never been an adjudication of any such petition in this case.  Moreover, the Bakers argue that the legislature

recently amended the aforementioned statute, and they urge this Court to apply the policy for the amendment, as they perceive it, to the present case.

At the outset, we must determine which version of the statute at issue applies to the present case. The Bakers filed their petition to terminate the Hes' parental rights to A.M.H. on June 20, 2001. The legislature amended section 36-1-113(g)(9) of the Tennessee Code in 2003 to provide as follows:

> The parental rights of any person who, *at the time of the filing of a petition to terminate the parental rights of such person or, if no such petition is filed, at the time of the filing of a petition to adopt a child*, is not the legal parent or guardian of such child . . . may also be terminated based upon any one (1) or more of the following additional grounds[.]

Tenn. Code Ann. § 36-1-113(g)(9)(A) (2003) (emphasis added); *see also* 2003 Tenn. Pub. Acts ch. 231, § 10. In light of this amendment, our supreme court has noted that "there now exists statutory authority to apply the additional grounds for termination enumerated in section 36-1-113(g)(9)(A) to persons who have established legal parentage, but did so subsequently to the filing of a petition seeking termination of their parental rights."[31] *In re D.A.H.*, 142 S.W.3d 267, 272–73 (Tenn. 2004). In *In re D.A.H.*, the petitioner argued that the new statutory language should be applied retroactively to enable the trial court to apply the statute to the biological father in that case. *Id*. at 273. Our supreme court disagreed, holding that the amended statute does not apply retroactively to cover events alleged in a termination petition filed prior to the amendment of the statute. *Id*. at 274–75. Accordingly, we must apply the pre-2003 version of the statute in effect at the time the Bakers filed their petition in the instant case.

Our supreme court addressed the pre-2003 language in section 36-1-113(g)(9)(A) of the Tennessee Code in *Jones v. Garrett*, 92 S.W.3d 835 (Tenn. 2002). In *Jones*, the biological mother and father of the child never married. *Jones*, 92 S.W.3d at 836. The mother voluntarily surrendered her parental rights to the child, and a non-relative couple subsequently filed a petition to adopt the child on April 9, 1998. *Id*. In their petition, the adoptive parents sought to terminate the parental rights of the biological father alleging abandonment of the child. *Id*. Thereafter, on May 26, 1998, the father filed a petition to establish his parentage of the child. *Id*. at 837. On February 5, 1999, the trial court entered an "Agreed Order" declaring the father to be the biological father of the child. *Id*. At the conclusion of the hearing on the adoptive parents' petition, the trial court found that the father "failed to file a petition to establish paternity within thirty days after receiving notice from the child's mother that he was believed to be the father of the child." *Id*. As a result, the trial court

---

[31] The Bakers filed their petition on June 20, 2001. Father did not file the acknowledgment of paternity in this case until March 15, 2002, therefore, the current version of the statute would negate his attempts to establish paternity after the filing of the termination petition.

terminated the father's parental rights pursuant to section 36-1-113(g)(9)(A) of the Tennessee Code. *Id*. Our supreme court disagreed, holding:

> The legislature's use of the present tense ("is not the legal parent") indicates that the grounds for terminating parental rights under Tennessee Code Annotated section [36-1-113(g)(9)(A)] do not apply to persons who are legal parents at the time of the proceeding. Clearly, [the father] meets the definition of "legal parent" because he was *adjudicated to be the father* of [the mother's] child *prior to the proceeding which resulted in the termination of his parental rights*. Thus, we find that the plain language of Tennessee Code Annotated section [36-1-119(g)(9)(A)] supports [the father's] contention that the statute is inapplicable to him.
>
> . . . .
>
> A father who establishes paternity prior to a termination proceeding should be permitted to enjoy the benefit of having established paternity. One such benefit is to be exempt from the additional grounds for terminating parental rights under Tennessee Code Annotated section [36-1-113(g)(9)(A)]. After a father has been granted an *adjudication of paternity*, it is incongruous to terminate his parental rights because he failed to timely file a petition to establish paternity.

*Id*. at 839 (emphasis added).

The Bakers argue that there has never been an "adjudication of paternity" in the present case. The Bakers cite to the introductory paragraph of our supreme court's holding in *Jones*, wherein the court stated as follows: "We hold that Tennessee Code Annotated section [36-1-113(g)(9)(A)(vi)] applies only to cases in which no legal relationship between the parent and child has been established." *Id*. at 836. The Bakers note that the supreme court did not elaborate on what constitutes a "legal relationship between the parent and the child." In light of the supreme court's decision in *Jones*, the Bakers seemingly concede that an "Agreed Order" establishing paternity is sufficient, however, a voluntary acknowledgment of paternity is not sufficient as it is not an "adjudication." Conversely, the Hes assert that the Bakers' position on appeal overlooks section 24-7-113 of the Tennessee Code which they contend places a voluntary acknowledgment of paternity on equal footing with an adjudication of a petition to establish paternity.

We find the Bakers' position on appeal to amount to an attempt to limit impermissibly the supreme court's holding in *Jones*. Section 24-7-113 of the Tennessee Code provides, in relevant part, as follows:

(a)  A voluntary acknowledgment of paternity . . . *shall constitute a legal finding of paternity on the individual named as the father of the child in the acknowledgment*, subject to rescission as provided in subsection (c).  The acknowledgment, unless rescinded pursuant to subsection (c), *shall be conclusive of that father's paternity without further order of the court.*

. . . .

[(b)](3)  *No judicial or administrative proceedings are required*, nor shall any such proceedings be permitted, to ratify an unchallenged acknowledgment of paternity in order to create the conclusive status of the acknowledgment of paternity.

. . . .

(e) (1)  If the voluntary acknowledgment has not been rescinded pursuant to subsection (c), the acknowledgment *may only be challenged* on the basis of fraud, whether extrinsic or intrinsic, duress, or material mistake of fact.

Tenn. Code Ann. § 24-7-113 (2003) (emphasis added).  "[Section 24-7-113 of the Tennessee Code] establishes a simplified procedure for unmarried fathers to legally establish their paternity *without the intervention of the court*, by simply executing a voluntary acknowledgment of paternity."  ***In re C.A.F.***, 114 S.W.3d 524, 528 (Tenn. Ct. App. 2003) (emphasis added).

Admittedly, all of the cases which have addressed the application of the statute at issue involved a biological father filing a petition to establish paternity.  *See In re D.A.H.*, 142 S.W.3d at 271; ***Jones***, 92 S.W.3d at 837; ***In re S.M.***, 149 S.W.3d 632, 641 (Tenn. Ct. App. 2004); ***In re H.E.J.***, 124 S.W.3d 110, 113 (Tenn. Ct. App. 2003).  However, we believe that a biological father who executes a voluntary acknowledgment of paternity prior to the termination proceeding is exempt from the application of the version of section 36-1-113(g)(9)(A) of the Tennessee Code applicable to this case.  *See Jones*, 92 S.W.3d at 840 ("A father who establishes paternity prior to a termination proceeding should be permitted to enjoy the benefit of having established paternity.").  The Bakers also overlook the definition of "legal parent" found in the adoption code:

(28) "Legal parent" means:

. . . .

(D) A man who has been adjudicated to be the legal father of the child by any court or administrative body of this state . . . *or who has signed, pursuant to § 24-7-113 . . . an unrevoked and sworn*

-100-

*acknowledgment of paternity* under the provisions of Tennessee law
. . . .

Tenn. Code Ann. § 36-1-102(28) (2001) (emphasis added). The legislature expressly qualified the application of section 36-1-113(g)(9)(A) by stating that its provisions apply when "[t]he parental rights of any person who is not the *legal parent* or guardian of such child" have not been established. Tenn. Code Ann. § 36-1-113(g)(9)(A) (2001) (emphasis added). Pursuant to the statutory definition of "legal parent," a voluntary acknowledgment of paternity entered pursuant to section 24-7-113 of the Tennessee Code and prior to the trial court's ruling on the termination petition prevents the operation of section 36-1-113(g)(9)(A) of the Tennessee Code.

Since Father executed an acknowledgment of paternity prior to the termination proceedings in the instant case, we conclude that, consistent with the supreme court's holding in *Jones* and the definition of "legal parent" in the version of section 36-1-102(28)(D) of the Tennessee Code applicable to this case, Father established a "legal relationship" between himself and A.M.H. making section 36-1-119(g)(9)(A) of the Tennessee Code inapplicable to the present case. Accordingly, we reverse the trial court's decision regarding this issue.

**5.**
**Persistent Conditions Ground for Termination**

Section 36-1-113(g)(3)(A) of the Tennessee, commonly referred to as the "persistent conditions ground" for termination, provides as follows:

> (3) (A)  The child has been *removed* from the home of the parent or guardian *by order of a court* for a period of six (6) months and:
> (i)  The conditions which led to the child's removal or other conditions which in all reasonable probability would cause the child to be subjected to further abuse or neglect and which, therefore, prevent the child's safe return to the care of the parent(s) or guardian(s), still persist;
> (ii)  There is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parent(s) or guardian(s) in the near future; and
> (iii)  The continuation of the parent or guardian and child relationship greatly diminishes the child's chances of early integration into a safe, stable and permanent home.

Tenn. Code Ann. § 36-1-113(g)(3)(A) (2001) (emphasis added). In its memorandum opinion, the trial court concluded, as a matter of law, that "this section of the statute [is] inapplicable to this cause

because AMH was not removed from [the Hes'] custody by State action, rather [the Hes] voluntarily relinquished custody and guardianship of AMH through a consent order awarding custody."

On appeal, the Bakers argue that this ground for termination does not require removal of a child by the state before it may apply in a given case. Further, the Bakers contend that the statute does not require that the child at issue be "forcibly removed" from the parent's custody, but it merely requires that a child is "no longer an occupant of the parent's home." They assert that "removal" can even be accomplished by a biological parent's voluntary relinquishment of custody to another party. Conversely, the Hes argue that the statute requires some form of state action in accomplishing the removal before it may apply in a given case.

When we are called upon to construe the language inserted into a statute by the legislature, we employ the following principles:

> Construction of statutes and application of law to facts are questions of law, which we review under a purely *de novo* standard, according no deference to the conclusions of law made by the lower courts. *See Ganzevoort v. Russell*, 949 S.W.2d 293, 296 (Tenn. 1997). In construing statutes, this Court's role is "'to ascertain and give effect to the legislative intent without unduly restricting or expanding a statute's coverage beyond its intended scope.'" *Houghton v. Aramark Educ. Res., Inc.*, 90 S.W.3d 676, 678 (Tenn. 2002) (quoting *Owens v. State*, 908 S.W.2d 923, 926 (Tenn. 1995); *State v. Sliger*, 846 S.W.2d 262, 263 (Tenn. 1993)). Legislative intent is derived from the plain and ordinary meaning of the statutory language unless the statute is ambiguous. *See Owens*, 908 S.W.2d at 926. If statutory language is ambiguous, then we must look to the entire statutory scheme to determine legislative intent. *Id*. Component parts of a statute should be construed, if possible, consistently and reasonably. *See State v. Alford*, 970 S.W.2d 944, 946 (Tenn. 1998).

*In re D.L.B.*, 118 S.W.3d 360, 365 (Tenn. 2003). "If a statute's language is expressed in a manner devoid of ambiguity, courts are not at liberty to depart from the statute's words." *Freeman v. Marco Transp. Co.*, 27 S.W.3d 909, 911 (Tenn. 2000).

The definition section of the adoption code does not define the term "removed." *See* Tenn. Code Ann. § 36-1-102 (2003). "When approaching statutory text, courts must also presume that the legislature says in a statute what it means and means in a statute what it says there." *BellSouth Telecomms., Inc. v. Greer*, 972 S.W.2d 663, 673 (Tenn. Ct. App. 1997). As such, we turn to the ordinary dictionary definition of the term at issue. *See Freeman*, 27 S.W.3d at 912; *Gleaves v. Checker Cab Transit Corp., Inc.*, 15 S.W.3d 799, 803 (Tenn. 2000). "Removal" is defined as "[t]he transfer or moving of a person or thing from one location, position, or residence to another." Black's Law Dictionary 1298 (7th ed. 1999). Conspicuously absent from this definition is the requirement

that removal be accomplished by a state entity. The Hes and the Amici argue that the requirement that the removal be conducted "by order of a court" adds credence to their assertion that the removal must be accomplished by a state entity in order for this ground for termination to apply. We decline to adopt such a restrictive application of the statute.

We are cognizant of the fact that many of our decisions, too numerous to cite here, deal with this ground for termination in the context of a child being removed from the parents by the Tennessee Department of Children's Services. However, our research has revealed no Tennessee case interpreting the statute at issue in the manner urged upon this Court by the Hes and the Amici. In fact, this Court has previously addressed the application of the aforementioned ground for termination in two cases where the child was removed from the parent and placed with another party without state involvement. *See In re R.D.T.*, No. E2003-01835-COA-R3-PT, 2004 Tenn. App. LEXIS 516, at *37–39 (Tenn. Ct. App. Aug. 12, 2004) (perm. app. denied, 2004 Tenn. LEXIS 947 (Nov. 8, 2004)); *In re V.D.*, No. M2003-00186-COA-R3-CV, 2004 Tenn. App. LEXIS 465, at *24–28 (Tenn. Ct. App. July 26, 2004) (no perm. app. filed). It is not for the courts of this state to alter or amend a statute. Instead, we must simply interpret and apply the statute as written by the legislature. *See Gleaves*, 15 S.W.3d at 803. The statute at issue is plain and unambiguous. Had the legislature intended for this ground for termination to apply only in those instances when the Tennessee Department of Children's Services removed the child from the biological parents, it could have clearly stated as much. Accordingly, we find that the statute at issue may apply when a parent voluntarily relinquishes custody of a minor child to another party pursuant to a consent custody order. Thus, we reverse the trial court's conclusion of law on this issue.

While the trial court's legal justification for holding that section 36-1-113(g)(3)(A) of the Tennessee Code did not apply in this case constitutes error, the statute remains inapplicable for another reason. In *In re Audrey S.*, No. M2004-02758-COA-R3-PT, 2005 Tenn. App. LEXIS 539, at *76 (Tenn. Ct. App. Aug. 25, 2005), this Court refused to interpret section 36-1-113(g)(3)(A) of the Tennessee Code, as we do in the present case, to exclude orders entered in cases involving child custody disputes. However, in *In re Audrey S.*, we held that the persistent conditions ground for termination applies only "where the prior court order removing the child from the parent's home was based on a judicial finding of dependency, neglect, or abuse." *Id.* at *82; *see also In re K.C., Jr.*, No. M2005-00633-COA-R3-PT, 2005 Tenn. App. LEXIS 636, at *34–37 (Tenn. Ct. App. Oct. 4, 2005). Thus, while it is possible that the persistent conditions ground for termination may apply in cases where the child is not removed by the state, the order directing the change in custody must be prompted by a finding of dependency, neglect, or abuse. The June 4, 1999 consent order transferring custody of A.M.H. to the Bakers was not based on a finding of dependency, neglect, or abuse. As a result, section 36-1-113(g)(3)(A) of the Tennessee Code is inapplicable to the present case. Accordingly, we affirm the trial court's decision on this issue, albeit for different legal reasons.

### G.
### Best Interest of A.M.H.

A finding that the record contains clear and convincing evidence of one of the statutory grounds for termination does not end our inquiry on appeal. We must now turn our attention to the trial court's conclusion that terminating the Hes' parental rights was in the best interest of A.M.H. *See* Tenn. Code Ann. § 36-1-113(c)(2) (2001). When conducting the statutorily required best interest analysis, the trial court must consider numerous factors which may include the following:

(i) In determining whether termination of parental or guardianship rights is in the best interest of the child pursuant to this part, the court shall consider, but is not limited to, the following:

(1) Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;

(2) Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;

(3) Whether the parent or guardian has maintained regular visitation or other contact with the child;

(4) Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;

(5) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;

(6) Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household;

(7) Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol or controlled substances as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;

(8) Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child; or

(9) Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to § 36-5-101.

Tenn. Code Ann. § 36-1-113(i) (2001). This list is not exhaustive, and the statute does not require the court to find the existence of every factor before concluding that terminating the biological parent's parental rights is in the child's best interest. *State v. T.S.W.*, No. M2001-01735-COA-R3-JV, 2002 Tenn. App. LEXIS 340, at *9 (Tenn. Ct. App. May 10, 2002).

In conducting the best interest analysis in this case, the trial court made the following findings:

277. The Court concludes, by clear and convincing evidence, that AMH is a minor child of tender years, who has developed a strong psychological and emotional attachment to the Bakers, and that removal of AMH from the Bakers would cause substantial harm to AMH.

278. The Court concludes, by clear and convincing evidence, that the Bakers have provided AMH a safe, stable, healthy, loving environment for such a length of time that removal of AMH from that environment would cause substantial harm to AMH.

279. The Court concludes by clear and convincing evidence, that continuation of any parent-child relationship between AMH and either Mr. or Mrs. He greatly diminishes AMH's chances of early integration into a safe, stable, and permanent home.

280. The Court concludes that the risks inherent in removing AMH from AMH's present circumstances substantially outweigh any risks posed by transcultural placement and loss of contact with AMH's biological parents, the Hes.

281. The Court concludes, by clear and convincing evidence, that there is parental misconduct or inability to parent by the Hes.

282. The Court concludes, by clear and convincing evidence, that both Mr. and Mrs. He are unfit parents, based on abandonment of AMH by both Mr. and Mrs. He.

283. The Court concludes, by clear and convincing evidence, that it is in AMH's best interest to terminate the parental rights of both Mr. and Mrs. He.

284. Applying the factors in *Tennessee Code Annotated* § 36-1-113(i)(1–9) for determining whether termination of parental rights is in the best interest of the minor child, the Court concludes, by clear and convincing evidence, that termination of the Hes' parental rights is in the best interest of AMH because:

(1) the Hes have failed to make such an adjustment of circumstances, conduct, and conditions as to make it

-105-

safe and in AMH's best interest to be in the Hes'
home;

(2) the Hes have failed to maintain regular, meaningful
visitation and contact with AMH;

(3) the Hes have failed to establish a meaningful
relationship with AMH due to the Hes neglect and
inattentiveness;

(4) the effect of a change of caretakers and physical
environment will have a negative and detrimental
impact on AMH's emotional and psychological well-
being;

(5) the physical environment of the Hes' home is
unhealthy and unsafe;

(6) Mrs. Hes' [sic] emotional instability would be
detrimental to AMH; and

(7) the Hes' [sic] have failed to provide anything more
than token support for AMH, despite the Hes' ability
to pay such support.

On appeal, the Hes argue that the record does not support the trial court's findings. Greater Seattle
has submitted a brief to this Court presenting certain social science information aimed at addressing
the need for the courts of this state to consider cultural factors when deciding cases of this nature.

Since voluntarily relinquishing custody of A.M.H. to the Bakers, the Hes have not maintained
regular visitation with A.M.H. *See* Tenn. Code Ann. § 36-1-113(i)(3) (2001). Regarding the initial
three month foster care period, the trial court made the following finding which the Hes do not
dispute:

> During the ninety-day foster care period, February 24, 1999, to May
> 23, 1999, the Hes visited the Bakers' home for approximately one (1)
> hour each week, a total of approximately twelve (12) hours during the
> first three months of AMH's life. During this period, neither the
> Bakers nor Mid-South placed any restrictions on the frequency or
> duration of the Hes' visits in the Bakers' home. The Hes never
> requested to visit AMH more frequently or for longer periods during
> the ninety-day foster care period . . . .

As for the Hes' visitation between June 4, 1999 (the date of the juvenile court's consent custody
order) and January 28, 2001 (the last time the Hes visited A.M.H.), the trial court made the following
finding which the Hes do not dispute:

> Between June 4, 1999, and January 28, 2001, either Mr. or Mrs. He,
> or both, visited AMH in the Bakers' home, approximately eighty (80)

times. The Hes visited AMH, on average, approximately once per week. There were some occasions when the Hes would go two weeks or longer between visits with AMH. The average time of each visit was approximately one (1) hour, with the shortest visit lasting approximately thirty (30) minutes and the longest visits lasting approximately two (2) hours. The approximately eighty (80) hours of time that the Hes have visited AMH, from June 5, 1999, to January 28, 2001, amount to a total of less than four (4) days of AMH's life.

The Hes did not visit AMH after the January 28, 2001 incident at the Bakers' home. The only contact after that date was a phone call by Mother to the Bakers instructing them to come to the Hes' apartment to retrieve a baby bed the Bakers previously gave the Hes.

The record also establishes that the Hes have not established a meaningful relationship with A.M.H. *See* Tenn. Code Ann. § 36-1-113(i)(4) (2001). Mother gave birth to A.M.H. on January 28, 1999, and the Hes voluntarily placed A.M.H. in the care of the Bakers on February 24, 1999, a few weeks after she was born. A.M.H. has remained in the continuous custody of the Bakers' since that time, which amounted to the first five years of her life by the time the trial in this matter was conducted.[32] On May 8, 1999, the Hes sent Mrs. Baker a Mother's Day card which stated: "You are the real Mom of [A.M.H.]." After the juvenile court entered the June 4, 1999 consent custody order, the Hes wanted A.M.H. to call the Bakers "mommy" and "daddy" and refer to the Hes as "Jack" and "Casey." The very bond that the Hes sought to foster between A.M.H. and the Bakers was, as the record demonstrates, established in this case. Dr. Goldstein, the court appointed psychologist, testified that A.M.H. views the Bakers as her "psychological parents." In conducting his evaluation of A.M.H., he noted that she has a high level of attachment to the Bakers, but she does not have a similar attachment to the Hes. He conducted an "attachment session" in September of 2003 and noted that A.M.H.'s behavior, as demonstrated by the videotape of the session, supports these conclusions. While he agreed that A.M.H. did approach the Hes during the session, he opined that she did so based on the Hes' use of food and gifts to reinforce her interaction.

The record also demonstrates that a change in caretakers and physical environment at this stage in A.M.H.'s life will likely have an adverse affect on her emotional and psychological well being. *See* Tenn. Code Ann. § 36-1-113(i)(5) (2001). After stating his opinion regarding the strong attachment A.M.H. now has for the Bakers, Dr. Goldstein testified that A.M.H. would likely experience separation anxiety and could possibly develop a severe depressive disorder if she were removed from the Bakers. We are also mindful of the strong attachment A.M.H. has developed to the Bakers' other children. We are cognizant of the fact that the Hes presented expert testimony to contradict Dr. Goldstein's assertions, however, the trial court found that the Hes' experts lacked

---

[32] A.M.H. has lived with the Bakers since she was less than one month old, and for almost seven years she has known no other parents, no other home, no other environment, no other siblings, and no other life. The dissent concedes that there is no meaningful relationship of parent and child between the Hes and A.M.H.

credibility. We find no clear and convincing evidence in the record to disturb this finding. ***See Wells v. Tenn. Bd. of Regents***, 9 S.W.3d 779, 783 (Tenn. 1999).

As previously discussed, we do not give the same weight as the trial court did to the Hes' failure to pay child support for A.M.H. during the pendency of this case below due to the Baker's refusal to accept such support. ***See*** Tenn. Code Ann. § 36-1-113(i)(9) (2001). Admittedly, there is nothing in the record to indicate that the Hes are presently unable to care for A.M.H. financially. However, we are permitted, as did the trial court, to consider the parties' ability to support A.M.H. should they receive custody of the child. Mother testified that, if she were to regain custody of A.M.H., she planned to return to China. She stated that she has an a one-bedroom apartment in China currently occupied by her grandparents, and she, Father, A.M.H., and their two other children would reside in the apartment. Mother indicated that her family would help to provide for the Hes' financial needs upon returning to China until Father found a job. Father noted at trial that the Bakers' have incurred a sizeable amount of debt in prosecuting their petition to adopt A.M.H. and terminate the Hes' parental rights. However, the Bakers, unlike the Hes who face deportation, do not presently face the possibility of losing their current sources of income. Moreover, there is nothing in the record to demonstrate that, in spite of their sizeable legal bill, the Bakers are presently unable to provide for A.M.H.

The Hes also presented the testimony of their expert, Dr. Cooper, to address the issue of the "one-child" rule in China. On direct examination, Dr. Cooper testified that the Chinese government does not impose fines on parents who have more than one child outside of China then return to that country. However, under cross-examination, Dr. Cooper conceded that the Chinese government could impose such fines. In a letter addressed to this Court, the Chinese Embassy seeks to defend its "one-child" policy by stating that "there are various circumstances under which people can have more than one or two children. These circumstances apply to Chinese citizens who return to China from abroad with more than one child." Further, the letter seeks to inform the Court that the Chinese government does not impose financial penalties or remove government services and benefits for violations of this policy. It is entirely within the purview of the Chinese government, as a sovereign nation, to formulate and enforce such a policy within China. However, our focus in this case must be on the best interest of A.M.H., an American citizen, and the effect such a policy may have on the Hes' ability to provide for her well-being should they regain custody of A.M.H. and return to China. Most noteworthy is the fact that the letter does not elaborate on what "circumstances" warrant an exception to the "one-child" policy or if the Hes qualify for such an exception. Nor does the letter indicate what sanctions are imposed for violating the policy. Thus, we must conclude, as did the trial court, that the possibility remains that the Hes could be adversely penalized in some manner for violating the "one-child" policy which, in turn, could have an adverse affect on A.M.H.

Finally, the trial court noted the Hes' questionable character as evidenced in the record by the Hes' defiance to legal authority and untruthful statements over the course of events giving rise to the current appeal. The trial court determined that such character flaws could have an adverse effect on A.M.H. The record in this case supports this conclusion.

The record, viewed in its entirety, fully supports the trial court's conclusion that terminating the Hes' parental rights is in the best interest of A.M.H. Accordingly, we affirm the trial court's decision in this regard.

# V.
## CONCLUSION

In the dissenting opinion filed in this case, it is argued that we apply "a different standard than would have been applied had the termination of parental rights been sought by the Tennessee Department of Children's Services ("DCS")." The dissent contends that our approach on this issue "is wrong." The dissenting opinion is replete with references to how the result in this case would be different if only DCS were involved. Respectfully, this Court can only adjudicate the case before it. We are not at liberty to create hypotheticals or to wish that the facts in a given case were otherwise.

We are asked simply to resolve whether the Hes' conduct in the four months immediately preceding the Bakers' petition to terminate their parental rights was willful. The dissent acknowledges that in *In re W.B., IV* we stated that, in cases involving private parties, a parent's lack of knowledge regarding the abandonment ground for termination is merely "*a factor* in determining willfulness." *In re W.B., IV*, No. M2004-00999-COA-R3-PT, 2005 Tenn. App. LEXIS 262, at *38 (Tenn. Ct. App. Apr. 29, 2005) (emphasis added). A "factor" is defined as "[o]ne of two or more quantities that when multiplied together yield a given product." Webster's II New College Dictionary 401 (2001). A factor is, therefore, but one element to be considered, perhaps among many, in reaching a conclusion. Thus, whether or not a private party with custody of the child notified the biological parents of the potential grounds for terminating their parental rights is but one factor to be considered. Yet, the dissent would impose a *per se* rule in cases of this nature, stating: "How can this disparity be justified? Fairness dictates that parents and petitioners in all termination cases be held to the same standard, regardless of whether DCS is involved . . . ."

The answer to the question posited by the dissent is quite simple. Ours is a limited role. "The grounds for terminating parental rights in Tennessee are defined by statute." *Jones v. Garrett*, 92 S.W.3d 835, 838 (Tenn. 2002); *see also* Tenn. Code Ann. § 36-1-113(g) (2003). As the judicial branch of government, we are to address the issue presented by the Hes in this case and asercertain whether the statutory scheme adopted by the legislature comports with the Fourteenth Amendment of the United States Constitution. The dissent overlooks the constraints, or the lack thereof, imposed by the United States Constitution and proceeds to formulate what it believes to be sound policy in this area of the law. We are told repeatedly by the dissent that it is not fair for the legislature to require DCS to provide parents with notice of the abandonment ground for termination while not requiring the same notice when private individuals are involved. *Compare* Tenn. Code Ann. § 37-2-403(a)(2) (2003) *with* Tenn. Code Ann. § 36-1-102

-109-

(2003) **and** Tenn. Code Ann. § 36-1-113(2003).  The reason the legislature is permitted to make this distinction is well settled in the law.  When DCS, a *state agency*, seeks to terminate a biological parent's parental rights, the notice requirement imposed upon DCS by the legislature seeks to ensure that the biological parent's fundamental rights as parents are protected from unwarranted state infringement.  The United States Supreme Court has recognized as much, stating: "When the *State* moves to destroy weakened familial bonds, *it* must provide the parents with fundamentally fair procedures." *Santosky v. Kramer*, 455 U.S. 745, 753-54 (1982) (emphasis added.)  Why do we draw a distinction when private parties are involved?  Because it is only state action, not the actions of private individuals, which the Fourteenth Amendment seeks to safeguard against. *The Civil Rights Cases*, 109 U.S. 3, 11 (1883).  Therefore, the legislature is permitted to make the distinction which the dissent finds most troubling.

While the dissent may find this distinction unjust, it comprises the legal framework which must guide our resolution of this issue.  "The powers of the government shall be divided into three distinct departments: legislative, executive, and judicial."  Tenn. Const. art. II, § l.  "No person or persons belonging to one of these departments shall exercise any of the powers properly belonging to either of the others, except in the cases herein directed or permitted." Tenn. Const. art. II, § 2.  "It is primarily for the Legislature to determine the public policy of this state . . . ." *Cary v. Cary*, 937 S.W.2d 777, 781 (Tenn. 1996).  "When the legislature, *acting within its constitutional powers*, has spoken upon a particular subject, its utterance is the public policy of the State upon that subject, and *the courts are without power to read into the Constitution a restraint of the legislature* with respect thereto." *Cavender v. Hewitt*, 239 S.W. 767, 768 (Tenn. 1921) (emphasis added).  "[I]f a modification or change in such policy is desired, the lawmaking department must be applied to, and not the judiciary, whose function is to declare the law but not to make it." *Fields v. Metro. Life Ins. Co.*, 249 S.W. 798, 800 (Tenn. 1922).  By extending an invitation to our supreme court and the state legislature to enact changes in the law, the dissent, after trying to convince us that the law supports a different conclusion on this issue, concedes that the law is not as the dissent attempts to portray it.  Otherwise, no such invitation would be necessary.

We are troubled by the dissent's attempt to fit the facts of this case into our decision in *In re W.B., IV*.  The dissent states: "The majority in this case dismisses the Hes' lack of knowledge as 'merely' a factor to consider in determining whether their failure to visit A.M.H. was willful, *even though that same factor was found to be determinative* in *In re W.B., IV*." (emphasis added).  Regarding the mother's failure to visit her children in *In re W.B., IV*, the Court, in addition to noting the lack of notice to the mother, also noted that the mother did not know the whereabouts of her children.  *In re W.B., IV*, 2005 Tenn. App. LEXIS 262, at *36.  As the Court stated, "[i]t is difficult to understand how Mother could have visited the children while she was unaware of their whereabouts." *Id.*  In the present case, the Hes knew the whereabouts of A.M.H. for the entire four month period at issue.  Our reading of *In re W.B., IV* reveals that the Court found that the mother's lack of notice of the ground of abandonment *coupled with* the mother's lack of knowledge regarding the whereabouts of her children constituted evidence that the mother's failure to visit was not willful.  Thus, it is difficult to understand how the dissent

justifies its conclusion that the lack of notice of the ground of abandonment *alone* produced the result this Court reached in *In re W.B., IV*.[33]

The dissent devotes a significant amount of discussion to our failure to discuss the trial court's finding that the visitation by the Hes prior to the four month period at issue constituted "token visitation." The dissent refers to the statutory definition of "token visitation," *see* Tenn. Code Ann. § 36-1-102(1)(C) (2003), and concludes that "visitation is token if it is *either* perfunctory, *or* of an infrequent nature, or both." (emphasis in original). The dissent contends that the Hes' visitation with A.M.H. *prior to the four month period* at issue is crucial to a determination of whether their failure to visit within the four month period was willful.[34]

Pursuant to the definition of "token support," the courts of this state are only concerned with whether the visitation *during the four month period* at issue was token in nature. *See* Tenn. Code Ann. § 36-1-102(1)(E) (2003) (defining "willfully failed to visit" as "the willful failure, for a period of four (4) consecutive months, to visit or engage in more than token visitation"). Thus, when we examine the four-month period at issue in this case, we find that the Hes did not visit their daughter at all. The dissent notes that visitation can be token if it is "perfunctory" or "infrequent." It is difficult to see how *no visits* during the four-month period at issue cannot, therefore, be included in the definition of "token visitation." Instead of focusing on the statutory four-month period at issue, the dissent contends that we should consider the pattern of visitation engaged in by the Hes since the beginning of their relationship with the Bakers in order to ascertain if they willfully failed to visit A.M.H. What else should the Court consider outside of the statutory four-month period? One could consider the fact that the Hes wanted the Bakers to raise A.M.H. until she turned eighteen so the Hes could remain in the United States. There is the fact that the Hes wanted A.M.H. to call the Bakers "mommy" and "daddy" and the Hes "Jack" and "Casey" which could be relevant to a determination of the Hes' willfulness. These facts occurred, however, well beyond the four month period at issue. We are careful to note that, under our statutory scheme, they can have *no bearing* on our determination of whether the Hes' conduct within the four-month period was willful. The dissent acknowledges the most crucial fact to our determination: "Of course, all of the Hes' visits with A.M.H. took place prior to the commencement of the statutory four-month period."

---

[33]The dissent charges that we "sidestep the real problem" because the statutory definition of abandonment is the same regardless of whether the petitioner is DCS or a private individual; however, the dissent's complaint to the legislature does not relate to the definition of abandonment, but rather to the question of notice. The dissent attempts to apply a blanket rule both to state action and the conduct of private parties, although the statute by its terms addresses only state action.

[34]Conduct prior to, or outside of, the statutory four-month period is relevant only to the question of willfulness, or support, or the lack thereof, *within the four-month period* prescribed in the statute. This principle does not open the floodgates so as to allow a broad sweep of allegations and events in the hope that one or more of them might stick. There must be a nexus established between the events alleged and the crucial four-month period that we are mandated to examine. The dissent has failed to show that facts which occurred *before* the statutory period are determinative of whether the Hes' failure to visit *within* the four months was willful.

-111-

We approach our duty in this case somewhat differently than the dissent by confining our analysis to the parameters of the statute which must guide our decision. The legislature has directed that we are to consider the parents' conduct in the four months preceding the filing of the petition to terminate their parental rights. *See* Tenn. Code Ann. § 36-1-102(1) (2003). In the present case, it is undisputed that the Hes did not visit A.M.H. during the four months prior to the Bakers' petition to terminate the Hes' parental rights.

Once the parameters of our analysis are limited to the statutory four-month period, it is apparent that the line of demarcation between the majority opinion and the dissent is not as distinct as it might first appear. The dissent concedes the existence of many of the facts we deem determinative of this issue. The dissent notes that "[i]t is undisputed that the Hes did not visit A.M.H. after the altercation at the Bakers' home on January 28, 2001"; "The majority rightly concludes" that "the Hes' failure to visit was not based on the Hes' fear that they would be arrested and physically harmed, as the Hes asserted"; and, "In the petition Brown prepared, Mother sought custody of A.M.H., but did not request visitation."

With reference to the Hes' motivation to avoid deportation, the dissent focuses upon Father's testimony regarding the correlation between the calls from immigration officials and the filing of the petitions to regain custody of A.M.H., finding such testimony to be inconclusive. The dissent argues that "there is no evidence on the substance of the conversation between Father and the INS official, any issues raised by the official, or how the filing of the petition for custody would have addressed any INS concerns." The dissent seeks to impose a "proof beyond a reasonable doubt" standard in parental termination cases. However, our case law does not support the dissent's characterization of the evidence. When evaluating a trial court's decision in parental termination cases, we must first evaluate a trial court's findings of fact *de novo*, presuming those findings to be correct unless the *preponderance of the evidence* is otherwise. *In re M.J.B.*, 140 S.W.3d 643, 654 (Tenn. Ct. App. 2004). (emphasis added). "Second, we must determine whether the facts, either as found by the trial court or as supported by the preponderance of the evidence, *clearly and convincingly* establish the elements required to terminate a biological parent's parental rights." *Id*. (emphasis added). "'Willfulness' does not require the same standard of culpability required by the penal code." *In re Muir*, No. M2002-02963-COA-R3-CV, 2003 Tenn. App. LEXIS 831, at *14 (Tenn. Ct. App. Nov. 25, 2003) (citation omitted). "Intent is seldom capable of direct proof, and triers-of-fact lack the ability to peer into a person's mind to assess intentions or motivations. Accordingly, triers-of-fact must infer intent from circumstantial evidence, including a person's actions or conduct." *Id*. at *17 (citations omitted).

It is apparent that the dissent has lost sight of the manner in which the trier of fact evaluates evidence. Father's testimony is but one component of the trial court's finding that the Hes' reasons for filing the petitions to regain custody were driven by a desire to avoid deportation. As we set forth heretofore, the record is replete with instances when the Hes expressed concerns about deportation as it relates to custody of their daughter. Parental termination cases are factually driven and require individualized decision making. *See In re*

-112-

***Swanson***, 2 S.W.3d 180, 188 (Tenn. 1999). The trier of fact is permitted to draw all reasonable inferences from the evidence presented on an issue. We must also defer to credibility determinations made by the trier of fact. ***See Wells v. Tenn. Bd. of Regents***, 9 S.W.3d 779, 783 (Tenn. 1999). From the aggregate of the aforementioned facts, it was reasonable for the trial court to infer that the Hes' actions in filing the petitions to regain custody of their daughter were designed to avoid deportation. On appeal, this Court is not permitted to reject the inferences drawn by the trial court from the circumstantial evidence and substitute our own inferences instead. ***See State v. Thacker***, 164 S.W.3d 208, 221 (Tenn. 2005) (citing ***State v. Evans***, 108 S.W.3d 231, 236–37 (Tenn. 2003)).

The Bakers have asked this Court to reverse the trial court's order consolidating their petition to terminate the Hes' parental rights with Mother's petition to modify the June 4, 1999 custody order, and we find this issue to be without merit. Regarding the trial court's rulings on the Hes' pre-trial motions, we affirm the trial court's order denying the Hes' motion, pursuant to Rule 60.02, to set aside the June 4, 1999 custody order; we affirm the trial court's order denying the Hes' motion to dismiss the Bakers' adoption petition; and we affirm the trial court's order denying the Hes' motion to bifurcate the proceedings. Regarding the Hes' constitutional arguments, we find that section 36-1-102 and section 36-1-113 of the Tennessee Code are not unconstitutional in light of the facts in this case. We conclude that the trial court did not err in ruling that the notice provisions found in section 37-2-403 of the Tennessee Code did not apply in this case. We conclude that the trial court did not err by ruling that the "superior parental rights doctrine" did not apply to Mother's petition to modify the June 4, 1999 consent custody order.

Regarding the grounds for termination, the trial court did not err in ruling that the "settled purpose doctrine" did not apply in this case. Turning to the abandonment ground for termination, we reverse the trial court's ruling that the Appellants willfully failed to support A.M.H. in this case as the record does not contain clear and convincing evidence to support such a finding. We conclude that the trial court erred in finding that Father was not the legal parent of A.M.H. when the Appellees filed their petition in this case, therefore, termination of Father's parental rights under section 36-1-113(g)(9) of the Tennessee Code was not appropriate in this case. The trial court erred in finding that the "persistent conditions" ground for termination codified at section 36-1-113(g)(3)(A) of the Tennessee Code requires the removal of a child by the state. For other legal reasons, however, we affirm the trial court's ruling that section 36-1-113(g)(3)(A) of the Tennessee Code does not apply to this case. We affirm the trial court's ruling that the record contains clear and convincing evidence to support a finding that the Appellants willfully failed to visit A.M.H., therefore, termination of their parental rights was justified in this case. Finally, we affirm the trial court's conclusion that terminating the Appellants' parental rights is in the best interest of the minor child at issue in this case.

We are cognizant of the fact that the parties have raised other issues in their briefs which are not addressed in this Opinion.[35] In light of our holdings on the issues which are discussed in this Opinion, a discussion of the other issues raised by the parties would have no bearing on the outcome of the case on appeal, therefore, they are pretermitted. Costs of this appeal are to be taxed to the Appellants, Shao-Qiang (Jack) He and Qin Luo (Casey) He, and their surety, for which execution may issue if necessary.

_____
ALAN E. HIGHERS, JUDGE

---

[35] Specifically, the Hes ask this Court to evaluate the following: whether the trial court erred in issuing a no-contact order prior to a trial in this matter; whether the trial court erred in entering an order appointing the Bakers guardians of A.M.H.; and whether the trial court erred in denying their motion to set aside the order appointing Mid-South as next friend to investigate the Bakers' adoption petition. As previously noted, a majority of the issues presented by the Bakers are not independent issues which deserve evaluation, but they constitute responses to the issues raised by the Hes in this case. From the Bakers statement of the issues, we have elided two independent issues which have been addressed herein.